**UNITED STATES of America,
Plaintiff,**

**v.**

**E. I. DU PONT DE NEMOURS AND COMPANY, General Motors Corporation, United States Rubber Company, Christiana Securities Company, Delaware Realty & Investment Corporation, Pierre S. du Pont, Lammot du Pont, Irenee du Pont, et al., Defendants.**

Civ. A. No. 49 C–1071.

United States District Court,
N. D. Illinois, E. D.

Dec. 3, 1954.

See also 13 F.R.D. 490; 14 F.R.D. 341; 126 F.Supp. 27.

Stanley N. Barnes, Asst. Atty. Gen., and Victor H. Kramer, Washington, D. C., Earl A. Jinkinson and Willis L. Hotchkiss, Sp. Assts. to the Atty. Gen., Ewart Harris, Paul V. Ford, Charles W. Houchins, Chicago, Ill., Margaret H. Brass, Washington, D. C., Dorothy M. Hunt, Francis C. Hoyt, and Raymond P.

Hernacki, Chicago, Ill., for the United States.

Covington & Burling, Washington, D. C., by John Lord O'Brian, Hugh B. Cox, Charles A. Horsky, Daniel M. Gribbon, Wilbur R. Lester, Washington, D. C., Sidley, Austin, Burgess & Smith, Chicago, Ill., by Howard Neitzert George Ragland, Jr., Chicago, Ill., for defendant E. I. du Pont de Nemours and Co.

Root, Ballantine, Harlan, Bushby & Palmer, New York City, by John M. Harlan, Philip C. Scott, New York City, Sidley, Austin, Burgess & Smith, Chicago, Ill., by Howard Neitzert, George Ragland, Jr., Chicago, Ill., for defendants Pierre S. du Pont, Irenee du Pont, Christiana Securities Co. and Delaware Realty and Investment Corp.

Pope & Ballard, Chicago, Ill., by Ferris E. Hurd, Frank F. Fowle, Jr., Chicago, Ill., Henry M. Hogan, and Robert A. Nitschke, Detroit, Mich., James D. Carpenter, Jersey City, N. J., William A. Grier, New York City, for defendant General Motors Corp.

Snyder, Chadwell & Fagerburg, Chicago, Ill., by John T. Chadwell, Rudy L. Ruggles, James A. Rahl, Chicago, Ill., Arthur, Dry & Dole, New York City, by Paul H. Arthur, Morris E. Dry, Nelson F. Taylor, Walter Barthold, Jr., New York City, for defendant United States Rubber Co.

Howard Ellis, Chicago, Ill., A. Leslie Hodson, Chicago, Ill., guardian ad litem for certain minor defendants.

Andrew J. Dallstream, Chicago, Ill., guardian ad litem for certian minor defendants.

Claude A. Roth, Chicago, Ill., guardian ad litem and Atty., for Henry Belin du Pont, III.

Moore, Prangley & Clayton, Chicago, Ill., by Mark H. Clayton, Chicago, Ill., Berl, Potter & Anderson, Wilmington, Del., by William S. Potter and William Poole, Wilmington, Del., Morris, Steel, Nichols & Arsht, Wilmington, Del., by Alexander L. Nichols, Wilmington, Del., for certain individual defendants.

Winston, Strawn, Black & Towner, Chicago, Ill., by Guy A. Gladson and Thomas A. Reynolds, Chicago, Ill., Richards, Layton & Finger, Wilmington, Del., by Robert H. Richards, Jr., Wilmington, Del., for defendant Wilmington Trust Co.

LA BUY, District Judge.

This action is brought by the United States Government for alleged violation by defendants of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, declaring illegal every contract, combination or conspiracy in restraint of trade and prohibiting monopolization or the attempt to monopolize trade and commerce, and Section 7 of the Clayton Act, 15 U.S.C.A. § 18, declaring illegal the acquisition of stock by a corporation in another where the effect of such acquisition may be to substantially lessen competition or tend to create a monopoly.

The defendants against whom the action is brought are named and identified in the amended complaint as follows:

The three defendant "manufacturers": E. I. du Pont de Nemours and Company, General Motors Corporation, and United States Rubber Company. All of these companies transact business within the Northern District of Illinois and are found here.

The three "corporate" defendants: Christiana Securities Company; Delaware Realty & Investment Corporation; and Wilmington Trust Company, individually and as trustee.

The remaining defendants come within the categoric description of "members of the du Pont family." These members of the du Pont family are divided into the following:

The three "defendant individuals": Pierre S. du Pont and Lammot du Pont, for whom Suggestions of Death were filed May 6, 1954 and January 16, 1953, respectively; and Irenee du Pont.

The five "individual defendants": Lammot du Pont Copeland; Colgate W. Darden, Jr.; Henry Belin du Pont; Pierre S. du Pont III; and George P.

Edmonds. These defendants are alleged to be members of the du Pont family and to hold substantial amounts of voting stock of the defendant United States Rubber Company.

The twenty-six "beneficiary" defendants, ten of whom are minors, also identified as "party in interest" defendants, who are not named as conspirators and who are beneficiaries of one or more trusts of which the defendant Wilmington is trustee.

With the exception of the twenty-six beneficiary defendants, all defendants are alleged to have participated in acts which violate the anti-trust statutes.

The Government's statement of the offense is stated as follows:

The Amended Complaint charges that the defendants have engaged in a conspiracy to restrain trade in certain products produced by the du Pont Company, United States Rubber, and General Motors, in violation of Section 1 of the Sherman Act, and to monopolize a substantial part of such trade in violation of Section 2 of the Sherman Act. It also alleges that the defendant du Pont Company has acquired a controlling interest in the stock or other share capital of General Motors in violation of Section 7 of the Clayton Act. The Amended Complaint states further that the defendants have done the things which they conspired to do, namely, that they have restrained trade and monopolized a part of the commerce in certain products. (Post-trial Brief, U.S., Vol. I, p. 3.)

In its summary of the statement of evidence the Government states that the evidence, when viewed as a whole, shows that the defendants have designed and followed a pattern of business conduct which has three basic objectives. The first of these objectives has consisted of obtaining control of the management and policies of the three manufacturing defendants, du Pont, General Motors, and United States Rubber. The second of these objectives has consisted of the creation and exploitation of protected markets for certain of the products produced by du Pont and United States Rubber, to the exclusion of competitive suppliers. The third of these objectives has consisted of the reservation of certain exclusive fields of production to the du Pont Company. These three purposes have been served by the fostering of a network of interrelationships among the corporate and individual defendants. This has insured the perpetuation of control of the corporate entities under persons possessing in essence the same interests, and has enhanced the market position of each of the manufacturing defendants.

The Government further charges that the central thread of the entire pattern of conduct is the acquisition of interlocking stock controls and the use of such controls to dominate the management of the controlled corporations. (Post-trial Brief, U.S., Vol. I, p. 5.)

There is no dispute regarding the facts culminating in the formation of the present du Pont Company. From 1802 to 1899 it was operated as a family partnership. The first corporate predecessor to du Pont was formed in 1899. In 1902 T. Coleman du Pont, Alfred I. du Pont, and Pierre S. du Pont acquired the assets of the 1899 company pursuant to a proposal advanced by Alfred I. du Pont. These assets were later taken over by the 1903 company. Until 1915, T. Coleman du Pont was the largest stockholder in du Pont; his holdings being about equal to the combined holdings of Alfred I. du Pont and Pierre S. du Pont. The present du Pont Company was organized in 1915 to succeed the 1903 company.

The factual approach to the issues involved herein will be clarified and simplified by division of this memorandum into two general categories: First, the aspects of alleged control reflected in stock holdings, selection of officers, board and committee members; and, second, the trade aspects. The issue of conspiracy underlying as it does both phases of the case is of necessity interwoven and inseparable and is an ultimate fact which permeates the entire case.

### Facts as to Control

*Christiana and Delaware*

In December 1914 T. Coleman du Pont offered to sell a substantial block of his du Pont stock to du Pont for resale by the company to its principal younger executives, but the offer was rejected since the price was considered too high.

In the early part of 1915 T. Coleman du Pont offered to sell his stock to Pierre S. du Pont and others at a higher price.

It is admitted that in 1915 Christiana was formed by a syndicate composed of Pierre S. du Pont, Lammot du Pont, Irenee du Pont, together with A. Felix du Pont, R. R. M. Carpenter, and John J. Raskob, for the purpose of acquiring this stock.

The evidence shows that Christiana was organized so that members of the syndicate could use the stock of the corporation as security for a loan it was necessary for them to obtain to buy the stock of Coleman du Pont.

This block of stock consisting of 63,-314 shares of common and 14,599 shares of preferred was transferred to Christiana along with 28,177 shares of du Pont common transferred to it by the six syndicate members. The six incorporators of Christiana held all of the 75,000 shares of Christiana. The day after Christiana was organized each returned to its treasury approximately 15% of the Christiana stock to be distributed to the chairman of the Executive Committee of du Pont, the eight department heads of du Pont, and the General Counsel of du Pont under an agreement that the stock so assigned to each would become his property if he continued in the employ of the company for one year and that no assignee would sell or hypothecate the stock for three years. After this allocation, the six incorporators held 68,250 shares of the 75,000 outstanding shares of Christiana.

After Coleman's stock had been acquired, Alfred du Pont and others brought suit alleging that Pierre and his associates abused the trust of their official positions in obtaining the Coleman stock. The trial court determined to submit to a vote of the stockholders the question of whether or not the Coleman du Pont stock should be acquired by the du Pont Company. In the ensuing proxy battle, the Pierre S. du Pont group won.

Thus, Christiana at its inception held 91,491 shares of the du Pont common stock amounting to approximately 27% of the du Pont's outstanding common shares. The evidence shows that commencing with the original acquisition of the Coleman stock, this percentage has continued throughout the years and that substantially all the stock now held by Christiana traces directly to the stock transactions occurring in 1915. No additional or other acquisitions of du Pont stock have been made by Christiana, and the evidence shows that a majority, or 68% of the outstanding Christiana stock has been held continuously by Pierre S. du Pont and the members of the du Pont family, either directly or through Delaware.

In 1923 Pierre S. du Pont, having retired from active business life, decided to invest in an annuity to provide himself and his wife with an appropriate income. His decision to buy an annuity was based in part on the favorable tax treatment granted annuities under the existing tax laws. Pierre S. du Pont being unable to find a standard life insurance company which would offer him an arrangement not involving the sale of his stockholdings which event would depreciate the value of his estate, a group of his brothers and brothers-in-law offered to sell him an annuity.

In 1923 Pierre S. du Pont transferred the bulk of his holdings in Christiana consisting of 49,000 shares, together with 24,000 shares of du Pont common, and other stock in other companies to Delaware Realty & Investment Corporation, which was specifically organized to hold the same and pay him and his wife an annuity for life. The common stock of Delaware was then divided into eight equal shares for Pierre S. du Pont's

eight brothers and sisters or their families.

The evidence shows that the stock of Delaware up to the date of the filing of the complaint has continued to be wholly owned by the members of the du Pont family and in many instances transfers were made through the formation of trusts. Delaware also holds 49,000 shares of Christiana, being Pierre S. du Pont's previous holdings, which constitutes about 32% of the outstanding Christiana stock.

On March 29, 1944 E. H. Tinney, Secretary of Delaware, submitted a memorandum to members of the Advisory Committee of Delaware Realty and Trust dealing primarily with tax considerations on the advisability of liquidating that corporation. In addition to the tax factor, he stated:

"Liquidation would afford greater flexibility, including better marketability, and permit diversification. Without liquidation, the stockholders are practically compelled to go along together; whereas if liquidated each stockholder could do as he thought best suited his individual purpose. There is no certainty whether those factors would in the final analysis represent reasons for or against liquidation.

Delaware Realty, at least to some extent, facilitates control of the du Pont and General Motors industries. While liquidation would not eliminate this immediately, it would weaken it; more particularly with the passage of time." (GTX 1335.)

There is no evidence that Tinney knew anything about the relations between du Pont and General Motors and no evidence that he knew anything about the intentions of the individual defendants or other members of the du Pont family or that he was acquainted with their state of mind as it related to Delaware. Pierre S. and Irenee du Pont both testified that Delaware was not organized for the purpose of controlling du Pont or General Motors as charged by the Government and that it was not used for that purpose. Similar testimony was given by other individual defendants. Having heard the testimony of these witnesses, the Court finds their testimony more persuasive than the statement of opinion made by Tinney.

Defendants admit that Christiana holds 3,049,800 shares of du Pont common stock out of 11,158,340 outstanding du Pont stock, equivalent to 27%; that Delaware holds 304,480 shares of du Pont common stock, or 3%, of the outstanding du Pont stock; that defendant individuals and certain members of the du Pont family, who are either officers or directors of du Pont, own a further block of approximately 5.3% of the stock of du Pont; while other members of the du Pont family, who are not officers or directors of du Pont, own directly a further 2.2% of the stock of du Pont. Du Pont common stock at the time the complaint was filed was held by 82,000 shareholders.

It is also admitted that 30% of the outstanding du Pont common stock held by Christiana and Delaware has been consistently voted as a block always in support of du Pont management at du Pont stockholder meetings, that directors of Christiana have in most instances been directors and officers of du Pont, and that defendant individuals, younger members of the du Pont family and officers and directors of Delaware have assumed major responsibilities in du Pont management.

There is no evidence that either Christiana or Delaware, or both of them, had voting control of du Pont. However, the fact that the du Pont family had voting control of Christiana and Delaware whose du Pont stock is consistently voted as a block in favor of du Pont management, coupled with the fact that for many years members of the du Pont family have been major executives of the corporation, indicates control of management of du Pont by the du Pont family.

The Government has failed to prove that the stock held by the defendant in-

dividuals and members of the du Pont family in Christiana and Delaware was for the purpose of perpetuating control over the du Pont Company, and has failed to prove that there was any agreement, understanding, or conspiracy that they would continue to hold such stock, keep it within their families, or dispose of or vote the Delaware stock for the purpose of utilizing du Pont to create protected markets for du Pont, or to otherwise restrain or monopolize trade. The Government has further failed to prove that either Christiana or Delaware, or both, were formed, and their stock held, for the purpose of creating protected markets for du Pont and to otherwise restrain or monopolize trade.

*General Motors Corporation*

In the spring of 1914 Pierre S. du Pont purchased approximately 2000 shares of General Motors upon the recommendation of John J. Reskob. His personal holdings from 1914 to 1917 are set forth in GTX 114. Irenee du Pont purchased 400 shares of General Motors in 1914 on the expressed enthusiasm of John J. Reskob, but did not know his brother had done the same, His personal holdings from 1914 to 1917 are set forth in GTX 115. He attended no General Motors meetings during this period.

General Motors was organized in 1908 by W. C. Durant and had acquired a number of previously independent automobile manufacturing companies— Buick, Cadillac, Oakland and Oldsmobile. In 1910 in order to raise needed working capital Durant had been compelled to borrow $14,000,000 from a group of "Boston" bankers under a voting trust agreement which supplanted Durant as President by Charles W. Nash, and gave control of the Board of Directors for five years to said bankers. Upon leaving the active management of General Motors, Durant and close associates incorporated the Chevrolet Motor Company to manufacture a new low-priced car. The Chevrolet Motor Company bought stock of General Motors until in 1916 it owned 450,000 shares of common stock out of 825,000 outstanding.

About September 1915 Pierre S. du Pont and John J. Raskob became actively involved in the affairs of General Motors when both attended a stockholders meeting at the invitation of Mr. Kaufman, who was president of the Chatham & Phoenix National Bank of New York. At this meeting, Durant and the lending bankers, who were operating General Motors under the voting trust agreement which expired in 1915, became deadlocked on the composition of a new Board. A compromise was reached whereby both sides agreed that each name seven candidates and Pierre S. du Pont was empowered to name three neutral directors not connected with either Durant or the lending bankers. Pierre S. du Pont submitted the names of J. A. Haskell, who had been a vice-president of du Pont for many years and now retired; John J. Raskob, Treasurer of du Pont; and Lammot Belin, his brother-in-law. These were accepted by both factions. Pierre S. du Pont was elected Chairman of the Board.

Durant extended an invitation to Pierre S. du Pont and John J. Raskob to become members of the General Motors Finance Committee, which invitation was declined, and in October 1916 both declined chairmanship of that committee. In January 1916 Durant offered Pierre S. du Pont and Raskob the opportunity to exchange their General Motors holdings for Chevrolet Motor stock on the basis of five shares of Chevrolet for one share of General Motors, which offer was declined. Raskob stated "we were not sure he had control of the General Motors Company and being in the position of neutral directors, we might be charged with taking sides should we do anything which would tend to give one side or the other control of the Company." (GTX 119.) After it became clear in May 1916 that Durant, through Chevrolet Motors holdings in General Motors, had obtained control of General Motors, Pierre S. du Pont and Raskob availed themselves of the offer which Durant had held open for them, and as a result Pierre S. du

Pont and Raskob became large holders in Chevrolet Motors which controlled General Motors.

In August 1917, Pierre S. du Pont and Raskob accepted Durant's invitation to become members of the General Motors Finance Committee, and Durant suggested that the "Wilmington people, as he called it, take more stock and more interest in the General Motors Corporation." (Pierre S. du Pont 1997.) After Pierre S. du Pont and Raskob became members of the Finance Committee both saw a "good deal" more of Durant and he talked freely to them about operations and finances of General Motors and plans for its future expansion.

Shortly prior to December 19, 1917, Raskob talked with Pierre S. du Pont with respect to a proposed company investment in General Motors. Raskob prepared a draft report in connection with this proposal which was reviewed and approved by Pierre S. du Pont and discussion was had between them regarding parts of the report. Raskob proposed to Pierre S. du Pont that he take on the promotion of such a plan with the du Pont directors and it was submitted in final form as a Report of the Treasurer to the Finance Committee of du Pont. On December 21, 1917 the Executive and Finance Committees of du Pont approved the acquisition of common stock in General Motors and Chevrolet Company in the amount of $25,000,000.

General Industries, Inc., all of whose stock was held by du Pont, was formed to acquire the General Motors stock. By March 8, 1918 General Industries, Inc., had purchased approximately 23% of the common stock of General Motors and Chevrolet. During the next two years the investment was increased to approximately $49,000,000 and in 1920 du Pont owned approximately 23.96% of the outstanding stock of General Motors.

The Raskob report submitted to the Finance and Executive Committees of du Pont in connection with the proposed purchase of General Motors and Chev-rolet stock summarized the following points in favor of a substantial investment in the motor industry:

"1. With Mr. Durant we will have joint control of the companies.

"2. We are immediately to assume charge and be responsible for the financial operation of the Company. This involves the direction of cash balances which will aggregate upwards of $25,000,000 and the handling of annual gross receipts aggregating $350,000,000 to $400,000,000. From a financial standpoint, I feel that a consolidation of the financial divisions of the du Pont and General Motors Companies will be of tremendous advantage to us as well as to the General Motors Company and is a thing to be sought and desired from our standpoint.

"3. The du Pont Company, if the Class A stock is sold to the stockholders, will share in the profits of the industry to an extent equal to 120% on our investment and will receive 14% in annual dividends thereon; or in the event of carrying Class A stock in our Treasury the dividend rate will be about 12.6% and will share in the earnings about 42% and this after paying $20,000,000 war taxes.

"4. Our purchase is on better than an asset basis.

"5. Our interest in the General Motors Company will undoubtedly secure for us the entire Fabrikoid, Pyralin, paint and varnish business of those companies, which is a substantial factor.

### Management

"Perhaps it is not made clear that the directorates of the motor companies will be chosen by Du Pont and Durant. Mr. Durant should be continued as President of the Company, Mr. P. S. du Pont will be continued as Chairman of the Board, the Finance Committee will be ours and we will have such representa-

tion on the Executive Committee as we desire, and it is the writer's belief that ultimately the Du Pont Company will absolutely control and dominate the whole General Motor's situation with the entire approval of Mr. Durant, who, I think will eventually place his holdings with us taking his payment therefor in some securities mutually satisfactory. * * * " (GTX 124.)

Announcement of the purchase was made in the annual report of du Pont to its stockholders as follows:

"Announcement was recently made of the acquisition of a large interest in the General Motors Corporation and Chevrolet Motor Company. Though this is a new line of activity, it is one of great promise and one that seems to be well suited to the character of our organization. The motor companies are very large customers of our Fabrikoid and Pyralin as well as paints and varnishes." (P. S. du Pont 2245.)

Raskob's report, the testimony of Pierre S. and Irenee du Pont and all the circumstances leading up to du Pont's acquisition of this substantial interest in General Motors, as shown by the record, establish that the acquisition was essentially an investment. Its motivation was the profitable employment of a large part of the surplus which du Pont had available and uncommitted to expansion of its own business.

The Government asserts that an agreement was made in 1917 at or about the time of du Pont's investment in General Motors which bound the latter to purchase from du Pont substantially all of its requirements of products of the kind made by du Pont. It also argues that du Pont's investment in General Motors was made with the purpose of using its alleged control of General Motors to require it to buy from du Pont.

The principal basis for both of these contentions appears to be the portion of Raskob's report wherein he stated:

"Our interest in the General Motors Company will undoubtedly secure for us the entire Fabrikoid, Pyralin, paint and varnish business of those companies, which is a substantial factor." (GTX 124.)

The Court has also considered in passing upon these contentions of the Government the testimony of Pierre S. and Irenee du Pont and other documents written at the time of or within a few years following the investment.

The Court finds on the basis of all the evidence of record that no agreement was made in connection with du Pont's investment in General Motors, or subsequent thereto, which bound the latter to buy any portion of its requirements from du Pont. Raskob's report does not describe any such agreement. Pierre S. du Pont was party to the preparation of this report and he testified that he had no knowledge of any such agreement. Irenee du Pont similarly testified that he knew of no such agreement. The Court believes it most unlikely that an agreement of the kind alleged by the Government would have been made without the knowledge of these two important officials. On the General Motors side, neither Sloan nor Pratt was ever advised of any such agreement though both occupied positions under Durant in which they would be expected to have known of one had it existed. No document, either contemporaneous with the making of the alleged agreement or subsequently executed, makes reference even indirectly to an agreement of the kind alleged by the Government. The Court does not find in the actions over the years of du Pont's executives or salesmen or General Motors purchasing personnel corroboration of the existence of the alleged agreement.

The Court also finds based on all of the evidence of record that du Pont did not invest in General Motors with the purpose of restricting that company's freedom to purchase in accordance with its own best interests. Du Pont, the record shows, never intended to preclude

General Motors from dealing with suppliers of its choice, never made any effort to so preclude General Motors, and did not limit General Motors' purchasing freedom.

Raskob's reports and other documents written at or near the time of the investment show that du Pont's representatives were well aware that General Motors was a large consumer of products of the kind offered by du Pont. Raskob, for one, thought that du Pont would ultimately get all that business, but there is no evidence that Raskob expected to secure General Motors trade by imposing any limitation upon its freedom to buy from suppliers of its choice. Other documents also establish du Pont's continued interest in selling to General Motors—even to the extent of the latter's entire requirements—but they similarly make no suggestion that the desired result was to be acheived by limiting General Motors purchasing freedom. On the contrary, a number of them explicitly recognized that General Motors trade could only be secured on a competitive basis.

At the time of this investment, Pierre S. du Pont, Haskell and Raskob were members of the General Motors Board and after the investment two additional du Pont nominees were elected to that Board. In 1919 the Board was increased to twenty members and the du Pont nominees remained at six.

The Finance Committee consisted of seven members, five of whom were du Pont representatives—Pierre S. du Pont, Irenee du Pont, John J. Raskob, Henry F. du Pont, and J. A. Haskell. Mr. Raskob was appointed chairman. It is apparent, and it is admitted, that a majority of this committee were officers and directors of du Pont.

The Executive Committee consisted of ten members, including one du Pont nominee, J. A. Haskell, with Durant as chairman and the other members consisting of management representatives.

The evidence establishes that following the period of this investment until 1920 du Pont and Durant jointly controlled General Motors and that du Pont, through its affiliation with Durant, assumed the responsibility for the financial operation of General Motors.

During 1918 and 1919 General Motors acquired the assets of the Chevrolet Company, United Motors, which was an amalgamation of a number of accessory companies, the McLaughlin Buick properties in Canada, and a sixty per cent interest in Fisher Body Corporation. This expansion of General Motors had required the raising of new capital.

The Board of Directors of General Motors in 1920, after a previous unsuccessful effort to raise the necessary additional capital by an issue of seven per cent debenture stock, authorized an issuance of approximately 3,200,000 shares of new common stock to the common stockholders at $20 per share. It was also decided that du Pont and Durant would turn over their stock subscription rights amounting to 1,800,000 shares to Nobel and Canadian Explosives, Ltd., since Durant and du Pont were reluctant to make any further investments. J. P. Morgan & Co. subscribed to 600,000 shares of the new issue and one of its partners was named to the Board, together with representatives of Nobel and Canadian Explosives. The stock acquisitions of Nobel and Canadian Explosives were in large part taken over by du Pont at a later date.

The evidence shows that this new issue was accompanied by the formation of a syndicate managed by J. P. Morgan to buy and sell General Motors stock and subscription rights for the purpose of supporting the value of General Motors stock in the market. During the Fall of 1920, Durant, through individual stock market operations apparently designed to support the market price, had become indebted in the amount of $27,-000,000 to various banks and brokerage houses for which he had pledged some 2,700,000 shares of General Motors stock. These stock market investments by Durant were disclosed to Pierre S. du Pont and Raskob in November and

alarm was felt as to the possible consequences in the event Durant failed in the market. Du Pont Securities Company was organized to borrow $20,000,-000 and take over Durant's loans, pay his creditors and preserve for him a 40% equity in du Pont Securities stock, which was later exchanged for 230,000 shares of General Motors stock. The new company had seven million dollars in cash and loaned 1,375,000 shares of General Motors stock to borrow the balance needed. Du Pont in 1921 authorized a bond issue in order to finance the transaction.

The net result of the foregoing stock transactions was that du Pont owned, through du Pont Securities, the equivalent of 7,362,540 shares of General Motors stock at a cost of $75,581,259 and in addition owned directly 200,000 shares acquired at a cost of $4,000,000; being the equivalent of approximately 38% of General Motors stock outstanding.

In 1923 du Pont sold about 2,250,000 shares of General Motors stock (substantially the amount acquired through the 1920 stock transactions) to Managers Securities, a corporation organized by General Motors for the purpose of providing additional incentive to principal executives of General Motors. Du Pont began to surrender the voting rights on this stock in 1930, and from time to time thereafter surrendered such rights as holders of Managers Securities stock surrendered their stock and took down the underlying securities. By 1938 du Pont had surrendered the voting rights on all of this stock. It is admitted that since the release of the voting rights to such stock, du Pont has for many years owned 10,000,000 shares, or approximately 23% of General Motors common stock, and that the remaining shares in 1947 were held by 436,510 stockholders, 92% of whom owned no more than 100 shares each and 60% owned no more than 25 shares each. In 1950 a two for one split was effected resulting in du Pont holding 20,000,000 out of 88,000,-000 shares, which did not change the percentage of du Pont holdings.

At the conclusion of the 1920 events Pierre S. du Pont became president of General Motors. He was urged to accept this position by the du Pont Finance Committee since du Pont had a large investment in General Motors to protect. In addition, the record discloses that he was urged to assume the presidency of General Motors by the bankers, by Sloan, and by others in the management.

Pierre S. du Pont held the presidency of General Motors until May 1923 when Alfred P. Sloan became president.

During Pierre S. du Pont's term of presidency significant and important changes were effected within General Motors. These were:

(1) A plan of reorganization for General Motors providing for substantial autonomy of the operating divisions of General Motors. The evidence shows that Pierre S. du Pont presented to the Board a plan, originated by Sloan during Durant's presidency, to decentralize the General Motors divisions.

(2) Certain changes in management and in the personnel of the Executive Committee were made. Under Durant the ten man Executive Committee consisted of managers of the operating divisions. In 1921 the Executive Committee was reduced to four members. They were Pierre S. du Pont, the President; Haskell and Sloan, heads of the Line and Staff Divisions; and John J. Raskob, Chairman of the Finance Committee. This four man committee was. enlarged to six in 1922 by the addition of Charles Fisher, a General Motors director, and C. S. Mott, also a General Motors man. Durant started a competing automobile company and the question of loyalty on the part of some of the car division managers to Durant was one of the reasons for reconstituting the Executive Committee.

The managers of the operating divisions became an Operating Committee under Haskell. Four out of five car division managers were appointed by Pierre S. du Pont, upon the recommendation of Sloan. Of the four re-

placed, two resigned and two were replaced as a result of disputes regarding contract rights under employment agreements made during Durant's presidency. The four new managers recommended by Sloan had in each case been with General Motors for years and never had any connection with du Pont. Testimony of witnesses shows that the changes in managers were unrelated to the use of du Pont products.

The Finance Committee of General Motors remained the same except the Durant vacancy was filled by Donaldson Brown, a former du Pont employee who was also a member of du Pont's Finance Committee.

(3) A General Purchasing Committee was created in 1922. This committee was created at the suggestion of Sloan in order to enable General Motors to set up machinery for standardizing items and for coordinating purchases where two or more divisions used a common product. James Lynah, who left employment of du Pont in 1919 under "acrimonious" circumstances, was appointed secretary by Sloan and the committee was composed principally of purchasing agents of the General Motors divisions. It is this committee which in September 1923 with Lynah's recommendation urged the adoption of a rule requiring a second source of supply for leather substitutes and rubber coated fabrics which were being purchased in large quantities from du Pont. John L. Pratt, who was a du Pont employee from 1905 to 1919 when he resigned and went to work for Durant at General Motors, also became a member of this committee and was its chairman from 1924 to 1929.

(4) In 1918, during the Durant regime, at the suggestion of the du Pont nominees, General Motors initiated a bonus plan to outstanding employees. Before retiring as president, Pierre S. du Pont recommended that another plan be instituted providing for additional compensation to principal executives of General Motors.

Allotment of bonus awards was made by the Chief Executive Officer of General Motors subject to the approval of the Finance Committee. This procedure was followed until 1936 when a Bonus and Salary Committee of the Board replaced that function of the Finance Committee.

In addition to these changes in General Motors, two important discoveries affecting the automotive industry occurred.

In the latter part of 1920 Edmund M. Flaherty, an employee of du Pont, invented and carried to the commercial development stage a quick-drying, durable nitrocellulose lacquer, which was patented and called "Duco".

The other was the discovery of tetraethyl lead. In 1918 General Motors engaged in an extensive investigation into the nature and the causes of "knocking" in engines. In the General Motors laboratories chemical research under the direction of Charles F. Kettering and Thomas Midgely developed that the use of tetraethyl lead blended with gasoline in proper proportions constituted an effective anti-knock. It was further revealed that TEL, as it was called, was a scarce and expensive product, production of which was extremely hazardous. General Motors discovered that TEL could be produced commercially from ethyl bromide. In 1922 General Motors and du Pont entered into an agreement under which du Pont manufactured TEL and it was distributed through a General Motors subsidiary organized to handle its marketing.

The record shows that during the 1920 to 1923 period du Pont had a 38% interest in the stock of General Motors. Three of the six members on the Executive Committee and seven of the eleven members on the Finance Committee were du Pont men. Haskell, former sales manager and vice-president of du Pont, who was willing to undertake the responsibility of keeping du Pont informed of General Motors affairs during Durant's regime, was Vice-President in Charge of the Operations Committee.

The defendants have conceded that "during the period of P. S. du Pont's

Chief Executive Officership nominees of du Pont were thrust into positions of responsibility in General Motors which went beyond the financial supervision which had been their earlier role." (D. P. Brief p. 332.)

On April 24, 1923 Pierre S. du Pont informed the Finance Committee of du Pont of his desire to retire as president of General Motors and of his intention to recommend Alfred P. Sloan, Jr., as his successor. Sloan was a vice-president of General Motors and was in charge of the General Advisory Staff. He had been president of Hyatt Roller Bearing Company, one of the companies controlled by United Motors, which had been organized in 1916 by Durant. When General Motors acquired United Motors, Durant appointed Sloan as its president. The Finance Committee of du Pont adopted a resolution acquiescing in Pierre S. du Pont's decision and expressing confidence in Sloan as his successor to the presidency. Thereafter, Pierre S. du Pont informed the directors of General Motors of his intention to resign and of his recommendation of Sloan for president.

On May 10, 1923 Sloan was elected president of General Motors and also was its Chief Executive Officer from 1937 until 1946. William S. Knudsen was elected president May 3, 1937 and served as such until September 3, 1940. In 1941 Charles E. Wilson was elected President and also became the Chief Executive Officer in 1946. Shortly after Sloan became president he was elected a director of du Pont.

*Board Members*

On May 10, 1923 when Sloan became president, the Board consisted of thirty-two directors. The evidence shows that during the period of Sloan's presidency and that of Wilson, the du Pont nominees on the Board never exceeded six. The total number of members of the Board between 1949 and February 1, 1953 did not exceed thirty-two and was not below thirty.

Of the thirty-two directors when Sloan became president, sixteen were so-called management directors and only two of these had been connected with du Pont—Donaldson Brown and Haskell. The other then management directors were five bankers, three American industrialists and two foreign industrialists.

Sir Harry McGowan of Imperial Chemicals, William McMaster of Canadian Explosives, Seward Prosser of Bankers Trust Co., Edward P. Stettinius of J. P. Morgan, William H. Woodin of American Car & Foundry, C. M. Woolley of American Radiator, and Owen D. Young of General Electric, all became members of the Board during the 1920 financing. There is no evidence that they were added at the suggestion of the du Pont nominees.

The defendants have admitted that in 1942 du Pont suggested additional directors who were neither management nor du Pont nominees. At that time there were only three directors on the Board who were neither management nor du Pont nominees.

In July 1944 Carpenter wrote to Sloan urging selection of additional non-management and non-du Pont directors. Sloan testified he took the initiative in attempting to find qualified men who would be willing to serve. He also testified that in such search he sought suggestions from other members of the Board, including du Pont nominees, and discussed generally with all Board members the suggestions received.

In 1943 Sloan wrote to Carpenter, who was a member of the General Motors Board, that in his search for "outside" directors, he was "against Bankers on Boards of industrial companies" and had therefore eliminated the suggestions of Henry C. Alexander, Vice-President of J. P. Morgan, and R. K. Mellon, President of Mellon National Bank, whose names had been proposed by Carpenter some time previously. On January 8, 1948, five years later, R. K. Mellon was named to the Board of General Motors.

at the suggestion of Donaldson Brown. Mellon had by this time become "a very large stockholder in General Motors". In 1949 at the request of Sloan, Alexander, the other banker, was added to the Board. Thus some period of time passed between Sloan's indicated aversion to bankers on boards and the subsequent appointments.

In addition, on December 18, 1944, Lammot du Pont wrote to Sloan regarding Bernard Peyton, a nephew of Eugene du Pont who owned 60,000 shares of du Pont common "which is more than enough to give him a predominating interest in the affairs of that company and indirectly in General Motors." (GTX 1230.) Lammot du Pont wondered if "this would be a suggestion for consideration from the standpoint of directorship in General Motors". Sloan's reply admitted that neither he nor Donaldson Brown, to whom he spoke about Peyton, knew Peyton, and replied that if Peyton was the owner of a large block of du Pont common involving indirectly substantial ownership in General Motors, together with his past business experience as Vice President and Treasurer of New York Air Brake Company, he would be qualified. He further stated that if necessary he would make inquiries regarding Peyton, but felt that since Lammot du Pont knew him no more was needed. In any event, Peyton never became a member of the Board.

On December 10, 1945 Sloan wrote to Carpenter, then President of du Pont and a member of the General Motors Board, regarding the suggestion of Mr. Pratt to consider General Marshall as a member of the General Motors Board, and indicated that he did not favor the suggestion. A reply came from Lammot du Pont, Chairman of the Board of du Pont and also a member of the General Motors Board, that he was not in favor of General Marshall's membership. On Sloan's letter to Carpenter, there appears a handwritten notation of the name of "E. F. Johnson", and in the following month Johnson was elected a director of General Motors. Prior to his service with General Motors, he was an employee of du Pont.

On April 22, 1930, in an exchange of correspondence, Lammot du Pont agreed with Sloan's suggestion that Mr. Bishop should not be re-elected a vice-president of General Motors but thought he should be retained as a director, and suggested further that Curtis C. Cooper, who had severed connections with the corporation, be dropped as a director. On May 1, 1930 Mr. Bishop was not re-elected Vice-President but continued as a director, and Mr. Cooper was not retained as a member of the Board.

In 1928, Raskob, while chairman of the General Motors Finance Committee became Chairman of the National Democratic Committee in connection with the candidacy of Alfred E. Smith for President. Sloan testified he considered it unsound for Raskob to manage a political campaign and at the same time continue as "unofficial" spokesman for General Motors because he felt it put General Motors in politics. Raskob differed with Sloan's view and was supported by Pierre S., Irenee, and Coleman du Pont. The episode resulted in Raskob's resignation and also the resignation of Pierre S. du Pont as Chairman of the Board. Both, however, remained as members of the Board and the Finance Committee. Lammot du Pont succeeded Pierre S. du Pont as Chairman of the General Motors Board and held that position until 1937.

Mr. Sloan testified that he discussed prospective directors, particularly "outside" directors, with the entire Board.

A majority of the directors have always been the nominees of management. Sloan testified that management directors were always nominated by him when they had achieved in the management hierarchy of the corporation a position which entitled or required that they be on one of the committees of the Board, and further that he never discussed these nominations with anyone except the management group and after his recommendation their election was automatic. Sloan and Carpenter testified that no du

Pont nominee ever objected to the number of management directors which Sloan wanted on the Board.

*Committees of the Board*

The Executive Committee, until merged with the Policy Committee in 1937, dealt with operational management problems. In May 1923 when Sloan became president of General Motors there were six members, three of whom were du Pont representatives, i. e., Pierre S. du Pont, Chairman of the Board, John J. Raskob, Chairman of the Finance Committee, and Donaldson Brown, a member of the Finance Committee. The membership of this committee was increased to twelve during the period 1923–1934, and new members were added at the suggestion and request of Sloan.

It is the Government's contention that du Pont directly intervened in decisions touching on changes in the membership of the Executive Committee and refer to the incident following the resignation of Raskob and Pierre S. du Pont from the Executive Committee. Irenee du Pont, then Vice-Chairman of the Board of du Pont wrote to Lammot du Pont, Chairman of the Board of General Motors, reminding him of the recommendations made by Pierre S. du Pont and Raskob for their vacancies—that Knudsen be placed on the Executive Committee for Raskob, Mr. Mooney in place of Mr. Mott, and possibly Walter Carpenter in place of Pierre S. du Pont. Knudsen was placed on the Executive Committee within three months; Mooney became a member of the Executive Committee some six years later; and instead of Carpenter, Lammot du Pont took Pierre S. du Pont's place on that committee. Neither Knudsen nor Mooney was connected with du Pont.

On April 22, 1930 Sloan received a reply from Lammot du Pont, then Chairman of the Board of General Motors, which approved of Sloan's idea expressed in an earlier letter of abolishing the Operations Committee and of placing its members on the Executive Committee. Lammot du Pont went on to say this meant that Bradley, Grant, Hunt and Wilson, all of whom were vice-presidents, would have to become members of the Executive Committee and presumably would have to be elected directors, but added there was no reason why Glancey, Reuter and Strong, who were also vice-presidents, should be added to the Board. Some four or five years later, 1934 and 1935, Bradley, Hunt and Wilson were added to the Executive Committee and to the Board. The others mentioned by Lammot du Pont never became directors.

Lammot du Pont, Chairman of the General Motors Board, who had become a member of the Executive Committee in 1930, resigned as a member in 1934. In this connection Sloan wrote to Lammot du Pont inquiring whether Lammot du Pont would like to have Carpenter elected in his place. The evidence shows that Carpenter did not go on the Committee and no one replaced Lammot du Pont. After his resignation, du Pont had no representative on the Executive Committee. Donaldson Brown remained a member of this committee.

The Finance Committee until merged with the Policy Committee in 1937 dealt primarily with financial matters. In 1923 of the eleven members, seven were du Pont men. These were Pierre S. du Pont, Chairman of the Board of du Pont, Irenee du Pont, President of du Pont, Lammot du Pont, Vice President and a director of du Pont, John J. Raskob, a director and member of the du Pont Finance Committee, J. A. Haskell, a vice-president and director of du Pont, H. F. du Pont, a director and member of the Finance Committee, and Donaldson Brown, a director and member of the Finance Committee of du Pont. With the death of Haskell in 1923, the du Pont representation was reduced to six. The Finance Committee in 1923 with continuing du Pont representation reflected the original understanding with Durant that in financial matters the du Ponts would assume the primary responsibility.

In 1924 this committee was increased to twelve and eventually to fourteen. In 1927 Carpenter became a member of this committee.

With the resignation of Raskob from the Executive Committee and Chairmanship of the Finance Committee, Lammot du Pont, then President of du Pont and a director of General Motors, wrote to Sloan regarding the chairmanship of this committee stating that he felt it was up to du Pont to make a nomination since du Pont "has always assumed the responsibility for the financial direction of General Motors" and suggested the appointment of Carpenter and, if not agreeable, Donaldson Brown. The record shows that Donaldson Brown succeeded Raskob as Chairman.

On May 3, 1937, the membership of the Finance Committee was fourteen, seven of whom were du Pont representatives, i. e., Pierre S., H. F., Irenee, and Lammot du Pont, Raskob, Brown and Carpenter. The other members were Baker, Prosser, Sloan, Whitney, Morgan, Mott and Bradley. Sloan testified that most of the additions to this committee during the period 1923–1937 had been at his suggestion.

In 1937 at the insistence of Sloan, the two committee operation was consolidated into the Policy Committee. Sloan testified that the change was desirable because experience proved that the Finance Committee for some years prior to 1937 had dealt with problems which though financial in nature were operating problems as well. After some discussion, his recommendation was accepted and a Policy Committee which had complete authority to deal with broad policy questions was established. At this time Sloan resigned as President and was succeeded by Knudsen. Sloan remained the Chief Executive Officer and Chairman of the Board.

The one committee idea had been discussed with du Pont representatives. It was considered by the Finance Committee of du Pont and the committee was in favor of the objectives of the proposal, but misgivings were expressed with respect to the discontinuance of the Finance Committee without creating some body whose particular function would be the handling of financial problems. A proposed compromise plan was submitted which was not adopted.

In connection with the 1937 reorganization, Lammot du Pont wrote to Carpenter reporting on a conference held in New York. Those present, including himself, were Alfred Sloan, Donaldson Brown, J. T. Smith, John Raskob, John Pratt and Pierre S. du Pont. At this conference it was agreed that the Board would be reduced to 28 omitting McGowan, H. F. du Pont, W. A. Fisher, Kaufman, Opel, Swayne, Woolley and Young; a Policy Committee would be appointed consisting of Bradley, Brown, Knudsen, Sloan, Smith, Wilson and three representatives of du Pont; and an Administrative Committee would be appointed with Wilson as Chairman. In addition it was agreed that eventually Sloan should become Chairman of the Board and Knudsen, President. Lammot du Pont stated that Sloan seemed so insistent on his one committee idea, which was concurred in by the others, that he felt any objections Carpenter or he had should be waived in view of the fact that some other man of financial experience from du Pont might be named on the Policy Committee.

The record shows that during the life of the Policy Committee, continued misgivings were expressed as to its efficacy. Sloan, Carpenter and Lammot du Pont exchanged correspondence with reference to the weaknesses disclosed by operating under the Policy and Administration Committees. Sloan had reached the conclusion that the committee set up should be altered. In writing to Donaldson Brown, Sloan stated "we put too many things on the Policy Committee that involve administration and do not confine their work sufficiently to broad questions of policy." In addition, Sloan in his correspondence with Lammot du Pont stated that the General Motors Organizational scheme of things was not adaptable to the same type of organizational set up existing in du Pont. A change in committee organization was effected in 1946 by a return to the two committee plan: one was the Financial Policy Committee and

the other the Operations Policy Committee. Mr. Sloan testified as to the considerations evoking a return to this system. He also testified that the reason correspondence evidence existed with the du Pont group and none with the management group of directors was that the management group was in the same office and these matters of organization changes were discussed orally with them.

The Policy Committee always consisted of nine members. During the entire period of this committee the following du Pont officers and directors, not including Sloan, were members: Donaldson Brown, Carpenter and Lammot du Pont. The management members were Bradley, Sloan, Smith, Wilson and Knudsen, who was replaced by Hunt in 1940 on the nomination of Sloan. The other member was George Whitney of J. P. Morgan. With the exception of Knudsen, the personnel of this committee remained the same throughout its life.

In 1943 Sloan wrote to Lammot du Pont asking his reaction to the suggestion of Kettering as a member of the Policy Committee. Lammot du Pont did not favor the suggestion and Kettering was not appointed. Testifying regarding this incident, Sloan stated that others agreed with Lammot du Pont, including himself after giving the subject further consideration. Sloan also testified that he consulted with all the directors regarding the appointments to the Policy Committee.

In 1946 with the change of committee organization, there were no du Pont representatives on the Operations Policy Committee. The Financial Policy Committee started with nine members and was later increased to ten. At no time during its existence were there more than three du Pont representatives on this committee.

The evidence shows that since 1934, with the exception of Donaldson Brown, no du Pont representative was on the Executive Committee. Brown had been described by Sloan as a General Motors man although he was a former officer of du Pont, retained his membership on its

Board and its Finance Committee when he went to General Motors. Brown became a part of the General Motors organization in 1921 when Raskob in a letter to Irenee du Pont, who was then President of du Pont, wrote that General Motors needed expert financial assistance and that the person selected should not only be a man of unquestioned ability but one who enjoyed the absolute confidence of the directors of du Pont, which now controlled General Motors. He recommended Donaldson Brown and stated that since the financial interests of both companies were so closely interwoven, Brown should be retained as a director and member of the Finance Committee of du Pont. Brown eventually succeeded Raskob in General Motors and became chief financial advisor to its president.

There is no evidence that Brown was active in commercial relations between du Pont and General Motors or that he ever did anything to encourage the use of du Pont products by General Motors.

During the life of the Policy Committee, of a membership of nine, three, including Brown, were du Pont representatives. There were no du Pont representatives on the Operations Policy Committee.

On the Finance Committee, which was changed to the Policy Committee in 1937, there were seven du Pont representatives, including Brown, in a total membership of fourteen. Of the ten members on the Financial Policy Committee in 1946, three were du Pont representatives. Thus, numerically, the du Pont representatives were not in a majority on the governing committees of General Motors. The record shows that during 1941 du Pont was interested in the retention and placing of able personnel in the financial department of General Motors.

The participation of the du Pont representatives in the selection of General Motors directors and in determining the organization of the board and the composition of its committees does not estab-

lish that du Pont has been the controlling force in the direction of General Motors affairs, or has been in a position to act as if it owned a majority of General Motors stock. The record shows consultation and conference, but not domination. Moreover, in all these matters Sloan has clearly been the leader and the dominating influence and has largely determined the results. With a minimum of consultation with du Pont representatives he has selected the management. In large part, though with somewhat more consultation with du Pont, he has suggested the names of directors and led the discussion in that respect. Sloan's testimony and the record as a whole are convincing that at all times he acted independently and steadfastly in the best interests of General Motors.

The Court finds it highly significant that in all of the correspondence regarding General Motors directors the attitude of the suggested nominee toward du Pont was in no instance a consideration in his approval or disapproval. Accordingly, the Court finds, based on all the evidence, that du Pont's participation in the selection of General Motors directors and management does not establish that it controlled General Motors or that it sought through such participation to place people in General Motors who would further du Pont's interests as a supplier or as a chemical manufacturer.

### Bonus Plans and Awards

The record shows that in 1923 du Pont sponsored and supported the Managers Securities Plan. The idea had been suggested by Pierre S. du Pont, then President of General Motors, and the details, with some variations before the final adoption, are set forth in a report prepared by Raskob and Brown. This report was submitted to the du Pont Finance Committee and stated that Pierre S. du Pont's interest in the plan caused the report to be made. The report stated that Pierre S. du Pont felt that the most effective manner of attaining maximum success in the conduct of the affairs of General Motors was to interest its prin-

cipal men as substantial stockholders or partners in the business, that du Pont with its large and controlling interest in General Motors would enhance the value of its own investment by the adoption of such a plan in General Motors and would retain the same control of General Motors through owning two-thirds of the stock of General Motors Securities Company, plus the fact that "it will definitely tie up with us in the management and control of this huge investment the men in General Motors Corporation who are definitely charged with the responsibility and success of the corporation." (GTX 235.)

Managers Securities Corporation was organized by General Motors to purchase 2,250,000 shares, or approximately one-third of the common stock of General Motors Securities Company, the du Pont Company which held 7,500,000 shares of common stock in General Motors. Du Pont from time to time surrendered voting control of the 2,250,000 shares until 1938 when the successor corporations, General Motors Securities, was liquidated.

In the course of evolving this additional compensation plan, the evidence shows that Irenee du Pont had certain objections and suggested that the stock for Managers Securities be procured through circularization of General Motors stockholders. Mr. Laffey, Chief Counsel for du Pont, advised Irenee du Pont that a direct sale of the stock to General Motors would have incurred a federal capital gains tax. Irenee du Pont testified to this as one of the considerations for the plan ultimately adopted. The plan originally proposed by Raskob and Brown, and objected to by Irenee du Pont, was retained and du Pont supplied the stock which was the sole asset of Managers Securities. The Managers Securities common stock was sold to General Motors and resold by it to about eighty of its executives.

General Motors agreed to pay Managers Securities 5% of its earnings annually, plus $2,000,000 per year, after deducting 7% on invested capital. Pri-

or to Managers Securities, General Motors had annually set aside 10% of its earnings, after deducting 6% on invested capital, for the bonus fund. With the creation of Managers Securities, one-half of the 10% previously set aside for the bonus plan, or 5%, was allocated to Managers Securities for distribution in Class A stock, having a par value of $100, and Class B stock, having a par value of $25. Sloan testified that the Class A, five million par value stock of Managers Securities was not entirely allotted to executives, a reserve being held so that in subsequent years the allotment to Managers Securities was reduced below 5%, the balance going to the bonus fund. The Class B stock of Managers Securities received the dividends earned by 2,250,-000 General Motors common purchased by Managers Securities from du Pont.

The executives purchasing Managers Securities stock paid one-seventh of the purchase price in cash and the balance was paid on a deferred payment basis out of future bonuses and out of the earnings of the stock purchased.

The Board of Directors created a committee which was empowered to designate the employees of General Motors who were to participate in the Managers Securities stock. This committee consisted of three members—Pierre S. du Pont, Chairman of the Board, and two other directors, Seward Prosser of J. P. Morgan, and Arthur G. Bishop, President of a Flint, Michigan, bank.

Sloan testified the stock allotments were made and determined by the special committee, then submitted to him as Chief Executive Officer for consideration and recommendation in the way of changes in the allotments. The initial awards of Managers Securities stock were made November 22, 1923 when Pierre S. du Pont wrote to the two other members of his committee making suggestions as to the distributions of stock. Sloan testified that the original allotment by the committee was made before submission to him, that Exhibit GM 30 contained the final allotment after submission to him, and showed the changes he had made.

Pierre S. du Pont testified the general method followed in bringing to the Special Committee recommendations for allotments for General Motors personnel of Managers Securities stock was that allotments were initiated by heads of the different departments of General Motors in a recommendation to the president of the corporation, who expressed his opinion thereon and passed the entire recommendation to the committee of three and so far as he knew no recommendation was changed by the committee after it came from Sloan. Sloan testified that bonuses were distributed by the Chief Executive Officer of the corporation whose recommendations went before the Finance Committee for approval. He further testified that although the chief executive officer had jurisdiction so far as the higher executives of the corporation were concerned, their compensation came through Managers Securities and he made no allotments to the higher officers since it was automatic and determined by the Special Allotment Committee. With respect to the operation of the bonus plan, he stated that although the responsibility rested with the chief executive officer he could not determine the allotments in the lower echelon of authority. A certain amount was allocated to a division and the chief executive of the division was the responsible agent in distributing the bonus within that division. He then submitted his recommendations to the chief executive officer who in turn submitted them to the Finance Committee until the year 1936 and thereafter to the Bonus and Salary Committee. Sloan testified that he could not remember any instance where the recommendations so made were changed by the Finance Committee or the Bonus and Salary Committee.

In 1923 the Finance Committee of General Motors, which received the recommendations of the Chief Executive, and the heads of the divisions, still reflected the original understanding with

Durant that in financial matters du Pont would assume primary responsibility. Du Pont had six representatives in a total membership of eleven. After the membership was increased to fourteen in 1923, there were six du Pont representatives.

For the years preceding 1941 there are no records of the personnel of the Bonus and Salary Committee which replaced the function of the Finance Committee in connection with the compensation plan. From 1941 to 1948, Government Exhibit 276 shows that of the five directors constituting this committee, the majority were du Pont representatives. They were W. S. Carpenter 1941–1944; H. B. du Pont 1944–1948; John J. Raskob 1941–1945; Echols 1946–1948; and Lammot du Pont 1941–1945, who was also its chairman during that period. The other members were John L. Pratt 1941–1946; George Whitney 1941–1948; and E. F. Johnson 1947–1948. Carpenter suggested his position on the Bonus and Salary Committee in 1944 be taken by H. B. du Pont and added that this would give H. B. du Pont "an excellent opportunity to better familiarizing himself with the personnel" of General Motors. (GTX 210.)

Mr. Sloan and Pierre S. du Pont testified that in the allocations made no consideration was given to the purchasing practices or attitudes of any executives toward du Pont.

The Managers Securities Plan as submitted and approved by the General Motors stockholders gave the corporation an irrevocable option to repurchase all or any part of the Class A or B stock and provided that the Finance Committee make a yearly review of the recipients of stock for the purpose of determining whether their stockholdings were disproportionate to the service being rendered, and providing for repurchase of stock in the event it was so found.

The Managers Securities Plan was terminated in 1929 because with the increase in the number of executives it was felt "something had to be done to broaden the scope of the plan." On January 1, 1930 a new seven year plan was developed and General Motors Management Corporation was organized. Du Pont did not provide any of the stock for this new corporation. Upon the expiration of the Management Corporation plan in 1938, General Motors reverted to the old Bonus Plan as the sole vehicle for rewarding its personnel.

The Court finds no evidence that any action taken by du Pont representatives with respect to the compensation of General Motors executives was intended to influence those executives to deal with du Pont or to refrain from dealing with du Pont competitors. Nor is there evidence of any instance in which a General Motors executive favored du Pont out of consideration for the latter's sale of stock to Managers Securities Company or out of deference to the position of du Pont representatives on the General Motors board.

Du Pont for many years has had supplemental compensation plans in various forms. Pierre S. and Irenee du Pont testified that they believed strongly that management should share in the success of a company and should participate in its earnings as owners. Their sponsorship of the Managers Securities Plan was no more than the application to General Motors of a business principle they had long practiced.

The record shows that some du Pont representatives did participate in the determination of the allotments under the Managers Securities plan and the bonus awards. There was opportunity, therefore, for them, in passing judgment on such matters, to attempt to further du Pont interests as a supplier of General Motors and as a chemical manufacturer. However, there is no evidence that any of them made any such attempt. The witnesses who testified and who would have been parties to such efforts vigorously denied the Government's charges. The Court refers to Pierre S. du Pont, Irenee du Pont, and Carpenter. A number of other executives who were witnesses such as Sloan, Kettering, Pratt, Lawrence Fisher, Lynah, and Wilson are

among those who would have been "influenced", if the Government's contention is correct. These men, the record shows, acted at all times solely in the best interest of General Motors.

The record as a whole and the findings made in the previous sections of this memorandum support these further findings on the issue of the alleged control of General Motors.

After the dramatic collapse of Durant and the ensuing financial crisis when du Pont representatives were thrust into positions of responsibility in General Motors, and after General Motors had been rescued from that crisis, du Pont's influence and position in General Motors declined radically. During the twenties, a force of considerable-strength arose in General Motors that was important in determining any question of control. This force was the management, headed by such a forceful and resolute character as Sloan and including such positive personalities as Kettering, the Fisher brothers, Knudsen, Pratt, Brown, and Wilson.

More than a quarter of a century has passed since the twenties, and the strength and standing of the management have continued to increase and improve. The du Pont representatives who had originally been interested in General Motors have died or retired. These developments are reflected in the contemporaneous documents, the changes in the membership of the board, the various committees of the board, and in the testimony of Sloan and other witnesses.

Irrespective of what its position may have been before and during the Durant crisis, since the 1920's du Pont has not had, and does not today have, practical or working control of General Motors. On the basis of all of the evidence the Court finds as a fact that du Pont did not and could not conduct itself, for the past 25 years, as though it were the owner of a majority of the General Motors stock.

The Government cross-examined Sloan respecting GTX 1307 which shows the percentage that the du Pont stock voted at the annual General Motors stockholders meetings bears to the total stock voted at such meetings. Counsel for the Government sought to obtain from him an admission or concession that du Pont's block of stock was at all times sufficient to prevail at a stockholders meeting. Sloan's position was that he did not believe one could tell what would happen if there was a conflict at a stockholders meeting. He pointed out that, for instance, in the year 1932 there were 17 million shares which were not represented at the meeting and further stated that, if there had been a contest for directors, there would have been a much larger representation than 26 million shares. His conclusion was that he did not think that anyone could tell how that large representation would vote because it would depend upon the issue that caused a particular conflict. He further stated that the stockholders owning those shares would be guided by the record of General Motors Corporation with respect to the ·advancement of its competitive position, its earnings, and its dividends.

Sloan testified that at no time had there been a contest over the selection of directors. He said that while it was true that the du Pont block of stock represented over 51% of the stock at certain of the meetings he emphasized that it. was not 51% of *all* the stock entitled to vote. In this connection he said:

"In case of conflict you immediately—the interest you arouse and all that, and the issues that are put before the stockholders, would mean that a much larger percentage of the stockholders would come into the meeting, and that would dilute in a way the du Pont interest. So I can't just say what would happen. * * * It would depend, as I say, upon a lot of circumstances that I can't evaluate." (3087.)

The Court finds the testimony of Sloan on this question of control both reasonable and persuasive.

There is a substantial failure of proof that du Pont controlled General Motors, even though it was voting at times 51%

of the stock voted at a stockholders meeting. The testimony is that there was such satisfaction with the management and operation of General Motors that a large number of stockholders did not choose to vote their stock and made no protest with respect to the management of the company or the actions of the Board of Directors. It is entirely conjectural whether or not du Pont by its stock ownership could control if there had been a contest.

*United States Rubber Company*

It is admitted that in June 1927 the defendant individuals, · together with Henry B. du Pont, Lammot du Pont Copeland and certain other members of the du Pont family and their close business associates formed a syndicate to purchase United States Rubber stock. It is the Government's contention that the syndicate's acquisition of this stock stemmed from a scheme to bring United States Rubber into the alleged conspiratorial plan involving General Motors and the du Pont Company. United States Rubber Company at this time was one of the largest manufacturers of rubber products in the United States.

In 1913 Irenee du Pont purchased 400 shares of United States Rubber common as a personal investment. He testified he made this initial investment through his confidence in a former fraternity brother, Raymond B. Price, who had invented a rubber reclaiming process which was sold to United States Rubber, and because he "was quite aware of the peculiar properties of rubber" and felt a "rubber company ought to be a good growing business." He later increased his holdings to 12,000 shares and the extent of his investment from 1913–1926 is set forth in GTX 1029. During this same period, Lammot du Pont had also invested in United States Rubber common without the knowledge of his brother, Irenee.

Irenee du Pont testified as to the background, the reasons and circumstances which caused the formation of the syndicate to buy United States Rubber Stock. He stated that in 1927 the stock took a very "sudden nosedive", but the stock of other rubber companies remained firm; that he believed the drop in price was due to the fact that "somebody knew the position of the United States Rubber Company was not what it ought to be; that there had been mismanagement somewhere, and somebody wanted to get out of it and get into something else"; that the United States Rubber balance sheet showed excessive accounts receivable, and excessive inventories, materials, supplies, and finished products which he thought indicated incompetent financial management. However, he thought this was a good time for a profitable investment in United States Rubber, but since it would have required a larger investment than he could properly go into alone, he discussed the formation of a syndicate to purchase United States Rubber stock with his brother-in-law, William Winder Laird. He testified that he and Laird were of the opinion that if they could get a group to purchase a large block they would establish prestige with the management and be in a position to make suggestions and offer criticisms.

Without discussing the identity of the syndicate members with Irenee du Pont, Laird drew a syndicate agreement. With the exception of Raymond Price and Henry Davis, who were solicited by Irenee du Pont, Laird solicited the other ten members of the first syndicate who were, in the main, clients of Laird's brokerage firm.

Irenee du Pont wired Raymond Price on June 17, 1927, as follows:

> "Would you join syndicate to buy control your former company." (GTX903.)

He also sent him a letter reciting the fact that it would be a good plan to organize a syndicate to acquire control. Price accepted the invitation. On June 30, 1927, Irenee du Pont wrote inquiring whether Price would return to United States Rubber if "we should succeed in getting a large block and had a voice in the management". (GTX906.) Irenee du Pont testified this invitation to Price was not to replace anybody with him,

since they "were backing the management, not through revamping the management" but supporting the management with the best advice. He stated that the syndicate thought the company would be impressed by the weight of a large stockholder, would get the matter "cleaned up" and as a result the company as a whole would prosper.

The syndicate agreement dated June 30, 1927 recited that the purpose was to acquire common stock in "quantities sufficient to give practical control, or at least a voice in the management". There were twelve persons in the syndicate at its inception. With the exceptions of Price and Henry Davis, all were stockholders in Christiana Securities and four —Irenee, Lammot and H. B. du Pont and W. W. Laird—who subscribed for over half of the amount were Delaware stockholders. Six of the subscribers were directors of the du Pont Company and the rest, with the exception of Price and Davis, were members of the du Pont family. At this time Irenee du Pont was Vice-Chairman of the Board of du Pont and Lammot du Pont was its President. Both were serving on the Finance Committees of the General Motors and the du Pont Company.

A report, addressed to Mr. Laird and presumably undertaken at his suggestion, was submitted on August 4, 1927 by Mr. Lytle on the problems and potentialities of United States Rubber. It was brought to Irenee du Pont's attention and he testified that it confirmed his views of the problems besetting United States Rubber.

A second syndicate was formed September 2, 1927 after the first syndicate had purchased 97,750 shares of United States Rubber stock. The second syndicate was formed in order to admit six additional subscribers. Among them was Pierre S. du Pont, who was Chairman of the Board of du Pont and General Motors, a member of the Executive Committee of General Motors, and also a member of the Finance Committees of du Pont and General Motors. With the exception of H. S. Meeds, Jr., the additional sub-

scribers were Christiana or Delaware stockholders.

By December 9, 1927 the syndicate had purchased 154,750 shares of common stock, or 11% of the 1,379,503 total outstanding shares, both preferred and common, since both had voting rights. Of the 154,750 shares, the defendant individuals and members of the du Pont family, all of whom were stockholders in Christiana or Delaware, held 149,500 shares and the balance of 5,250 shares was held by Henry Davis, Raymond Price, and H. S. Meeds.

In December 1927 the syndicate operation was closed and some 154,000 shares of United States Rubber common were distributed to the syndicate members. Irenee du Pont testified that because they already had the ear of management there was no further need for the syndicate. In connection with the syndicate dissolution, H. B. du Pont wrote to Irenee and Lammot du Pont and other members on December 30, 1927 suggesting a voting trust of the syndicate stock be formed. On January 25, 1928 Henry B. du Pont, in writing to Pierre S. du Pont, indicated that all the members of the syndicate approved the idea and it was agreed that the trustees—Irenee and H. B. du Pont and H. S. Meeds—were to receive the stock from the syndicate members, deposit it in a box at the Wilmington Trust Company, and vote the stock as they saw fit. Irenee du Pont testified the reason for this procedure was to reassure Seger, then President of United States Rubber, that the investment by the group was not for speculation and also to make it possible to vote the stock as a unit.

In December 1929 after the termination of the second voting trust, Rubber Securities Company was organized by the syndicate members. Irenee du Pont had written to the syndicate members the month preceding that Mr. F. B. Davis, Jr., President, Mr. William de Krafft and Mr. Henry Davis, Directors of United States Rubber, were willing to undertake to organize a company to be known as Rubber Securities Company with a capi-

tal of 110,000 shares for the purpose of centralizing control of certain stock of United States Rubber. The syndicate stock of 254,300 common shares was to be sold at $26.50 to Rubber Securities; Rubber Securities stock was to be issued and subscribed to by such of the syndicate members who cared to subscribe in an amount equal to $29.50 for each share of United States Rubber common. This sale of syndicate stock to Rubber Securities permitted the members to crystalize a tax loss since the stock had been purchased at $40.50 per share. Thus, H. S. Meeds, Jr. wrote to Irenee and Lammot du Pont on December 14, 1928 proposing the formation of a corporation with a view of taking advantage of such losses and expressing the belief that a corporation would offer a better means for "concerted action of the several interests involved" and suggested a Delaware corporation be formed.

In connection with the formation of Rubber Securities, Irenee du Pont invited Cyrus Eaton, a banker, to join in the purchase of Rubber Securities stock and sell his United States Rubber shares to Rubber Securities. It appears from the record that Eaton, through Continental Shares, had about 100,000 shares of United States Rubber stock. Irenee du Pont testified that he thought it would be a very good thing to have him "definitely working with us rather than against us." Eaton refused the invitation.

The idea of centralizing the stock holdings of the syndicate members was one of the purposes for the creation of the new corporation. This is shown by both the record and testimony of Pierre S. du Pont.

Rubber Securities issued 106,335 shares of stock. A total of 101,146 shares was held by the members of the du Pont family; 80,930 shares were held by Delaware stockholders, and 5,159 shares were held by others who were not stockholders in Delaware or Christiana. Thus, 95% of Rubber Securities stock was held by Delaware and Christiana stockholders. Rubber Securities Compa-

ny in December 1929 held 314,000 shares of United States Rubber common and 46,000 shares of preferred, or about 17% of the voting stock of 2,107,915 shares. It is admitted that this stock was voted as a unit at United States Rubber stockholders meetings.

The stock of Rubber Securities was closely held and kept intact until November 13, 1937 when, in anticipation of its dissolution, its stockholders received United States Rubber preferred and common stock on an approximate pro rata exchange for Rubber Securities stock. The reason for the dissolution of Rubber Securities, which was completed by December 1, 1938, was stated by Irenee du Pont to be a feeling among the stockholders that they would like to have something of tangible value on the stock exchange that they could borrow on as collateral and, further, the need for holding the group together had disappeared because they had the ear of management.

After the dissolution of Rubber Securities, the holdings of United States Rubber stock were held by individuals and members of the du Pont family. These holdings have remained substantially intact since the dissolution of Rubber Securities. On June 30, 1949 the members of the du Pont family held a total of 324,516 shares of United States Rubber common, or 18% of a total of 1,761,000 shares, and 75,619 preferred, or 11%, of a total of 651,000 shares. The record shows that there were 14,000 other stockholders in United States Rubber besides the holdings above described. United States Rubber has introduced evidence showing that from 71.7% to 76.-8% of United States Rubber stockholders were represented at the annual stockholders meetings for the years 1947–1949. At no time subsequent to the dissolution of Rubber Securities have the members of the du Pont family held more than 17% of the United States Rubber voting stock.

Irenee, Lammot and Henry B. du Pont transferred large blocks of their original holdings of Rubber Securities stock to

trusts for the benefit of their children wherein the Wilmington Trust Company was designated as the trustee. On June 30, 1949 the Wilmington Trust Company held approximately 150,425 shares of United States Rubber common and 17,736 shares of United States Rubber preferred in the various trusts so established. Thus, almost one-half of the family holdings in United States Rubber common stock are held by the Wilmington Trust Company, as trustee. Most of the trust agreements provided that stock in the corpus of the estate may be voted by the trustee only with the advice and consent of a designated Advisor. Twenty-one of these trusts are listed in Appendix A to the Amended Complaint.

In this connection the Government asserts that the Wilmington Trust Company is controlled by the du Pont family and this control directed the voting of shares of United States Rubber held by Wilmington Trust as trustee.

George Edmonds, President and Director of the Wilmington Trust Company, testified that the provisions regarding the holding and voting of securities underlying the trusts were entirely usual and in common use throughout the country; that specific or "blanket" approval by the Advisor to vote all the stock in a particular trust in favor of the management, provided there is no dispute, is required before the trustee will vote the stock; that where there is no contest for election of directors or other controversial question, the trustee follows the policy of voting for the management.

The members of the du Pont family hold 31,590 shares of voting stock in Wilmington Trust, and Christiana Securities hold 7,210 shares, constituting 24% of the total 161,150 shares of outstanding Wilmington Trust stock. The Raskob report lists the Wilmington Trust under the heading of "du Pont control". The government has introduced GTX 3 and 1276 to show that members of the du Pont family and their close associates have been and are directors of Wilmington Trust. As of June 1949, the board of Wilmington Trust consisted of twenty-two directors, seven were members of the du Pont family and three were their close associates.

Kuhn, Loeb & Co. had been issuing bankers for United States Rubber since 1917 and had been underwriters for about twelve issues of United States Rubber securities before 1927. It was in connection with the 1917 financing that Seger became a director in United States Rubber on recommendation of Kuhn, Loeb.

Beginning in October 1927 Irenee du Pont had a series of meetings with Charles B. Seger, whom he met for the first time in July and who was the President and Chairman of the Board of United States Rubber. Irenee du Pont testified that the first time he met him, Seger inquired whether he had called to obtain his resignation. Irenee du Pont replied that they had bought into United States Rubber to support him and give what assistance they could to effect an improvement in the financial setup of the corporation. He also testified that he was favorably impressed with Mr. Seger and that he felt reassured that conditions would improve with guidance from some one who had been "through the mill" in similar problems. He sent Seger a copy of the Lytle report and a copy of the du Pont bonus plan, with the suggestion as to the latter that Seger see John J. Raskob, who had no interest in United States Rubber, regarding his views on United States Rubber adopting some such plan.

When the syndicate made its investment Irenee du Pont at a meeting with Wiseman and Schiff of Kuhn, Loeb & Co., subsequent to his meeting with Seger. informed Kuhn, Loeb of the syndicate investment in United States Rubber and asked for their cooperation in improving its financial management. At Schiff's suggestion, Irenee du Pont and the Kuhn, Loeb representatives met with Seger. Irenee du Pont offered to help Seger solve United States Rubber's problems of excessive accounts receivable and inventories. Seger appeared receptive to the views expressed at these meetings.

After the meetings with Irenee du Pont, Seger invited him to become a member of the United States Rubber Board but he declined for the reason he did not want to undertake the burdens and feared the presence of a du Pont name on the Board might mislead the public as to the value of United States Rubber stock.

Early in 1928 when the price of crude rubber dropped from forty cents to twenty cents a pound, United States Rubber having a large inventory was faced with a possible inventory loss of almost two million dollars. This drop in the price of rubber reduced the value of the company's assets below the point at which payment of dividends was permitted under the terms of one of its note indentures, and the decline in the value of its assets made it imperative to conserve the company's cash for meeting approaching maturities on its borrowings.

Wiseman and Irenee du Pont testified that Seger was reluctant to recommend that no dividend be paid, but was eventually persuaded by Kuhn, Loeb to recommend to the Board that no dividend be declared. Seger, in a letter to the stockholders on April 5, 1928, explained the action of the company and stated that "except for the limitations imposed by the Indenture" there was no reason why the dividend should not have been declared at this time. Wiseman testified that Seger's reluctance to recommend non-payment of the preferred dividend strengthened the Kuhn, Loeb view that Seger needed help in running the company.

During the Spring and Summer of 1928 the price of crude rubber continued to decline and the company's loss of inventory value, plus a twenty million dollar indebtedness, created, concern among its creditors and it was feared that a receivership might result.

In April 1928 Lewis L. Strauss of Kuhn, Loeb prepared a plan for the issuance of new common stock by United States Rubber. Irenee du Pont also regarded the raising of new capital necessary. Seger, however, took no action regarding it.

In the Summer of 1928 the syndicate sold 27,600 shares of United States Rubber stock at a loss. Irenee du Pont testified the sale was made by the syndicate members for the reason that they suspected there might be a receivership and "that we had better sell some of the stock and reduce our commitments". In October 1928 the Guaranty Trust Co. threatened to cut off its credit to United States Rubber and several other banks expressed concern to Kuhn, Loeb about the continuance of credit to the company. Seger was finally persuaded that it was necessary to raise new capital, and at his request in October 1928 Kuhn, Loeb drafted another plan for the issuance of common stock. The issue of 728,412 shares of common was to be offered to the existing common stockholders on a share for share basis. Kuhn, Loeb invited other banking and brokerage firms to participate in the underwriting, including Laird, Bissell & Meeds, who were included at the request of Irenee du Pont.

Sir William Wiseman testified that as early as 1927, Kuhn, Loeb had come to the conclusion that Seger should be replaced as President because of his poor health, his difficulty in reaching decisions on pressing problems, and for the reason that United States Rubber was making a poor showing in comparison with its leading competitors.

Irenee du Pont, in November 1928, wrote the members of the syndicate informing them of the decision for the new issue of stock and suggesting that in order to improve the management the Board be enlarged by three additional members and to fill the two vacancies; that these appointees should be two from Kuhn, Loeb, two from the syndicate, and the proposed new president. In December 1928 Roger Winthrop and Sir Wiseman of Kuhn, Loeb and Henry Davis, for the syndicate, were elected members of the Board. In addition, it was contemplated that these members of the Board would become members of the Finance

Committee. Irenee du Pont testified that the decision to replace Seger as president became necessary because nothing had been accomplished to improve the weak financial structure of the company, and because of his unrealistic attitude in the dividend controversy and the new stock issue.

With the exception of H. F. and H. B. du Pont, all of the syndicate members decided to subscribe to the new stock issue. H. B. du Pont testified he was discouraged over the prospects of United States Rubber and did not wish to risk more capital in the company.

In the underwriting of the new common stock issue, Kuhn, Loeb allotted to Laird, Bissell & Meeds a 20% participation which was approximately the percentage which the syndicate members held in the common stock of United States Rubber. Wiseman testified this was a common arrangement. Thereafter, Laird, Bissell & Meeds and the syndicate members had an agreement whereby the syndicate members would receive a discount of $2.40 out of each $3.00 cost of underwriting their stock. The new stock was issued January 11, 1929 and the syndicate acquired 125,150 shares at a cost of over four million dollars.

Preceding the investment and issuance of the new stock, Irenee du Pont testified that the syndicate members had decided that if they were to take up their subscription rights to the new issue some safeguard against lack of proper financial management would be necessary and took "the position with Kuhn, Loeb that we should have some representation on a body which might be termed a finance committee so that we would have some control over the financial management of the company". This concern over the financial structure and the desire of the syndicate to assume that responsibility is reflected in several letters written by Irenee du Pont.

*Officers, Directors*

Wiseman testified that he and Mr. Schiff, his partner, urged Seger to become Chairman and that a younger and more active man be made President. Kuhn, Loeb were unable to find anyone whom they considered suitable and in November 1928 asked Irenee du Pont to try to find such a person.

Irenee du Pont testified that H. S. Meeds suggested F. B. Davis, Jr. to him and Davis stated that Meeds had advised him he might be approached by Irenee du Pont. Shortly after the suggestion of Meeds, Irenee du Pont saw Davis and asked if he would be willing to take the post if elected, and Davis accepted.

On January 5, 1929 Irenee du Pont wrote a letter to Schiff of Kuhn, Loeb, sending a copy to Seger and Davis stating he had found a suitable man for the office of President. That same month, at the request of Irenee du Pont, Davis met with Schiff and Wiseman of Kuhn, Loeb. Schiff and Wiseman introduced Davis to some of the directors—J. S. Alexander, H. R. Winthrop, Matthew Brush; and L. B. Gawtry. Wiseman stated that they were impressed with Davis' qualifications and concluded he was an excellent candidate for president. Mr. Schiff advised Irenee du Pont that Seger had no objection to bringing F. B. Davis into the situation, but that there was difference of opinion as to how this could be accomplished without unfavorably affecting the organization. Wiseman negotiated with Seger as to the terms of his retirement. Irenee du Pont in writing Wiseman January 11, 1929 stated he was in favor of continuing Mr. Seger's contract with United States Rubber and his salary payment "if it will assure the Rubber Corporation of his good advice based on many years' experience as head of that institution."

At a meeting of the Board on January 15, 1929 presided over by Wiseman, Seger resigned as President and Chairman of the Board, and F. B. Davis was elected President, Chairman of the Board and a director. Wiseman testified that Kuhn, Loeb, when sponsoring the election of Davis, did not know or inquire into the amount of stock held by the syndicate.

Prior to Irenee du Pont's letter to Kuhn, Loeb suggesting Davis as a suit-

able candidate for president, he had written to the Voting Trustees—H. S. Meeds, A. Felix du Pont, and Lammot du Pont—summarizing the steps regarding the central organization of United States Rubber which, as principal stockholders, the syndicate should advocate. Irenee du Pont indicated the recommended changes were to continue the body now known as the Executive Committee under the name of the Finance Committee to consist of five persons—two representatives of bankers, William Wiseman and James S. Alexander; two representatives from the syndicate, Henry Davis and William de Krafft; and the new president. Irenee du Pont stated: "(This would leave our group in control of those matters which will be delegated to the Finance Committee * * *)". (GTX 988.) A real Executive Committee was to be made up of not over eleven men familiar with United States Rubber operations headed by the president or one of the other principal employees, and the number and personnel of this committee to be subject to change on the advice of F. B. Davis, Jr. The evidence shows that the persons recommended by Irenee du Pont were elected members of the Finance Committee, and William de Krafft became its Chairman; that an Executive Committee was organized with F. B. Davis as Chairman and William de Krafft became a member the following year.

At the time F. B. Davis, Jr. was elected President, the syndicate's representation on the Board was one director—Henry Davis. In addition there were the two representatives from Kuhn, Loeb. There were fifteen members, including Seger, on the Board at this time.

F. B. Davis, Jr. was the President of the Viscoloid Company, a du Pont subsidiary, at the time he accepted the presidency of United States Rubber. In 1909 he had been in charge of the black powder division of du Pont, later becoming superintendent of the sporting powder division when Lammot du Pont was its divisional manager. Following the end of World War I, he was assigned to the du Pont Central Office as assistant in charge of salvage and later became superintendent of the Pyralin operations. He left du Pont because he was ambitious and felt there were too many bosses over him, going to General Motors as assistant in charge of its Saginaw Products Division where he remained until 1923. He was asked to return to du Pont by a member of the du Pont Executive Committee and accepted because, as he stated, du Pont had changed its organization to a decentralized type and because the compensation offered was larger than he was receiving. He became assistant general manager of the Pyralin Department, later its general manager, and was also made a du Pont director. The Pyralin Department was consolidated with the Viscoloid Company and in 1927 Davis became its president. After he became President of United States Rubber he continued as a director of du Pont until about 1941. He was also one of the incorporators of Rubber Securities, organized in December 1929. Irenee du Pont testified that F. B. Davis was known to all members of the syndicate and that therefore they were familiar with his record. He also said that he had discussed the suggestion of Challen Parker as president with the syndicate, but since none of the members knew him he withdrew the suggestion. Irenee du Pont stated that he felt it was a requisite that the new president be personally known so that they would know what kind of a man they were getting.

Both Davis and Pierre S. du Pont testified that while Davis was president of United States Rubber he visited with the du Ponts, particularly Irenee and Lammot. He discussed with them the affairs of United States Rubber, consulting with them regarding the financial side, because as he said, "that was the part of it that they were most vitally interested in", but did not seek their advice on management or the operating end except to report on accomplishments.

Prior to Davis becoming president, Lucius D. Tompkins, Vice President of the Tire Division in United States Rub-

ber, testified that it was a centralized organization and "was run by Mr. Seger as Chairman and President, and Mr. Homer Sawyer, Executive Vice-President". One of the first steps undertaken by Davis was to decentralize the organization and the commercial activities were conducted by separate and autonomous divisions, each under control of a general manager having full authority and responsibility as to manufacturing, selling, purchasing, accounting and research within his division, subject to the over-all policies decided by the Executive Committee.

Davis testified that the first thing he did on becoming president was to get acquainted with the Board, appraise the value of each individual member, and consult with them as to their desire to continue with United States Rubber; that he determined who would be most helpful to him and made up a proposed slate to be elected at the annual meeting. He testified further that he selected all the directors.

Davis testified that he not only discussed this proposed slate with the du Ponts but also with Sir William Wiseman of Kuhn, Loeb and "anyone else that seemed to me could be helpful in giving me advice on that subject". In addition, he stated he felt it was not only proper to discuss directors with important stockholders, but also with each member of the Board.

In March 1929, prior to the first meeting, Davis submitted his proposed slate to the members of the syndicate. This list consisted of twenty-eight names, some already members of the Board, and indicated that as to non-company representation, John W. Davis, and Samuel M. Nicholson desired to resign and that he did not favor continuing Lewis Gawtry. In addition he suggested that Henry L. Hotchkiss be dropped for reasons of age and Homer E. Sawyer be discontinued since he was relinquishing active duties with United States Rubber. He listed eight directors as outside representatives and three company representatives whom he considered desirable

to retain, and these were approved by the syndicate. The syndicate also approved three suggested additions for company representatives. Lammot du Pont replied to Davis' suggestions stating the syndicate members approved the retention of the men already on the Board; approved five of nine suggested additions to outside representatives; and stated in the event Gerard Swope, Victor M. Cutter and James A. Farrell would not serve as outside representatives, that the syndicate did not favor the suggestions made by Davis to substitute Carle C. Conway, Harold E. Talbott, or Lewis Gawtry.

Charles B. Seger and Gerard Swope did not wish to serve and Homer E. Sawyer and James A. Farrell were not elected. Lewis Gawtry and Carle C. Conway were elected directors on April 16, 1929 and August 6, 1929, respectively.

Davis testified that following 1929 when he became more experienced in United States Rubber operations there was no necessity for discussing changes on the Board with the du Ponts and syndicate members, but he did discuss the changes with every member of the Board to obtain their approval.

B. W. Doyle, a former Vice President of du Pont's Viscoloid Company, became a Board member in 1939; George P. Edmonds, a du Pont son-in-law and president of the Wilmington Trust, became a Board member in 1944; John L. Pratt was a director of General Motors at the time of his election to the Board of United States Rubber in 1937; W. P. Allen, a former vice-president and director of du Pont became a Board member in 1936; and H. E. Humphreys, Jr., a former employee of Delaware Realty, went on the Board in 1938. Allen, Doyle and Pratt were personally known to F. B. Davis. Between June 21, 1927 and June 30, 1949, a total of fifty-three men served on the United States Rubber Board, seven of whom were elected as temporary directors, leaving a total of forty-six regular members of the Board who served during this period at different times.

Davis and de Krafft did not get along together and eventually de Krafft resigned on June 30, 1938. Davis had previously met H. E. Humphreys, Jr., and thought he would be a suitable replacement. He asked Irenee du Pont whether Humphreys could be released from his duties as Secretary of Delaware Realty. Irenee du Pont approached Humphreys regarding United States Rubber, and when it was clear that he was interested his release was obtained and Humphreys was proposed by Davis as a member of the Board.

In 1942 Herbert E. Smith became President of United States Rubber when F. B. Davis resigned. Davis remained as Chairman of the Board and Chief Executive Officer. Smith had been an employee of United States Rubber for about fourteen years before the syndicate was formed. Smith testified that he had only a casual acquaintance with the three du Pont brothers. He stated that following his election he had discussions with the du Ponts and many other stockholders a few times a year regarding the financial situation in United States Rubber.

When Davis retired as Chairman of the Board on December 31, 1948, Smith became the Chairman and the office of President was filled by Humphreys.

In this connection Lammot du Pont Copeland on April 5, 1948 wrote to the three defendant individuals and George Edmonds about a discussion he and Wiseman had concerning the situation when Davis would retire. Lammot du Pont wrote to Davis asking what his views were and stated that he knew of no candidates for president, with a single exception. Herbert E. Smith testified that the "one man who had what it took, had all of the qualifications that I recognized to succeed me, was Elmer Humphreys".

After he became President, Humphreys stated that he discussed with the du Ponts certain proposals of importance involving financial matters, and followed their advice only half the time and acted contrary to their advice at other times.

*Executive Committee*

In a letter to the stockholders on April 23, 1929 Davis stated the Executive Committee was to be made up of those members of the organization who had been heretofore charged with the responsibility of some of the major activities of United States Rubber and would hold meetings each week to advise the president on all operations relating to manufacturing, selling, development and research. On April 23, 1929 the Executive Committee consisted of Edward J. Coughlin who had been with United States Rubber since 1892; William O. Cutter, an employee since 1916 who resigned from the Executive Committee in January 1930; William de Krafft who became a member in 1930; Ernest Hopkinson, an employee of United States Rubber since 1897; Herbert E. Smith, an employee since 1913; Lucius D. Tompkins, an employee since 1916; Eric Burkman, an employee since 1919; F. B. Davis, Jr., Chairman 1929. It is this committee which had the responsibility of approving contracts involving the sale or purchase of goods.

Six members of this Executive Committee were on Irenee du Pont's recommended list in addition to five others who were not elected. Irene du Pont had included all the company's chief executive officers on this committee for the reason he felt that experienced operating personnel should be members. Tompkins stated he was approached by F. B. Davis with respect to becoming a member and that thereafter Davis discussed with him appointments or recommendations to that committee. Tompkins testified that Davis indicated to him that length of service was one of the qualifications for membership. Aside from Davis and de Krafft, the other members of the committee had all been employees of United States Rubber for many years before 1929.

The replacement of Cutter by de Krafft as a member of this committee occurred

when Cutter was unable to perform the accounting functions inherent in a decentralized form of organization and there was no one in the company to take his place. Tompkins testified that when he and Davis were discussing this problem he told him that de Krafft impressed him as the type to undertake that responsibility. He testified he did not know that others had also considered de Krafft suitable for the post. De Krafft remained a member of the Executive Committee until his resignation in 1938.

*Finance Committee*

The old Executive Committee of United States Rubber served the functions of a Finance Committee during the Seger regime and when Davis became president it became the Finance Committee. Its members on April 23, 1929 were James S. Alexander, F. B. Davis, Henry Davis, and Sir William Wiseman. William de Krafft became a member in January 1930 when James S. Alexander's membership ended. Charles H. Sabin and D. Dwight Douglas were also added to the committee the same year. In November 1948 the following were members of the Finance Committee of United States Rubber: Colgate W. Darden, Jr., F. B. Davis, Jr., Henry Davis, Bernard W. Doyle, George P. Edmonds, H. E. Humphreys, Jr., Herbert E. Smith, and Sir William Wiseman.

On April 8, 1947 Lammot du Pont Copeland wrote Pierre S. du Pont, stating that he, Copeland, and Lewis Strauss had resigned as members of the Board and Finance Committee, that Colgate Darden was elected to fill his place but that the bankers' nominee remained open on the Board, and that Wiseman had suggested Schiff be appointed which idea was not accepted. He stated that because Wiseman was frequently absent, the management group on the Finance Committee were a majority, and since United States Rubber was again pretty well in debt, the Finance Committee should be strong and play a dominant part in watching the finances. At that time the Finance Committee was composed of three management representatives, F. B. Davis, H. E. Smith, and Elmer Humphreys; and three

non-management representatives, B. W. Doyle, Henry Davis and Sir William Wiseman. Copeland testified that his concern was that stockholder representation on the Finance Committee constitute a majority in order to maintain the proper balance between the Finance Committee and the Executive Committee; otherwise, a majority of management representatives on the Finance Committee would be approving their own actions, which "seemed like a weak position". In answer to this, Pierre S. du Pont replied, stating:

"I do not fear the result of the management group being in the majority. If such fear is real, we should change the management."

Pierre S. du Pont testified that he used the noun "we" as meaning all the stockholders. Copeland in his letter to Pierre S. du Pont had suggested that Darden and Edmonds become members of the Finance Committee but, since Darden's other interests were heavy, he suggested that Davis be urged to put Edmonds and Whelpley on that Committee. Irenee du Pont wrote Copeland April 21, 1947 stating that Darden should be given a chance to refuse, that Edmonds had his approval, and that he did not know Whelpley. Edmonds was elected to the Board and he and Whelpley became members of the Committee.

*Incentive Plan*

The stockholders of United States Rubber adopted an executive's incentive compensation plan in 1929 by a vote of 1,245,269 to 100. A study of several plans was made before the Managers Share Plan was finally adopted. The Plan provided that the Company should issue 100,000 shares of its common stock at $35 per share and the trustees would issue to the company 100,000 trust shares without par value, representing ownership of the assets to be held by the trustees of the plan. The plan further provided that the company should from time to time sell the trust shares to employees occupying responsible positions, including directors, actively engaged as officers, employees or members of the Ex-

ecutive Committee, to be chosen by a Special Committee of directors in such quantities as the committee determined and on such terms of payment, interest and prices as fixed by the Finance Committee of United States Rubber.

On December 20, 1929 Irenee du Pont wrote to Lammot, A. Felix and H. B. du Pont, H. S. Meeds and Henry Davis, officers of Rubber Securities, that he had discussed with F. B. Davis and William de Krafft the question of apportionment of Managers Securities stock and the setting aside of some 3000 shares of Rubber Securities stock for Davis to be paid out of bonuses voted him by Rubber Securities.

The members of the Special Committee appointed to act upon the allotment of trust shares from 1930 to 1949 were:

Matthew Brush, Chairman, 1930–1936
Lewis L. Strauss, Chairman, 1936–1947
Bernard W. Doyle, 1947–1949
Sir William Wiseman, 1930 to date; Chairman since 1947
Henry Davis, 1930 to date
F. B. Davis, Jr., 1948 to date

Wiseman testified that he consulted with Irenee du Pont with respect to the original allotment to be made under the plan in 1930 for the reason he had more experience than possibly any of the directors of United States Rubber and also asked him what allotment should be made for F. B. Davis. Irenee du Pont stated Davis should receive 15,000 shares. On March 28, 1930, Davis was allotted 20,000 shares by the Special Committee and Wiseman advised Irenee du Pont of that action. This action of the Special Committee was approved by the Rubber Securities Board and Henry B. du Pont testified that when there was an increase in Davis' allotment from 15,000 to 20,-000 shares it obviated the necessity of Rubber Securities assigning stock to him.

Irenee du Pont stated that at the time F. B. Davis went to United States Rubber his salary should not be less than Seger was receiving. The salary was fixed at that figure by a special sub-committee appointed for that purpose. Wiseman testified he did not know that Irenee du Pont had discussed with Davis the probability that his salary would be the same as Seger's. In 1937, after a study by a sub-committee of the Finance Committee, the company entered into an employment contract with Davis for a term of six years effective January 1, 1938 which remained in effect until his retirement in 1948. This action was adopted by vote of the stockholders. The contract fixed his salary at a definite figure and made him ineligible for any further participation under the incentive plan.

There is no evidence that the syndicate, or Rubber Securities Co., or the du Pont family in the aggregate ever had voting control of United States Rubber. The Government, moreover, has failed to show that the United States Rubber stock held by the defendant individuals and the members of the du Pont family was acquired with the intent to create a protected market for du Pont or for United States Rubber, or was ever used for that purpose. While much of the rubber stock acquired by the syndicate continues to be held, directly or indirectly, by members of the du Pont family there is no proof of any agreement or understanding that it will continue to be so held, or that it will be voted in concert.

## Trade

Prior to 1910 du Pont had confined itself principally to the manufacture of military and commercial explosives. Nitrocellulose, a nitrated cotton, was the principal raw material used by du Pont in the manufacture of both military and commercial smokeless powder. Du Pont sold its military powder largely to the United States Army and Navy. By 1908, these principal customers had erected and were operating plants of their own and du Pont foresaw the ultimate loss of its smokeless powder business and recognized that diversification and expansion into other fields was essential to its progress.

To this end in 1908 the Executive Committee of du Pont appointed a committee to report "what additional steps they would recommend, in the direction of developing further uses for guncotton or any of the other products of our smokeless powder plants." The Development Department whose immediate jurisdiction it was to explore these fields, made an investigation of new outlets for the excess nitrocellulose in 1909 and found the most important industries in order of size were celluloid, artificial leather, artificial silk, and lacquer, which du Pont was already producing.

In 1910 du Pont purchased the Fabrikoid Company, the largest manufacturer of artificial leather, which in 1913 was incorporated as the du Pont Fabrikoid Company.

During World War I, du Pont plant facilities, sales and profits in the powder and explosives fields expanded and its net profits from all business during 1915–1918 totaled approximately $232,000,000. In addition during 1917 the du Pont Company, anticipating the end of World War I and the cessation of orders for powder and explosives, determined to utilize part of its war profits to expand into fields other than gunpowder and explosives.

In September 1915 du Pont purchased the Arlington Company, one of the two largest celluloid companies in the United States.

In June 1916, the du Pont Fabrikoid Company, manufacturers of artificial leather, purchased the entire stock of the Fairfield Rubber Company, producers of rubber coated fabrics for automobile and carriage tops. The principal customer of Fairfield was the Ford Motor Company, which accounted for 60% of Fairfield's total business. Fairfield was dissolved and the entire stock was taken over by the Fabrikoid Company.

A report of the Development Committee of du Pont in August 1916 "recommended the paint and varnish industry shall be accepted as a suitable expansion of operations at Parlin" and it further

recommended "to acquire by purchase one or more suitable going concerns * * * with a view to transfer of operations to Parlin at the first opportune time."

In March 1917, du Pont purchased Harrison Brothers & Company, Inc. manufacturers of paint, varnish, acids, and certain inorganic chemicals used in paint manufacture. The Harrison Company owned 52% of the capital stock of the Beckton Chemical Company, the other 48% being owned by Cawley Clark & Company, a color manufacturer. In the middle of 1917 Harrison purchased Cawley Clark & Company, including its interest in Beckton Chemical Company. In 1917 the Bridgeport Wood Finishing Company, a varnish manufacturer, was acquired by Harrison.

After considerable study, du Pont in February 1917 decided that consideration of new industries at that time should be confined to five chemical fields: Dyestuff and allied organic chemicals; vegetable oil industry; paint and varnish; water soluble chemicals; and industries related to cellulose and cotton purification.

Thus by the end of 1917, preceding the investment in General Motors, du Pont had made investments in companies manufacturing artificial leather, celluloid, rubber coated goods, paints and varnishes. In 1917 du Pont was engaged in the production of paints, varnishes and related products although it was still principally producing powder and explosives and manufactured few items used in the production of automobiles; among these were celluloid, used in making side curtains, and artificial leather, used in seats and upholstery.

Following the investment in General Motors, du Pont in 1918 purchased a majority of the common and preferred stock of Flint Varnish & Chemical Works. This event was preceded by a letter from Raskob to Carpenter, Vice President of du Pont. Raskob stated Durant had told him that W. W. Mountain, President of Flint, had approached him about consolidating Flint with Harrison, since Moun-

tain knew du Pont had bought a substantial interest in General Motors and was interested in the paint industry; that Mountain felt he would lose a valuable customer, General Motors. Durant told him the du Ponts would not consider a consolidation but suggested "that they deliver control of the common stock to du Pont's" and that Willys-Overland, Mountain and General Motors retain a 20%–25% interest. This was effected— du Pont purchased 80% of the common stock; Willys-Overland, Mountain, and General Motors acquiring 20%, which was later purchased by du Pont. Flint was dissolved in 1924. At the time of the du Pont investment, Flint made products primarily used in the finishing of railroad equipment and automobiles.

A few months after the Flint investment, du Pont acquired certain assets of the New England Oil Paint & Varnish Company.

A report by the Development Department in 1920 showed that existing facilities at Flint were insufficient to meet the demands of General Motors and a considerable volume of that business was being diverted to competitors. In April, 1920, W. S. Carpenter, Vice President of du Pont, reported to its Executive Committee, that the Sales Department anticipated increased orders from General Motors and other automobile companies, prompting an interest in an additional plant, that he favored acquisition of The Chicago Varnish Company. That year du Pont acquired certain assets of the Chicago Varnish Company, and in 1934 it acquired the assets of Mountain Varnish and Color Works.

In addition to the above acquisitions, du Pont also made investments in and acquisitions of other companies as set forth in ¶¶ 88, 90, 91, 92, 94, 95, 96, 98, 99 100, 101, 102, 103 and 104 of the Amended Complaint.

It is admitted that du Pont is a substantial producer in the United States of explosives, powder and chemicals and that its principal manufacturing operations are conducted throught ten departments.

These departments and their products are:

*Electrochemicals:* Electro and industrial chemicals, including sodium, cyanides, peroxides, chlorinated solvents for metal cleaning, dry cleaning and extraction, refrigerants, formaldehyde, polyvinyl alchohol and acetate, ceramic decorations, and furfural products;

*Explosives:* Commercial explosives, blasting accessories, miscellaneous chemicals, liquid and solidified nitroglycerin, oil and gas well torpedo service, military and sporting powders, and commercial nitrocellulose.

*Fabrics and Finishes:* Pyroxylin, synthetic resin, neoprene and rubber coated fabrics, and processed plastic sheeting, window shade fabrics, rug underlay, and synthetic rubberized tubing, protective and decorative finishes for all industrial, automotive, marine, transportation, and household purposes, wire enamels, automotive maintenance specialties, adhesives, plasticizers, and pyroxylin solutions.

*Film:* Cellophane, cellulose bands, cellulose sponges and sponge yarns, cellulose acetate film, and polythene film.

*Grasselli:* Inorganic and organic acids and heavy chemicals, zinc and zinc products, fungicides, seed disinfectants, household sprays and dusts, insecticides, animal remedies, weed killers, adhesives, wood preservatives, and chemicals for the textile, water purification, paper, leather, steel and food industries.

*Organic Chemicals:* Dyestuffs, tetraethyl lead, neoprene, ethyl alcohol, camphor, and other organic chemicals for the rubber, petroleum, textile, paper, perfumery and other industries.

*Photo Products:* Motion picture, X-ray, portrait, lithographic, and micro films, intensifying and fluoroscopic screens, photographic printing papers, processing chemicals, and television phosphors.

*Pigments:* Titanium dioxide, extended titanium pigments, lithopone, dry colors, copperas, titanium metal and "Erifon" flame retardant.

*Polychemicals:* Ammonia, urea, urea fertilizer compounds, methanol, high alcohols, solvents, organic acids, hydrogenated products, antifreezes, food chemicals, acrylic plastics, polyvinyl butyral, polythene, cellulose nitrate and cellulose acetate plastics, nylon molding powder and monofilaments, polytetrafluoroethylene, and fabricated articles.

*Rayon:* Viscose rayon yarn, staple, and tire yarn, acetate rayon yarn and staple cellulose acetate flake and vinyl acetate, nylon yarn, staple and flake.

It is admitted that General Motors is the largest customer of the Fabrics and Finishes Department, that its purchases from that department exceed its purchases from any other department of du Pont, that the total purchases General Motors makes from this department exceed its total purchases from all other departments, and that the sales made to General Motors by it are a significant part of its total business.

General Motors admits its principal business consists of the manufacture of passenger cars and trucks, including various parts and accessories. Paragraph 14 of the Complaint alleges it is the largest producer of passenger cars and trucks in the United States, constituting 38% of the industry total in 1947 and 43% for the period 1937–1941. General Motors also manufactures diesel locomotives, ball bearings, roller bearings and a wire range of household appliances, such as electric refrigerators and heating systems. General Motors operations are conducted through the following four divisions:

*Car, Truck and Body Divisions*— Buick, Chevrolet, Cadillac, GMC Truck and Coach, Pontiac, Buick-Oldsmobile-Pontiac Assembly, Fisher Body and Oldsmobile.

*Accessory and Parts Divisions*—A C Spark Plug, Aeroproducts, Brown-Lipe-Chapin, Central Foundry, Delco Products, Delco Radio, Delco-Remy, Detroit Transmission, Guide Lamp, Harrison Radiator, Hyatt Bearings, Inland Manufacture, Moraine Products, New Departure, Packard Electric, Rochester Products, and Saginaw Steering Gear.

*Household Appliances*—Delco Appliance and Frigidaire.

*Engine Divisons*—Allison, Diesel Equipment, Cleveland Diesel Engines, Electro-Motive, and Detroit Diesel Engine.

United States Rubber admits it is the largest manufacturer in the United States of certain rubber products, other than tires and tubes. It conducts its business through five divisions: Tire; Mechanical Goods; Footwear and General Products; Naugatuck Chemicals; and Textile. General Motors and United States Rubber admit that United States Rubber is the principal supplier of tires and tubes to General Motors as original equipment on the cars produced and sold by General Motors.

General Motors admits that it sells truck and passenger cars to du Pont and United States Rubber.

Paragraph 18 of the Amended Complaint alleges, and the defendant manufacturers admit, that the assets, sales volume and net income after taxes for the year 1947 are substantially as follows:

|  | Assets | Sales | Net Income |
|---|---|---|---|
| Du Pont | $1,438,000,000 | $ 783,000,000 | $120,000,000 |
| General Motors | 2,473,000,000 | 3,815,000,000 | 288,000,000 |
| U. S. Rubber | 348,000,000 | 581,000,000 | 21,000,000 |
| Total | $4,259,000,000 | $5,189,000,000 | $429,000,000 |

Three phases of alleged trade control, apart from those specifically considered under Fabrics and Finishes, Tetraethyl Lead, Kinetic Chemicals, Synthetic Rubber, Antifreeze, miscellaneous products and Tires and Tubes, have been accepted by the Government. They are (1) exchange of data, figures, and information on suppliers by certain officers and employees of du Pont and General Motors, including requests and inquiries by certain officers of du Pont on volume of trade conducted with General Motors; (2) the use of the General Purchasing Committee as a medium in alleged trade

control; and (3) Fisher Body's trade with du Pont, and the use of the discount and rebate system in purchases and sales between the defendant manufacturers with special reference to Fisher Body.

*Exchange of Data, Figures and Information on Suppliers by certain officers and employees of du Pont and General Motors, including requests and inquiries by certain officers of du Pont on volume of trade conducted with General Motors*

Defendants admit that on occasion and for various purposes du Pont employees requested and obtained information from General Motors as to its suppliers and certain statistics.

During the time Durant was President, J. A. Haskell, former Sales Manager and Vice President of du Pont, then a member of the Executive Committee of General Motors, kept du Pont informed of General Motors affairs in order to better discharge the financial responsibility du Pont had assumed. The Government's evidence concerning Haskell shows that he was in contact with du Pont sales executives.

On April 15, 1918 Haskell wrote to William Coyne, Vice President of du Pont Sales, reporting that a conference had been held with General Motors car division managers and that the manager of the Oakland Division, Warner, had felt "it would be desirable to get each of the divisions using artifical leather and other material such as Pyralin" samples to see what was being used. Haskell said this would "pave the way for perhaps a more general adoption of our material" and suggested du Pont place itself in position to furnish Fabrikoid of required quality and consider how best to promote its use and adoption by the car companies. A copy of this letter was sent to Pierre S. du Pont and John Raskob. The text of this letter shows, the question under consideration was whether the General Motors Division should adopt the use of artificial leather for upholstering. In fact the General Motors Divisions did not adopt the use

of artificial leather for upholstery but continued to use genuine leather.

Shortly thereafter, at the request of the sales agent for du Pont Fabrikoid, Haskell provided him with a complete list of the firms comprising the General Motors organization.

In May 1918 Coyne in a letter to C. L. Petze, Director of Sales at du Pont Fabrikoid, reported on a discussion he had with Haskell regarding General Motors requirements for pyralin sheeting. He stated that Haskell agreed with him that du Pont could not afford to jeopardize its business with other motor car companies by giving General Motors preferential treatment, but that Haskell thought "a continuation of the present policy should result in their securing practically all of the business with General Motors without jeopardizing its business with other manufacturers". In addition, Coyne stated Haskell asked he be kept advised periodically "as to the business shipped and booked with the different motor branches of General Motors and also advise him what proportion of our business is going elsewhere," that " * * * With this information in his possession he will be able to keep in touch with the relations between the Arlington Works and the General Motors Company." (GTX 293.)

On June 15, 1918, one of the sales managers at du Pont sent Haskell information regarding pyralin sheeting sales to General Motors and the amount of General Motors business placed with du Pont competitors.

Car division managers including Olds Motor Works, GM Truck, Cadillac, Oakland Car Co. made reports to Haskell on purchases of artificial leather and yardage for top and side material for the period 1917–1918. GM Truck reported that it purchased all its artificial leather from du Pont. Other divisions of General Motors reported that they had purchased varying amounts of artificial leather from du Pont and from several of its competitors. For example, Cadillac

purchased the major share of its requirements from two competitors of du Pont, Pantasote Company and Hodgman Rubber Company. On July 12, 1918 Haskell received from du Pont Fabrikoid a report of General Motors yardage purchases for the month of June 1918.

J. S. O'Rourke of Oakland Motor in a letter to its manager, Warner, stated that purchases of artificial leather were being made from du Pont Fabrikoid and L. C. Chase and that the product of the latter company was superior to du Pont's, but upon being advised of the trouble had with the du Pont product, du Pont had sent a representative to investigate and another shipment had been received on which O'Rourke would report. Oakland, according to O'Rourke's report, had purchased small amounts of artificial leather from du Pont and substantial quantities from L. C. Chase, and also had purchased top material and curtain material in substantial amounts from competitors of du Pont.

The Vice-President of du Pont Fabrikoid wrote a letter to Haskell on July 3, 1918 stating that if they were ultimately to furnish all or the greater part of the top material for Chevrolet and General Motors cars it might be better to have the users agree upon a uniform shade and was writing to him because he thought Haskell would put the request into proper hands.

On November 18, 1919 du Pont Fabrikoid submitted a report to the directors of the company regarding a contract made to supply yardage to Buick. This report stated that prior to the company's acceptance of General Motors contracts, the Fairfield plant was to all intents and purposes a "one-customer" plant (Ford Motor Co.) and it had been difficult to interest manufacturers of higher grade cars; that following the contracts with Buick, Chevrolet, Oldsmobile, and Oakland, they were placed in the position of writing contracts in other directions "at considerably higher prices than" the General Motors contracts. In addition, Petze, the Vice-President, reported that Pierre S. du Pont had instructed that prices for the Buick contract be quoted as low as cost since he had been advised that due to du Pont's relations with General Motors competitors were quoting abnormally low prices.

In 1920 the manager of du Pont Fabrikoid's Statistical Bureau wrote to the Treasurer of General Motors stating that he was not receiving "the statistical information formerly received from Detroit regarding purchases of Leather Substitutes and Rubber Cloth by the several units of General Motors" and asked whether there was any reason why this information which was statistically valuable to du Pont could not be continued. Later the same year the manager wrote to Haskell acknowledging receipt of data from Olds Motor Works on its purchases of Leather Substitutes, Rubber Cloth and Mohair top material from December 1919 to May 20, 1920 and expressed his appreciation to Haskell for securing the information.

Pierre S. du Pont, then President and Chairman of the Board of General Motors, inquired of Lammot du Pont, Vice-President of du Pont, whether General Motors was taking its entire requirements of du Pont products from du Pont. Lammot du Pont on August 10, 1921 replied that they were not, listing seven divisions of General Motors and covering purchases of paint, varnish, fabrikoid, rubber cloth and transparent pyralin, stating where du Pont was enjoying all the business, where "no reason" appeared for withholding business, and "good reason" when withholding of business from du Pont was logically explicable. Pierre S. du Pont replied stating it appeared from the summary that Flint paint and varnish and fabrikoid were doing pretty well with General Motors and "that with the change in management at Cadillac, Oakland, and Oldsmobile", he thought du Pont should be able to sell substantially all the paint, varnish and fabrikoid products needed, further he thought a "drive for the Fisher Body business" should be made. Lammot du Pont replied that there appeared to be no real reason why Fisher

Body had not used Flint Varnish Co. products.

R. R. M. Carpenter of du Pont on October 7, 1921 addressed a letter to Pierre S. du Pont, President of General Motors, stating that while he knew that he personally could take no action, he wanted to know whether he was opposed to the policy of presenting to General Motors the subject of entering into negotiations to supply all the artificial leather and rubber goods on a mutually advantageous basis. He suggested this for two reasons: that du Pont was at a disadvantage owing to it its connection with General Motors since other artificial leather companies were quoting "ridiculous prices" to General Motors believing that "du Pont would take all the business anyway" which forced du Pont to accept the business at a loss; and if du Pont could secure all the artificial leather and rubber goods business, their plant could be operated on an economical basis resulting in lower costs which would operate to General Motors' benefit. There is no evidence that any arrangement of the kind described by Mr. Carpenter was ever made. In 1923 a somewhat similar proposal was made by du Pont to the General Purchasing Committee of General Motors and was rejected.

During the latter part of 1922, Lammot du Pont, Chairman of Flint, directed a letter to Fred Fisher, President of Fisher Body. This letter stated that in view of the stock ownership relation between Fisher Body, Flint Varnish, General Motors and du Pont, it would seem that Flint should be enjoying a large part, if not all, of Fisher Body's paint and varnish needs unless a good reason existed for not having it. He assured Mr. Fisher that Fisher Body orders would be given preference over those of any other customer, except General Motors, whenever contract conditions were equal between Fisher and Flint's other customers.

In this same period, Pierre S. du Pont, President of General Motors, wrote to Lammot du Pont, a member of the General Motors Board, stating he was considering Fred Fisher, already a member of the Board, as a member of the Executive Committee. As the reason for suggesting the membership of Fisher, he stated that Fisher Brothers had brought up the question of their future relations with General Motors, expressing a desire for closer association, and requesting consideration for an exchange of Fisher Body common stock for General Motors shares. He stated he had the approval of ten directors for such closer association with General Motors, and wanted the opinion of the members of the Board on adding Fisher and C. S. Mott to the Executive Committee. At this time General Motors owned 60% of Fisher Body, the Fisher brothers owned 20%, 10% was owned by interests friendly to Fisher, and the balance was owned by others. Pierre S. du Pont stated that a closer association and closer cooperation between the two corporations would be of great benefit. Lammot du Pont replied, approving, and stating in addition that such closer association would be desirable, suggesting merely that it might be advisable to hold the election of Fisher coincident with the arrangements on consolidation so it would not appear that an important General Motors executive was personally interested in a controlled subsidiary. There is no evidence that the proposal to place Fred Fisher on the General Motors Executive Committee was related in any way to the effort of Lammot du Pont to persuade the Fisher Body Company to use the products of the Flint, Varnish & Color Works.

Pursuing his initial effort to secure the Fisher Body business, Lammot du Pont again wrote to Fred Fisher on the subject of paint and varnish and again referred to the "close stock relationship of the companies", making it seem "ridiculous that no business should be done between Flint and Fisher." Eventually an exchange of telegrams took place between the two and a meeting was set between them. Lawrence Fisher, who met with Lammot du Pont as the

result of this exchange of telegrams, testified that the Fisher Body Division never did use the products of the Flint, Varnish & Color Works to any significant extent.

During the year 1921 Felix du Pont, Vice President of the Cellulose Products Department of du Pont, wrote to its Executive Committee reporting that the sales department was securing for Fairfield all the General Motors orders for rubber coated fabrics. He stated that both the sales and production departments had concentrated on General Motors and that today Fairfield was "solid" with General Motors, that with the "community of interest" existing between du Pont and General Motors he thought a plan should be worked out to make this a permanent arrangement so that the profits from manufacture could be retained. He stated that the latent resentment of the General Motors units encountered by du Pont in selling had been overcome since du Pont had started a fixed program of giving the best product, which several of the General Motors Divisions had considered to be equal to or superior to those of competitors.

On February 12, 1923, W. P. Allen, General Manager of the Cellulose Products Department, reported to the du Pont Executive Committee on the present status of General Motors relations with respect to Duco, Fabrikoid, and auto top material. He reported that several of the car divisions had expressed a keen interest in Duco but that they were unwilling to come to a decision until after extended experimentation and suggested that in view of this an aggressive campaign with other leading motor car manufacturers to test the material, who were anxious for du Pont to start experimental work with them, be adopted even though du Pont felt "under considerable obligation to General Motors in the development of this material on account of the assistance they had rendered". Allen stated the General Motors units were being furnished all leather substitutes and top material by Fabrikoid.

During 1923 Lammot du Pont wrote H. H. Rice, Manager of Cadillac, asking whether Flint could supply varnish to it if they could manufacture a varnish as good or better than that presently used by Cadillac. Rice replied, indicating Cadillac was already using Flint's primer color and finish varnishes on Cadillac chassis, but as to enamel Cadillac was not ready to make a change since Flint's enamel had not as yet passed the tests. Lammot du Pont expressed the hope that a modified Flint enamel would soon prove satisfactory. Later he again wrote Cadillac, stating he had heard nothing from Rice and that it was to the advantage of both General Motors and du Pont to have Flint products used 100%.

To this Rice replied that Cadillac was anxious to use Flint products but was cautious in changing paints only after long trial and felt that as Flint material proved itself it was expected to be adopted by Cadillac.

There are many letters in the record involving requests made to John L. Pratt by du Pont employees for information and assistance covering the years 1922–1934. Pratt had a personal feeling of gratitude toward du Pont for what it did in saving Durant and General Motors from bankruptcy in 1920, and was inclined to do favors for his friends when, as he testified, it involved no injury to General Motors.

John L. Pratt had been an employee of du Pont in 1905 and met Durant in 1917, doing some personal work for him. In 1918 he was in charge of du Pont's motor development section, which was doing some research for Durant. In the Spring of 1919 Durant asked Pratt to work for him. Pratt left du Pont in the Fall of 1919 and became Durant's general assistant. In late 1922 he took over Alfred Sloan's position as Vice President in charge of the accessories Division Companies of General Motors. He became a General Motors vice-president and director in 1921, a member of the

Executive Committee in 1924, and was chairman of the General Purchasing Committee from 1924 to 1929.

On October 23, 1922, MacGregor of the du Pont Paint Department, wrote to Pratt for assistance regarding getting a share of the up-keep paint for Hyatt Roller Bearing Company, since he had been unable to secure any orders from Weiss, its purchasing agent. Pratt replied stating he had written to the General Manager of Hyatt to look into the situation and asked whether the quality had been improved so that du Pont had a paint of the quality, price and service equal to other manufacturers which he could "conscientiously recommend" to General Motors, and if so he would gladly do so. The General Manager of Hyatt replied to Pratt enclosing a copy of the purchasing agent's memorandum which stated that Hyatt had been using du Pont paint except the undercoat, which several years ago proved to be unsatisfactory, but since receiving the General Manager's request he had inquired further into it and "regardless of the wishes of the Paint Department" would purchase the du Pont product which he felt would serve the purpose equally as good. The dollar amount involved was about $1500 per year.

On March 22, 1924 Harrington of du Pont's Dye Stuff Department, who had known Pratt for about eighteen or nineteen years wrote to him about the fading of Cadillac upholstery and inquired whether du Pont could possibly offer its service to Fisher Body as to dyes. In his reply Pratt stated that "the Fisher Body outfit is pretty difficult to deal with" and did not know how to advise Harrington in approaching them. Pratt testified that he talked with Fisher about the problem. Five years later, on January 29, 1929, Harrington again wrote Pratt that General Motors frequently rejected fabrics because of the dyes and inquired whether it would be helpful if du Pont offered the services of its dye laboratories to General Motors. Pratt replied he thought it a "constructive" suggestion and sent Harrington's

letter to Fisher, head of Fisher Body, and asked that if he agreed he would be glad to make the arrangements. Fisher replied that they didn't dare "dictate" to the manufacturers regarding dye.

In August 1924, Z. Phelps, head of the Development Department of du Pont wrote Pratt whether he could conveniently find out the total quantity of ethyl alcohol used by General Motors, because du Pont wanted to find an outlet for a small surplus instead of selling it on the open market. Pratt replied he would obtain the information but that General Motor's requirements were small. In reply to Pratt's inquiry, James Lynah informed him that 75,000 gallons a year would be required by General Motors and 50,000 for Fisher Body and this information was transmitted by Pratt to Phelps.

In 1925, H. F. Brown, Vice President of du Pont, wrote to Sloan informing him that du Pont and Kentucky Alcohol Corporation had formed Eastern Alcohol Corporation to manufacture industrial alcohol; stated that a news clipping had appeared concluding that glycerin had an advantage over alcohol as an antifreeze; that Kentucky Alcohol wanted to know whether General Motors was giving their official approval to such publicity, and, if so, "that their attention be called to the interest which the du Pont Company will have in the future" in the manufacture and sale of alcohol. To this Sloan replied that as a corporation, General Motors could take no position in the matter and must be guided by the facts in the case; that alcohol had been discovered to have a bad effect on Duco finish, used extensively by General Motors units, and therefore he would, out of necessity favor glycerin.

In 1926, Pratt wrote to F. LaMotte, Director of Purchases at du Pont, that after study General Motors had concluded that Prestone, an antifreeze manufactured by Union Carbide, was the most satisfactory mixture on the market and that General Motors was recommending its use. Thereafter, Sloan wrote to J. B. Jackson of General Motors Research

Laboratory requesting information regarding the amounts of glycerin and alcohol used in antifreeze mixtures and their respective merits. The Laboratory report specified several points favoring glycerin and Pratt conveyed the information to du Pont.

In an exchange of letters between Sloan and the Chief Engineer of Chevrolet, Sloan suggested that the Chevrolet instruction book simply state facts on antifreeze and omit the words "are to be preferred". The Chevrolet instruction book eliminated the paragraph expressing preference for glycerin.

In October 1926 du Pont began production of ethyl alcohol. General Motors was approached as an outlet and was also requested to ascertain to what exten gylcerin antifreeze might cut into the use of alcohol as an antifreeze. In addition, Phelps of the du Pont Development Department, asked Pratt to find out whether the shortcomings of glycerin as an antifreeze, as reported by du Pont, could be verified by the General Motors laboratory.

James Lynah, the Executive Secretary of the General Motors laboratory, reported to Pratt in November 1926 that as alcohol-water solutions were recommended for any class of service, and in view of the indifference toward Prestone, it was evident that General Motors divisions would largely employ the alcohol solution as an antifreeze. Lynah further stated that he had written Phelps regarding price considerations for volume purchases, and if that could be obtained, he would ascertain the requirements for the divisions.

Phelps again wrote Pratt stating some of the General Motors divisions, particularly Cadillac, were recommending glycerin instead of alcohol, although Buick recommended the use of alcohol. In the following month Cadillac recommended that only alcohol be used.

During this period when du Pont was seeking General Motors endorsement of alcohol for use as an antifreeze, glycerin manufacturers such as Armour & Company were similarly seeking General Motors endorsement of their product for use as an antifreeze.

In December 1926 Sloan advised Pratt that the General Technical Committee of General Motors, approved by the chief engineers of the car divisions, had decided on the policy of pointing out there were two antifreeze materials—glycerin and alcohol—and that the sole disadvantage of alcohol was that when spilled it would disfigure the finish and that glycerin was satisfactory if used in strict accordance with the manufacturers recommendation. In December 1926 Sloan wrote Pratt that he had looked over the file of correspondence Pratt had with du Pont on the question of alcohol and glycerin, and that with the decisions reached by the General Technical Committee, the new instruction books would contain a statement setting forth the advantages and disadvantages of both. The record shows that du Pont attempted in 1926, 1927 and 1928 to sell ethyl alcohol to General Motors. In each of these years its bid was rejected by General Motors Purchasing Committee.

On January 9, 1926 James Elms of the Paint and Varnish Department of du Pont wrote to Pratt about the Delco-Light Company, one of the accessory companies of General Motors. He stated that Delco-Light had been purchasing rubber and finish varnish from Lowe but that Lowe had been unable to solve a paint problem and du Pont had been called in; that the problem was solved and du Pont received an order from Delco-Light but before delivery it had been cancelled in order to give Lowe another opportunity. Biechler, General Manager of Delco, wrote Pratt that Lowe had come up with a satisfactory enamel, but continued that the manufacturing, chemical and purchasing divisions felt they would be in better hands to deal with du Pont than Lowe and would be sure to advise him of this within a few days. To this Pratt replied that in view of the sacrifice du Pont made for General Motors in 1920 and 1921, he felt where "conditions are equal from the

standpoint of quality, service and price, the du Pont Company should have the major share of those items" but that this was his personal sentiment and that Biechler should use his good judgment keeping in mind the prime consideration was what was the best for Delco. Pratt testified he invariably insisted that his personal sentiments were not to control and the division managers were to make their own decisions, but that he personally thought in the above situation du Pont had not been treated fairly. Du Pont made one sale of the enamel which was the subject of Elms' inquiry and thereafter a competitor, The Kay & Ess Company, took the business from du Pont and has ever since retained it.

AC Spark Plug Division of General Motors wrote a memorandum on April 15, 1926 to Curtice of General Motors stating that du Pont had been giving very poor service and it would be to the advantage of AC Spark Plug to change their source of supply. The President of AC Spark Plug, Albert Champion, wrote Pratt enclosing that memorandum stating it was being brought to his attention because naturally they wanted to do business with du Pont. Pratt sent the letter to Moosmann at du Pont asking how he should reply. Moosmann responded he would have the situation corrected. Some months later Champion wrote to Pratt enclosing a memorandum from one of his men who desired direct contact with Parlin to work out a technical problem. Pratt sent this to Moosmann. The matter was solved and Pratt thanked Moosmann for giving Champion the kind of service he should have.

On October 28, 1926, Lammot du Pont, President of du Pont, wrote to Sloan that du Pont's Paint Department was upset because of the difficulty of getting accurate information on the probable requirements of General Motors units for Duco and inquired whether there was any objection to giving production schedules he received from the General Motors Finance Committee, of which he was a member. Pratt, in Sloan's absence, replied stating the figures should not be given and upon his return Sloan confirmed this decision. Lammot du Pont pursued the subject further with Sloan and Sloan replied that in the meantime, until he looked into the matter, he had no objection to Lammot du Pont giving the production schedule figures to his paint man, confidentially. Pratt did not approve and wrote to Sloan that du Pont should not be put in any different position than any other supplier from whom General Motors was buying many times the amount purchased from du Pont.

On May 1, 1926 Phelps of du Pont asked Pratt whether he could conveniently get the approximate quantity of oilcloth and black enamel used by General Motors as du Pont was considering manufacturing oilcloth. Pratt sent the inquiry to Lynah and transmitted the information received from Lynah to Phelps. Pratt testified there were many inquiries along these lines not limited to du Pont and the committee customarily furnished the requested information as it was always interested in new potential suppliers.

Lammot du Pont in September 1926 wrote Pratt on behalf of Jack Sproul, a son of the Pennsylvania governor, who was with the General Refractories Company, about giving that concern a chance at the fire brick business of Remy Company, a General Motors accessory division, stating that it would be greatly appreciated if some business could be turned his way. Pratt replied that Sproul's effort to use influence to get business from General Motors would not work, that General Motors purchasing departments tried to get the best for General Motors, that suppliers had to establish the merits of their product and it was not the duty of the purchasing departments to give special consideration to any firm.

Again in 1931, Lammot du Pont wrote to Pratt that the anthracite coal people had protested to du Pont regarding General Motors entering into the manufacture of oil burners. Lammot du Pont stated that the outlook for du Pont's business in the anthracite field was jeop-

ardized, that though he was convinced that du Pont could not dictate to General Motors with respect to their going into the oil burner business nor could the advantages or disadvantages to du Pont be considered as a factor in General Motors' decision, that General Motors might be injured by going into that business. Pratt replied that because a "poorly led association of coal producers did not recognize that the world progresses" and takes an unsound position was no reason to discontinue that activity. Pratt continued to recommend the manufacture of oil burners by General Motors, and it entered that field and is still one of the large manufacturers of oil burners.

During 1934 Pratt wrote to Fred G. Hughes, General Manager for New Departure Manufacturing Company, a General Motors subsidiary, that some of his friends in du Pont had called him about the National Ammonia Company, a du Pont subsidiary, having lost the ammonia business they had formerly enjoyed with New Departure although their price and service were in every sense competitive and stated he would be interested to know the reason. Hughes replied that the du Pont product had proved unsatisfactory, that the Barrett Company product which they used gave no trouble, that the truck division had asked New Departure to buy from Barrett as it was a large user of General Motors trucks, and further he did not know National Ammonia Company was a du Pont subsidiary, but did not believe that should make any difference. Pratt wrote to National Ammonia enclosing Hughes letter and said it might be more desirable and do the "desk warmers" in du Pont some good to contact General Motors units more closely to see whether or not their product was suitable. Pratt testified that Hughes' letter showed that du Pont had not even contacted New Departure and did not know their ammonia was unsatisfactory. Pratt wrote Hughes thanking him and stating that his reason for buying from Barrett was entirely satisfactory.

The evidence relating to the exchange of data, figures, and information on suppliers by certain officers and employees of du Pont and General Motors, viewed as a whole, establishes that the du Pont Company was interested in selling its products to General Motors and made efforts to do so; a fact which is not denied by the defendants. The evidence, both oral and documentary, does not establish, however, that there was any agreement between the two companies that required General Motors to buy all or any part of its requirements from du Pont. Nor does the evidence establish that du Pont dictated or controlled the purchasing policies and practices of General Motors or sought to dictate or control those policies and practices. In fact, the evidence shows that General Motors exercised complete freedom in determining where it would purchase its requirements of products of the kind that du Pont manufactured.

*General Purchasing Committee (1923–1931)*

This committee was created at the suggestion of Sloan and was to enable General Motors to compete with Ford, which had approximately 55% of the business in 1921. James Lynah became its Secretary. After the establishment of this committee, Lynah conducted a study to determine what items might be common to some of the divisions and to pool the purchase of such items. Lynah reported a list of thirty-two possible items to Sloan, Chairman of the General Purchasing Committee. Only three of the thirty-two items listed were products manufactured by du Pont—imitation leather, top fabrics and paints.

In February 1923, Allen, General Manager of the Cellulose Department of du Pont, in a report to its Executive Committee on the subject of Fabrikoid and top materials, referred to a meeting in Detroit at which he, Lynah, the Assistant Director of the Purchasing Committee, Pratt, a member of that committee, and the purchasing agents for Chevrolet and Cadillac, met; that he dis-

cussed with them the great risk inherent in du Pont covering the grey goods requirements for six months and in turn selling the finished product on a requirements basis without protection against a slump in the motor industry; that their reaction was that it was a risk which other manufacturers in the same line assumed. The question of an additional source of supply was discussed and the conclusion reached that General Motors units should purchase 20% of their leather substitutes and top material from one of du Pont's competitors leaving 80% to du Pont at prices determined by competition.

The Government has placed considerable emphasis upon this document and others written at about this time which relate to General Motors' decision to limit its purchases of Fabrikoid and top materials from du Pont to not more than 75% or 80% of its requirements. GTX 406 and related documents reflect the imposition by General Motors upon du Pont of the two-source-of-supply purchasing policy. Lynah testified that early in 1923 the General Purchasing Committee began to put that policy into effect wherever it found that all the Divisions were buying their requirements from the same supplier. The records of the Purchasing Committee corroborate his testimony. Since Allen, in GTX 406, was reporting to his superiors a substantial loss of business, it was natural that he should attempt to soften the blow by expressing his confidence that no further losses need be anticipated. Lynah's testimony, as well as the other evidence of record—both testimonial and documentary—relating to du Pont's varying success thereafter in the sale of its fabric and top materials to General Motors indicate that there was no agreement between Allen and the General Motors officials; and that his confidence about retaining 80% of General Motors business was based upon a belief that du Pont's quality and service were superior to those of any competitor.

On July 18, 1923, William Coyne, Vice President of du Pont, wrote to Pierre S. du Pont, reporting that for the last six months of 1923 du Pont had lost 25% of the Chevrolet top business although the price and quality of the du Pont material was as good as that of competitors; that he had been told Mr. Knudsen had Pierre S. du Pont's permission to give 25% of the business to O'Bannon Corporation which was in the hands of receivers, and wondered whether he could tell him the reasons for this so that the next time 100% of the Chevrolet business could be procured. Pierre S. du Pont replied stating that he thought the "two source of supply" idea was foolish, but that he did not think it advisable to interfere in any case unless the "Executive Committee of the company outlines a policy advocating one source of supply", that as to the policy of General Motors he could not refuse permission to Knudsen to divide his orders for fabrikoid. He later sent a letter to Knudsen referring to the Chevrolet two source policy and expressing that he firmly believed that one good source of supply, properly maintained, was more reliable than two sources, but stated that Knudsen had no doubt given personal consideration to the Chevrolet matter and continued,

> "I find no fault with the principle which would apply as well to other manufacturers as to the du Pont Company." (GTX 410.)

The minutes of the General Purchasing Committee on September 27, 1923 sent to all division purchasing agents of General Motors on the subject of leather substitutes and rubber coated fabrics stated that it was shown du Pont supplied the larger portion of General Motors requirements of these items, that on account of constantly increasing consumption, sound judgment demanded maintenance of more than one source of supply, that du Pont had been afforded the opportunity of meeting competitive prices and that competitors now believed that no matter what price they

put in they would receive no business. It was agreed:

> "that on an equal competitive basis at least 25% of the business should be placed with sources other than the du Pont Company. That the du Pont Company be notified that they should make their best price in their initial offer and not count upon having the opportunity to meet competitive prices, and that on the basis of competitive prices the Divisions were free to place their business to the best advantage. * * *" (GTX 412.)

The minutes further directed the secretary to advise C. L. Petze, at du Pont's Newburgh plant regarding their decision. Lynah testified that it was he who brought up the subject of more than one supplier of imitation leather and rubber coated fabrics and further testified that there was no understanding that du Pont would have any particular percentage of the business, that being left to the division managers; that the instruction to advise du Pont of the decision was not unusual and was done with all large contractors.

From 1923 to 1931 the committee negotiated 709 contracts. Only fourteen were with du Pont, and thirty were with du Pont competitors. The committee rejected a total of 342 contracts, of which thirteen were proposed by du Pont or were for material du Pont was in a position to supply to General Motors. The committee authorized 147 contracts before any contract was made with du Pont.

Lynah testified that anyone in the corporation could suggest an item for consideration by the committee as a contract possibility and if worthwhile a questionnaire would be sent to the divisions from the committee asking for their annual consumption of the item, specifications under which they purchased, prices and sources of supply. If the item was approved by the committee after return of the questionnaire, the committee would notify the division that it intended to ask for bids and would be given an opportunity to suggest bidders. After bids were received, the committee would decide whether to contract for the item and with whom. If a contract was negotiated, the interested divisions were notified and required to participate unless specifically exempted, and any objecting division was excused from participation if it could not be persuaded or its objection "ironed out".

The rule against a division purchasing outside of a general contract was contained in a letter which Sloan sent to Pierre S. du Pont, John J. Raskob, C. S. Mott and Fred J. Fisher, as follows:

> "* * * as Chairman of the Committee I wrote to the Purchasing Agents of all Divisions and told them that they were not to be permitted to purchase outside of the General Purchasing Committee's contracts and indicated that anything of that kind that was done would certainly have the disapproval of the Corporation and in a way would not be tolerated." (GTX 458.)

The committee frequently referred specification problems to production experts with the view of ascertaining whether standardized specifications were feasible on some of the common items used by the divisions, where the specifications varied. Lynah testified that this was one of the important functions of the committee.

He further testified that the committee followed certain general rules in carrying out its work; such as (1) no general contract was developed unless the item was used by more than one division as there would be no price advantage unless there was increased volume, (2) no general contract was developed unless it would result in substantial savings, (3) where possible the committee desired more than one source of supply, (4) contract prices were to be kept confidential to protect sellers as the General Motors volume would justify lower prices than the seller could allow a customer purchasing in less quantity. These rules were adopted eighteen months before the

committee made any contract with du Pont.

The first items reached by the committee which were manufactured by du Pont were fabrikoid and top or rubber coated fabrics and no contract for these items was ever entered into by the General Purchasing Committee. In the Fall of 1923, twenty-one months after the formation of the committee, the subject of paints was considered and was referred to the Paint and Enamel Committee as there were no standards established for that material. No contract was entered into by the General Purchasing Committee requiring purchase of paints and varnishes, although du Pont requested such a contract. After quantity discount, a two year contract supplying requirements of seller's make was made.

The General Purchasing Committee rejected contracts with du Pont because of lack of volume on photographic supplies, maintenance paint, floor paint, stripping materials and thinners, machinery enamels and aluminum spar mixing liquid, and because of lack of savings rejected contracts with du Pont on pyralin, leather substitute and rubber coated fabrics, denatured alcohol, antifreeze material, antifreeze methanol, varnish and oil type materials.

Lynah testified that once the committee decided to contract for an item, selection of the supplier was premised only on "quality, service and price" and in 1928, answering a Mr. O. H. Briggs, Sales Manager of du Pont-Pathe Film Manufacturing Company, who had asked him to specify the use by General Motors of du Pont photographic film, stated:

"In the making of our purchases, we believe that each transaction should stand on its merits and we presume that the company buying films for our use is guided by this same principle and that if the quality of your product and service, consistent with prices quoted, are the best he can obtain, he will buy from you." (GM 194.)

Early in 1924 the committee developed the idea of a sliding scale discount contract permitting a supplier to fix his base price on volume of business he had previously enjoyed and for increased volume offer an additional discount. Many contracts were made by the committee on this basis and the divisions were encouraged to participate in them.

In April 1924 G. H. Kerr, a du Pont executive in the Explosives Department, wrote to Pierre S. du Pont, Chairman of the Board of du Pont and General Motors, stating that about two years ago he conceived the idea that it might be of value to du Pont to use their purchasing power for the purpose of influencing concerns from whom they purchase to purchase in turn from them; that if the purchasing power of General Motors were added to that of du Pont, and if used intelligently, it would result in securing large business for du Pont; that this was proved in the Acid and Heavy Chemicals Division of the Paint Department of du Pont which received consideration from Bethlehem Steel because of the purchases General Motors made from them. Pierre S. du Pont wrote to Sloan asking him to talk the matter over with Kerr saying that "one of our representatives was with the Bethlehem Steel people and happened to see their file card in which they classified du Pont and General Motors as one." Sloan replied to Pierre S. du Pont's letter stating the suggestion was constructive and referred it to the General Purchasing Committee. Lynah and a Mr. Kother subsequently saw Mr. Kerr.

About a year previously, Pratt, Vice President of General Motors, wrote to R. R. M. Carpenter that it had recently come to his attention that a number of the automobile companies outside of General Motors were considering their purchases from the General Motors Accessories Division and from du Pont as purchases from "one interest" and that consequently to have a better view point when considering those outside companies it might be helpful to get the entire volume of sales that du Pont and

General Motors make to the outside companies. He procured the sales figures from the Accessory Division and Parts Companies of General Motors and obtained from Carpenter the 1922 figures on sales du Pont made to outside companies.

On July 2, 1924 the General Purchasing Committee reported that while there are cases which might be profitably dealt with on a reciprocity basis, there were so many complications and difficulties involved that it would be best "to stand on our own equities and require our suppliers to do so"; but that the divisions were at liberty to treat such cases individually as the situation might require.

Lynah advised Kerr on August 13, 1924 that the information relating to Manhattan Rubber Company and Nairn Linoleum Company would be secured since it was available without any expenditure of time on the part of the divisions, but stated:

"It is understood that information in connection with our purchases such as I have tentatively agreed to endeavor to secure for you, is not to be used to influence our sources to place business with the du Pont Company, or to place the du Pont Company in a preferred position as a source because of its interest in General Motors.

"There would be no objection to your advising our sources that the du Pont Company holds a large interest in General Motors and solicit their earnest consideration on this account." (GTX 538.)

The following month, the General Purchasing Committee determined that as a practice General Motors could not undertake to supply information showing the volume of business done with any suppliers to the du Pont Company but "that in special cases, upon request by the President of the du Pont Company to the President of General Motors, the situation would be properly dealt with" by the presidents; and, that it was believed General Motors' buying position

"would be prejudiced in that suppliers who had been influenced to place business with the du Pont Company through their relationship with General Motors might reasonably expect" General Motors to place business with them.

On September 6, 1924, excerpts of the committee's meeting were sent to Irenee du Pont by Lynah with a letter wherein he stated the reciprocity practice had been discussed by the committee at two meetings and

"as we are following a very definite policy in General Motors of having our Sales activities and Purchasing activities maintain their own status without the one influencing the other, it was felt that to supply the du Pont Company with the information requested by Mr. Kerr would convey the impression that the du Pont Company could influence General Motors' purchases." (GTX 539.)

The General Purchasing Committee agreed that it could not undertake to supply to du Pont information showing the value of business done with its suppliers. Irenee du Pont answered that, of course, any action which General Motors took was entirely its own affair and du Pont should not be critical, but that reciprocity yielded excellent results.

That same month, Pratt wrote to the General Manager of the Paint Department of du Pont, who was anxious to secure an acid contract with Bethlehem Steel:

"It is practically impossible for me to give you any information as to where our steel requirements will be placed from month to month, as our Purchasing Agents in the various divisions do not know themselves until a day or two before the order is placed." (GTX 542.)

that one of the divisions was buying extensively from Bethlehem during the first six months of the year and would continue buying according to their needs if "Bethlehem's price and quality con-

tinue to be favorable in comparison with other companies."

The only special occasion in which the President of du Pont requested information from the President of General Motors occurred in 1928. In January 1928 Lammot du Pont wrote to Sloan that the du Pont Explosives Department was confronted with the loss of its trade through the use by a competitor of a reciprocity argument; that du Pont desired to supply Jones & Laughlin Steel and Inland Steel with figures as to purchases from them by du Pont and its affiliated companies; that General Motors 1927 purchases from Jones and Laughlin and Inland were requested; and stated:

"It is, of course, understood that in presenting these figures to our customers it will be for the purpose of retaining trade now enjoyed. There will be no promise or assurance that these purchases will continue or that the du Pont Company's efforts in the past have caused General Motors to place this business." (GTX 543.)

Sloan sent the letter to Pratt stating that on general principles he was not keen about this matter but it was the first time it had happened and was not very important since he did not believe General Motors was buying to any great extent from these companies. Pratt replied to Sloan indicating that little was bought from Inland but a great deal was bought from Jones & Laughlin, and continued, that as Chairman of the Purchasing Committee, he had invariably refused

"to give the du Pont Company any information which they might use in any way to influence their customers to think that the du Pont Company in any way could influence General Motors Corporation in buying their materials and supply because the particular customer bought from the du Pont Company. Personally, I think it is very necessary that we have a definite policy in this respect, especially in connec-

tion with our dealings with the du Pont Company (who are working on the principle of reciprocity while General Motors is not), as I am afraid there are instances where du Pont salesmen have implied that they could influence General Motors in choosing its source of supply as other than the three fundamentals of purchasing, namely, quality, service and price. * * *", (GM 201.)

He continued stating he had been guided only by the following considerations:

"(a) The du Pont Company in fact has no more right to such information than any of the other 60,000 stockholders in General Motors * * *

"(b) If we supply the du Pont Company with the amount of our purchases from any company they wish to sell, and their salesmen are allowed to display this information to their prospective customers, it necessarily follows that the impression would be made upon the customer that General Motors wishes that particular supplier to consider in dealing with General Motors its relationship with the du Pont Company, or otherwise General Motors would not supply the du Pont Company with the information.

"(c) * * * The principle of reciprocity must imply that you are giving something in order to get something. * * * If there is any thing to be gotten our position should be to see that it is gotten for General Motors Corporation rather than the du Pont Company.

"(d) If our Purchasing Agents know that we are willing to allow the du Pont Company to use our purchases to influence du Pont sales, can we expect them to always resist giving weight to other considerations than the best interest of General Motors in placing their orders?

"(e) I think that we are all pretty well agreed that we could not at

ford to use the principle of reciprocity in General Motors purchases. If that is true we certainly can not allow anyone else to imply that they can use General Motors' purchases for the purpose of reciprocity.

"In the particular case under consideration I see no difference in Mr. du Pont using the information he requested in order to retain business than for him to use same to get business. In my judgment, if the du Pont organization are not able to maintain the business they have through the quality of their goods and the service they render, then they should not be allowed to retain it because General Motors purchases goods from that particular customer of the du Pont Company. The steel companies must know the amount of business they are doing with General Motors Corporation and if being reminded of this volume of business by the du Pont Company results in the steel companies being willing to do something for the du Pont Company that they would not have done without such reminder, then we in General Motors are not getting all we should from the steel companies." (GM 201.)

He continued that since Sloan had promised the information to Lammot du Pont, it would be supplied but felt it was a very bad precedent to establish. Pratt testified concerning this letter that his seeming inconsistent attitude toward Mr. du Pont and toward "some of the small men in the du Pont organization" regarding exchange of information was that when Mr. du Pont was involved, General Motors was establishing a policy and when dealing with employees of du Pont it was on an individual basis.

Other than the single incident in 1928 referred to above, the Purchasing Committee Resolution of 1924 appears to have been a dead letter. The Government has offered no proof that any information was passed to du Pont since that time. Sloan could recall no instance and the last two presidents of du Pont not only could recall no such instance and also were unaware of the Resolution until the trial of this case. The Court is satisfied on the basis of all of the record that the Resolution never was carried out and does not represent the parties' practice—certainly not in the last twenty-five years. Accordingly, the matter deserves no further attention.

The General Purchasing Committee was abolished in 1931 and no centralized purchases of products have been made since that time.

The evidence of record does not establish, or tend to support, the Government's contention that the General Purchasing Committee was created and operated as an instrumentality to carry out the desires of du Pont. In fact, actions taken by the Committee were seriously detrimental to du Pont in a number of respects. For example, the Committee initiated the two source of supply policy in connection with artificial leather and top materials; it refused to make a contract with du Pont for pyralin; it encouraged the early development of competition for Duco, and refused to renew du Pont's requirements contract as soon as a competitive lacquer was available.

The Committee, the record shows, was created, operated and ultimately terminated in 1931 to serve General Motors interests—not du Pont. Relations with du Pont were but a minor aspect of its activities, and it dealt with du Pont only in the same manner as it did with other suppliers. All of its work is now ancient history and the evidence with respect to its activities has but limited probative value. But to the extent it deserves consideration it supports the position of the defense rather than the Government.

*Fisher Body; and use of the discount and rebate system in purchases and sales between the defendant manufacturers with special reference to Fisher Body.*

Lawrence Fisher testified that Mr. Durant, and Mr. Chrysler, who was associated with him, had stated that General Motors would have to expand their

capacity because of the increased public demand for closed bodies, that General Motors was not organized to do that, and needed a source of supply for such bodies, that they wanted the Fisher brothers to agree to come into General Motors for that purpose. In the negotiations, it was agreed that General Motors was to purchase from Fisher Body such of the closed body business as Fisher Body "was able to handle now and in the future". The affiliation was reported to the stockholders of both companies, each stating that the association of the two assured both a continuity of demand and supply for the Fisher Body product.

The voting trust agreement made in 1919 between Fisher brothers and Durant also provided that General Motors acquire 60% interest in Fisher Body and the majority of Fisher Body stock was placed in a trust for five years with the right to vote same placed in the hands of four trustees—two representing Fisher Body interests and two representing General Motors. At the same time the six brothers contracted to remain with and direct the operations of Fisher Body for five years ending in 1924; the voting trust to expire the same time as these contracts. The Fisher brothers had expressed a wish for closer association with General Motors, and in 1922 Fred Fisher, already a General Motors director, became a member of the General Motors Executive Committee.

In 1924 it was agreed that three of the brothers would devote their entire efforts to General Motors and the other three were to operate Fisher Body; that all six would take allotments in Managers Securities in lieu of compensation provided in the employment contracts; and the voting trust would expire. In October of that year Pierre S. du Pont wrote to Sir Harry McGowan that for months General Motors had been negotiating with the Fisher brothers for the purpose of arriving at a satisfactory plan to continue their association with General Motors and in the plan evolved it was thought that

"interesting two members of the Fisher family directly in General Motors will have a very beneficial effect in breaking up a line of separation of the two companies' interests that has not been altogether wholesome. From lack of knowledge, the two sides have tended to criticize each other, without good result. Hereafter the Fishers will better understand GM problems and difficulties and, I think, GM men will better appreciate the Fisher problems. * * *

"We all feel that the settlement of this business will prove very beneficial. Messrs. Fisher are very happy over the solution of the problem, as for some time they have been fearful lest failure to get together would necessitate the breaking up of relations, perhaps a break in the Fisher family, concerning which they naturally have great pride, as they have been phenomenally successful in the cleanest kind of a business enterprise." (GM 32.)

On June 30, 1926 General Motors acquired the remaining 40% interest in Fisher Body for the reason that Fisher Body had been unable to make price reductions which General Motors needed or to expand its plant capacity and reserve its entire production for General Motors. Fisher Body became a division of General Motors. In connection with this acquisition, John J. Raskob requested du Pont to loan General Motors a quarter of a million shares of General Motors common to finance the transaction, which was done.

In 1919 when the voting trust was first established only 25% of General Motors car production was in closed bodies, but by 1926 the percentage had increased to 90%. The 1919 contract with Fisher Body provided that Fisher Body was to receive cost plus 17% on all closed body work for General Motors.

At the time of the du Pont investment in General Motors, Fisher Body was building closed bodies for General Mo-

tors and buying pyroxylin coated materials for closed body tops from Textileather. Before and after 1917 du Pont sought to secure this business of Fisher Body but was unsuccessful. In July 1925 the Executive Committee of du Pont was informed that du Pont had been unable to sell Fisher Body closed car curtains and had lost orders of about 200,000 yards on rubber coated fabrics to Chase and Haartz, owing apparently to price considerations. In 1925 du Pont's total fabric sales to Fisher Body amounted to $303,000.

In 1925 three events occurred which established du Pont as a substantial supplier to Fisher Body of rubber coated material: (1) Fisher Body made a change from pyroxylin coated to rubber coated decking not produced by Textileather; (2) du Pont introduced a new rubber coated decking "Glazed Pontop" which tests showed to be superior to others; and (3) du Pont, at the request of a Fisher Body Vice-President, employed Mr. J. Henry Smith as its Detroit sales representative for coated and combined fabrics. This last event resulted in an order to du Pont for 300,000 yards of Pontop for the balance of 1925. This Brown testified was "about six times as much business as we had got from Fisher in previous years."

During the last half of 1925 Fisher Body placed with du Pont heavy fabric orders that increased its purchases almost fourfold the following year.

In early 1926 du Pont introduced "Everbright" a new rubber coated decking which was widely adopted by the automobile industry and in 1926, after Fisher Body had tested it, du Pont was supplying Fisher Body with considerably more than one-half of its top material requirements. Thus, during the last half of 1926 Fisher Body placed the greater portion of their rubber coated fabrics business with du Pont's Fairfield plant.

The advent of the so-called super discount plan is considered under this heading since the Government's analysis reflects that its operations were directed to the Fisher Body business.

Early in 1924 the General Purchasing Committee developed the idea of sliding scale discount contracts. This permitted a supplier to fix his base price upon the volume of business he had previously enjoyed and as an inducement for increased volume offered an additional discount. Several contracts were made by the committee on this basis and GM 162 contains excerpts of these.

Preceding the adoption of the super discount plan in August 1926, du Pont had been making discount arrangements with General Motors on certain fabric materials. In July 1925 the Paint, Lacquer and Chemicals Division reported to the Executive Committee of du Pont as follows:

"We are negotiating a one year's contract dating from July 1st with General Motors which will cover the entire requirements of the General Motors units for pyroxylin finishes and a minimum of 50% of Fisher Body requirements. The committee has approved an extension of the discount scale which has been in force this year, and by purchasing maximum amounts during any given quarter General Motors may gain up to 12% discount from the present standard price. It is hoped that, since almost all of the Fisher Body business must be included if General Motors as well as Fisher is to obtain this maximum discount, that this will prove such a strong inducement for Fisher to give us this business that competition for Fisher business will be greatly lessened." (GTX 454, p. 4.)

The General Purchasing Committee invited W. P. Allen of du Pont to present a proposal for sliding scale quantity discounts on all purchases from du Pont and invited Standard Oil of Indiana to submit a similar proposal on its products. In August 1926 W. P. Allen, General Manager of the Chemical Products Department of du Pont, attended a meeting of the General Purchasing Committee of General Motors and presented a plan for sliding scale quantity discounts

to General Motors and Fisher Body purchases on Duco, thinner, fabrikoid, rubber coated fabrics, pyralin, paints for maintenance purposes, etc., and the details were set forth in a letter from Allen to the General Purchasing Committee in September 1926, setting forth that the discount arrangement would begin when purchases totaled $9,000,000:

|  | Discount |
|---|---|
| $9,000,000 | $ 75,000 |
| 10,000,000 | 175,000 |
| 11,000,000 | 300,000 |
| 12,000,000 | 450,000 |
| Each additional One Million | 150,000 |

(GTX 461, 462.)

He wrote again, stating it was desirable to keep the arrangement confidential:

"I want to say a word to you about the desirability of keeping this matter confidential and in treating it as an arrangement within the du Pont-G.M. family rather than as a mere concession in prices on individual commodities.

"* * * I again want to emphasize the importance of treating this whole matter in a confidential manner. It is obvious that we would be unable to continue this arrangement unless we can secure much higher prices from our other customers; and, if the terms of this arrangement become public knowledge in the trade, we would inevitably be forced to reduce prices generally, which would in turn wipe out the earnings which we propose to return to you as a rebate under this plan." (GTX 463.)

In January 1927 Lammot du Pont wrote a memorandum addressed to Pierre S. du Pont, Chairman of the Board of General Motors and John Raskob, Chairman of its Finance Committee, giving figures on General Motors purchases of fabrikoid, rubber and parlin, and stated:

"I gather you were somewhat surprised at the statement that General Motors was not buying anywhere near all of their requirements of products which du Pont makes, from the du Pont Company." (GTX 460.)

The tabulation attached consisted of figures for the year 1926 on products consumed by General Motors and Fisher Body, which were not enjoyed by the Fabrikoid and Chemical Products Divisions of du Pont, in a total amount of $5,339,500. It showed that Fisher Body purchased from competitors a large amount of fabrikoid and rubber products than the other divisions and was the only one listed as purchasing from competitors products in the chemical field, approximately $3,012,500 in primers, surfacers, ground coats, black Duco and thinners. The reason for this was stated by Allen to be that the figures on chemical products did not mention General Motors car units since Buick, Chevrolet and Olds purchased practically 100% of their requirements from du Pont, so that Oakland was the only unit purchasing anything worthwhile from competitors and this mostly in undercoats. He stated:

"When we were discussing with the General Motors Purchasing Committee in the middle of last year the question of granting them a super discount as an inducement to place with the du Pont Company more of the General Motors business, they admitted that for the year up to that time General Motors and Fisher Body had bought a total of $12,000,000 worth of materials made by the du Pont Company, of which $8,000,000 had been placed with us and $4,000,000 with competitors." (GTX 460.)

A report by the Paint, Lacquer and Chemicals Department to the Executive Committee of du Pont for the month of November 1926 stated that General Motors was unwilling to make a requirements contract for 1927 although du Pont had reduced the prices of thinner and although these prices were subject to quantity discount; that competition in the pyroxylin finish field was apparently the cause for General Motors' attitude.

It was also reported that du Pont had succeeded in selling Buick its fabrikoid requirements for the first half of 1927 "notwithstanding competition from Federal Leather Co. at a differential of 11¢ per yard under our quotations."

The following month, December 1926, another report was made stating that General Motors' action in receiving a bid from U. S. Industrial Alcohol on specified thinner composition, compelled du Pont to make an offer "at approximately the same net price when all discounts are included" and that this would have to be extended to all customers with the result that profits from the thinner business during 1927 would be less than in 1926. The report also stated under Sales of Special Significance that Oakland Motor Co. had placed an order for their requirements of fabric for the first six months of 1927 with du Pont "notwithstanding lower prices being quoted by Federal Leather and Cotex." The contract on thinner requirements was granted by the General Purchasing Committee to U. S. Industrial Alcohol for a six month period.

In October 1927 the Paint, Lacquer and Chemicals Department reported as follows:

"Renewed interest on the part of General Motors people has been aroused in the question of the volume oil-type undercoats and black 'Duco' business that is being placed with competitors by Fisher Body Division. Their own estimate is that General Motors Corporation might save as much as 500,000 a year by placing this business with us, due to our lower prices on undercoats and the increased discount this added volume would enable them to obtain on all other purchases under our so-called 'super-discount's agreement. Our latest information is that this subject is being actively agitated by the General Motors Purchasing Committee but have not yet heard to what extent the operation of the super discount plan is swing-

ing sentiment in our favor." (GTX 492.)

The General Purchasing Committee of General Motors in July 1928 wrote the purchasing agents of the General Motors Divisions and Fisher Body regarding the du Pont super discount saying that while it was agreed that healthy competition was to be maintained if 80% of the purchases of material such as du Pont was in a position to supply are given to them on an even basis, the earnings under the super discount will be materially increased and they were urged to cooperate to that end.

During 1927 Fisher Body went back to pyroxylin decking on most models and purchased about one-half of its requirements from du Pont's competitors. In 1928 Fisher Body returned to Everbright and in 1929 competitive materials met its quality and Fisher Body reduced its purchases from du Pont to about one-third of its coated fabric requirements, which it continued to purchase until 1935 when the all steel top eliminated its use.

The du Pont Fabrics and Finishes Department reported to the Executive Committee for the month of June 1929 on the effect of the special discount plan stating that $379,000, representing discount earned on total purchases of du Pont products amounting to $11,528,000, had been paid for the year ending June 30, 1929, and that for the previous year the discount had amounted to $200,000 on purchases of $10,201,000; that

"While the value to us of this arrangement has been subject to question at times, there appears to be no longer any doubt that it has had and is continuing to have a very beneficial effect in fostering a friendly attitude toward du Pont products in general, which serves to minimize the occasioned differences that must of necessity arise in handling of such a large volume of varied products." (GTX 496.)

With the depression years, General Motors production and its purchases declined. From 1929 to 1932 Fisher Body curtailed its output 71%—from 1,360,·

617 units to 395,604 units—and its purchases from du Pont were reduced. Since General Motors requirements had been cut to a point where it was unable to earn a discount in 1930, du Pont lowered the minimum amount at which super discount would become payable during the next year. In 1932 the super discount plan was terminated.

In October 1931 du Pont bought 300,-000 shares of General Motors common stock from the Fishers; the other 200,-000 were purchased by the Opel interests in Germany. Before this purchase the Fisher Brothers held 532,069 shares of General Motors common, or 11.8% of the 4,509,060 General Motors common held in Managers Securities. In addition, they held 1,600,000 shares of common stock received when General Motors purchased the remaining 40% minority interest in Fisher Body in 1926. In 1934 F. J. and C. T. Fisher retired as directors and members of the Executive Committee of General Motors and L. Fisher succeeded C. T. Fisher as Central Office Executive at General Motors. He held this post until his retirement in 1944.

When the all steel top for passenger automobiles was adopted for all General Motors cars in the mid-1930s and until 1939 the principal use of fabrics at Fisher Body was the combined uncoated fabric for tops of convertible cars. Du Pont presently enjoys between one-third and one-half of this business. Fisher Body first used du Pont Teal, a fabric used for convertible tops, in 1926, and purchased 50% of its requirements of this fabric until 1930. In 1931 Fisher Body requested all its suppliers, including du Pont, to give a two year guarantee against damage by cleaning materials. Although du Pont tests showed its Teal would withstand cleaning materials, du Pont felt it could not make the guarantee, and Haartz Auto Fabric Company, which was willing to make such a guarantee, became Fisher Body's sole supplier of this type of fabric. By 1933 du Pont felt it could make the two year guarantee and sought to regain some of

this business, but secured none until 1948.

In late 1946 Fisher asked du Pont to develop a combined uncoated fabric which would not be subject to the fading and shrinking problems evidenced in Haartz material. By 1948 du Pont had solved the problem and was awarded part of Fisher's business. From that year to 1951 du Pont enjoyed one-half of Fisher's business, and in 1951 about one-third. Since 1946 or 1947 du Pont supplies Fisher Body with 35-45% of its coated and combined uncoated fabric requirements.

In 1940 and 1941 du Pont secured the major share of Fisher Body requirements for coated fabrics. Since 1947-1948 this business has declined and du Pont is only one of four major suppliers of this fabric to Fisher Body. The other suppliers are Haartz, Textileather, and United States Rubber. Fisher Body has adhered to a policy of several sources of supply.

The record, including all the evidence summarized in the preceding paragraphs, amply establishes that du Pont sought to sell its finishes and fabrics to Fisher Body. It early recognized that Fisher would be a substantial consumer of those products since it was making all of the closed bodies for General Motors cars. du Pont's sales efforts included a personal approach to the Fisher brothers by Lammot du Pont, at the suggestion of Pierre S. du Pont; the employment as a fabrics salesman of one Smith who apparently was favorably known to the Fisher management; and the offering of a substantial overall price reduction in the form of the super discount for a period of about five years during the 1920s.

The first of these efforts appears to have resulted in no advantage to du Pont since its stock ownership in General Motors did not persuade Fisher to use Flint products. The other two efforts did, it seems clear, increase du Pont's sale of finishes and fabrics to Fisher Body but they do not establish the existence of

any agreement or understanding that Fisher would favor du Pont, and they do not establish that du Pont's sales to Fisher resulted from its stockholdings in General Motors or its alleged control of General Motors. Moreover, the record indicates that even the discount did not secure for du Pont all of Fisher Body's business and indeed may not have increased the portion of Fisher's requirements purchased from du Pont though the total dollar purchases from du Pont by Fisher did increase. The record also shows that Fisher Body at all times conducted its purchasing with respect to finishes, fabrics and all other products in accordance with its own best judgment. The Court finds the testimony of Lawrence Fisher particularly persuasive in this respect. His competence and knowledge of this matter cannot be questioned. He was in active charge of the Fisher Company for many years and subsequently served in high executive capacities with General Motors. It is highly unlikely, if not impossible, that Fisher Body's purchasing practices could have been influenced by an agreement with du Pont or by the latter's position in General Motors without his knowledge. His forthright testimony and general demeanor on both direct and cross-examination are most convincing that Fisher Body was neither party to an agreement with du Pont nor the victim of du Pont domination.

Finally, the extent to which Fisher Body has purchased over the years from competitors of du Pont in substantial quantities cannot be squared with the charge that Fisher is a captive market for du Pont. The record is clear, for example, that Fisher immediately encouraged competitors of du Pont to produce a lacquer comparable to Duco, and has consistently over the years bought substantial amounts of topcoats from two or three of du Pont's competitors, and practically all of its undercoats are purchased from a single competitor of du Pont. Other examples are found in the detailed analysis of the evidence relating to the various products sold by du Pont.

## Finishes

### Duco

In 1910 General Motors and Chevrolet had been purchasing practically their entire requirements of automobile finishes from Flint. After the acquisition of Flint by du Pont, Flint's position as a supplier of paint and varnish to General Motors was not enhanced; in fact, Flint lost position as a supplier. In 1918 Flint had all the Buick, Oakland, Olds and Chevrolet business. In 1921 it lost half of the Oakland business, and in 1923 some of the varnish business at Buick, Oakland and Olds.

Immediately following World War I the automobile industry entered into an era of great expansion. One important problem remained, however, that of a finish which would last as long as the automobile and which could be applied on the assembly line in a matter of hours.

Du Pont had entered into the nitrocellulose lacquer field in 1903. By 1920 it had a small but varied line of products. These lacquers were quick-drying and provided a durable film, but use was limited because the lacquer did not contain much solid material and if that were increased the lacquer became too viscous to work.

General Motors officials were interested in the problem and upon recommendations of Walter P. Chrysler and Herman L. Weckler of Buick, a Paint and Enamel Committee was created in December 1921 to study the problem. Clements of General Motors Research became Chairman and representatives of the car divisions were members.

The Paint and Enamel Committee began to test the finish used in each of the car plants and discovered the difficulty was in the top coat. It contacted every reputable paint manufacturer in the country and tested available material.

Kettering and Fisher Body used lacquer on airplanes during World War I and Kettering thought it might be the solution to the problem in the automotive

industry. It had never been used on automobiles because it had a low solids content requiring application of many coats when used in colors.

Among the paint manufacturers approached was du Pont, which evinced an interest in the idea. By this time du Pont discovered a process for producing a lacquer with a high solids content, called Duco. Edmund M. Flaherty, Assistant Director of Sales for du Pont's Chemical Products Division, told Harry Mougey, a member of the General Motors research group, of this new lacquer and agreed to send samples to Dayton, Ohio, to be tested with the other materials under observation by the Committee.

After testing samples of this new lacquer, Kettering and Henry Mougey became enthusiastic over its possibilities. However, it lacked the high gloss of varnish and it would not adhere to the traditional undercoats used on metal.

This was in the Spring of 1922 and marked the beginning of an experimental and production testing period that lasted more than two years. Both General Motors and du Pont joined in the testing to adapt the new lacquer to the demands of the automobile production line and a great deal of collaboration ensued toward this end. Williams of du Pont spent a considerable period of time working with Mougey of General Motors before the problem was solved. Both Williams and Flaherty testified that they met no chemists from other companies in the General Motors laboratories.

While Duco was still in this testing stage Pierre S. du Pont, then President of General Motors, at the request of the Paint and Enamel Committee asked du Pont to stop all negotiations with other possible consumers and all plans for selling these products in the open market "until such time as a suitable conference may determine whether it is possible for General Motors Corporation to obtain the entire product for the du Pont factories over a period of time in order to insure a satisfactory quantity of ma-

terial". At the same time, he requested Sloan to secure a sample estimate from the several General Motors Divisions as to their probable needs if Duco were to be used so that du Pont might set about constructing the necessary facilities. This feeling had been orally expressed to Irenee du Pont and had been discussed at a meeting of the General Motors Paint and Enamel Committee which was attended by a du Pont representative.

In a report to the Executive Committee of du Pont in October 1922, the Cellulose Products Department stated that they had seriously considered the whole matter and after weighing all the factors was of the opinion that "it would not be to our best interests, nor General Motors', to give them this exclusive right." The report further stated that "any competitive advantage that General Motors might obtain by getting the exclusive use of our finishes must be temporary only" and such a practice "would have the effect of encouraging competition in the field," so that it would be better to take full advantage of the start du Pont had by being first in the field and "getting entrenched just as widely as possible."

Irenee du Pont in reply to Pierre S. du Pont's request said:

"We are embarrassed at your request to stop all negotiations with possible consumers and plans for selling these in the open market, this because we have already started a number of small users in business and cannot now cut them off from their source of supply. Also, the rumors of the value of these products are spreading and inquiries will be received from others who are users of Fabrikoid, Pyralin, etc., and we would be in a most embarrassing position to have to refuse sale of 'Viscolac' or 'Duco'. This might even result in their ceasing to use Fabrikoid and Pyralin by way of retaliation. Finally, if we don't sell on the outside the demand will be

filled by other manufacturers which will entrench competition for us at a later date." (GTX 380.)

Flaherty testified that du Pont was selling Duco to Franklin, Pierce Arrow and other automobile companies.

By early 1923 General Motors Research was convinced that Duco was the answer. In March 1923, Mr. Rogers, the paint superintendent at Oakland, did some experimental work of his own and developed a burnishing process that brought up the lustre of Duco. In the Spring of that year, Oakland decided to use Duco on its 1924 open car, with the hope that it would reestablish its lagging reputation. The promotion report on automobile companies in October of that year reported that Oakland distributors were demanding Duco on closed cars. Oakland's use of Duco was an immense success. Fisher Body Division, which was building the Oakland closed bodies, decided to use Duco.

Herman L. Weckler, Works Manager at Buick, recommended Duco to its manager, Mr. Bassett, in 1923, but Bassett decided to wait until the Oakland results were in. In the Spring of 1924, upon the continued recommendation of Weckler, Bassett decided that Buick would use Duco on its 1925 models.

H. H. Rice, President of Cadillac, wrote to Clements, who had urged a speedy decision on the use of Duco by General Motors Divisions, agreeing that "all speed should be used in making the investigation but I think one of the most dangerous things the Corporation could do would be to adopt, generally, the new method of painting before it had been tried out in every conceivable fashion." Lawrence Fisher testified that in 1924 Fisher Body used Duco on the first steel bodies for Cadillac. In writing to Allen of du Pont, Sloan stated that he disagreed with the attitude of Cadillac and would see what he could do toward helping the situation. Regarding Buick, he suggested that Allen contact Mr. Bassett of that Division.

The caution on the part of Cadillac and Buick in adopting Duco was set forth by Sloan in a letter to Allen on February 4, 1924 wherein he said that he was disappointed to find Cadillac and Buick reluctant to accept a car with a dull finish.

At a meeting in April 1924, Bassett stated that he intended to put the entire Buick production into Duco and it was adopted for both its open and closed bodies on the 1925 model. Cadillac, for about two years before it adopted Duco as its standard finish, offered it only on an optional basis, and did not make it standard until 1926. Thus the change over to Duco was slow. Sloan said:

"It is hard to separate reluctance from responsibility. Responsibility of a general manager of a division is very great, and while he wants to make technological progress, and improve his product, he has got to be pretty careful that any decisions he has made lead to that end. * * *" (Sloan 3017–3018.)

Sloan testified that he was interested in Duco because it had great significance from the standpoint of consumer appeal and because of its economic advantage; that he had no interest in "pushing" Duco other than improving General Motors; and that the decision to try Duco was left entirely to the respective Divisions who were given no orders by him or anyone else.

In July 1924 the General Purchasing Committee began development of a general contract covering Duco. The minutes of the General Purchasing Committee in November 1924 in connection with a discount provision in the proposed general contract for Duco stated:

"It was brought out that no effort had yet been made to develop competitive price situation as regards pyroxylin paints and that this fact should be given consideration by the du Pont Company."

In December 1924 an agreement was reached with du Pont whereby General Motors undertook to purchase its entire requirements of pyroxylin finishes for the first six months of 1925. Within a month, Lynah pointed out that a field

of competition for Duco should be developed and suggested that the Research Laboratories begin "characteristic and durability tests of competitive pyroxylin finishes." Lynah in February 1925 requested Research to test the products of seven named companies. The general contract provided for purchase of buyer's requirements of Duco and thinner.

By May 1925 Lynah, in a letter to Mougey, made reference to the fact that other automobile manufacturers—Paige-Jewett, Flint, and Packard—were using a competitive pyroxylin finish sold by the Zapon Company. Before the expiration in July 1925 of the first contract with du Pont, Lynah undertook again to find a competitive product and suggested to the members of the General Purchasing Committee:

"* * * It is appreciated that a field of competition for 'Duco' should be developed." (GM 172.)

At this time Fisher Body had started to use Forbes black lacquer in addition to Duco which it had adopted in 1924 although the Forbes product had not been tested or approved by General Motors Research. Du Pont did not regain any of the black Duco business from Fisher Body until 1931 when it offered a new and superior product. Du Pont, Rinshed-Mason, and Forbes have continued to be Fisher Body's major sources of supply for topcoats, and for undercoats Fisher Body has used Rinshed-Mason almost exclusively.

In May 1925, Mougey, Chief Chemist for General Motors Research, wrote to Lynah that the problem of testing lacquers was not easy:

"* * * the matter of tests on cellulose nitrate finishes is a very difficult one. When one is dealing with material as durable as Duco, it is very difficult to estimate its total life and also estimate the life of other materials as compared with Duco. * * *

"* * * One of the reasons why it is so difficult to approve finishes made by different companies is because each color is a problem in itself. A company may make a very good black and yet certain shades of grays, blues, etc., may be very bad. * * *

"Another factor which makes it very difficult to judge these finishes is the fact that all of the companies who are trying to duplicate Duco are constantly improving their materials. We feel that none of the exposure tests which we made last Summer and last Winter represent the same material as was submitted by you this Spring. In most cases we feel that the Companies have improved their materials in the meantime, but in some cases, due to inability to actually determine whether a change is an improvement or not, we feel that changes have been made for the worse. This matter of changing the composition of the material is one on which we have insisted very strongly with the du Pont Company. No changes are made in the material until after very extensive tests. * * *

"We feel that in the case of material which is advertised by our Companies as strongly as Duco, no production should be undertaken on material which has not had at least a full year exposure test on test racks. * * *

"In conclusion we believe that the other Companies who are competing with du Pont have already developed individual colors in many cases which are the equal of Duco. We also believe that most, if not all of the other Companies have not as yet developed a full line of colors of high durability. It is an open question whether it is possible at the present time to choose any individual color made by a competing company and guarantee that its durability is as great as that of Duco. In addition, there are many other properties such as quality of the color, ease of spraying, covering power, polishing properties, and other working properties which must be determined by actual

tests on cars under production conditions.

"Under these conditions we believe it would be desirable for the General Motors Corporation to put out a limited number of cars finished with the particular colors from competing Companies in which we are most interested. * * * In this way we feel that the General Motors Corporation will be in a position by next Spring to definitely put into production materials made by some of the Companies competing with Duco. * * *" (GM 176.)

Upon the expiration of the first general contract for Duco, a second agreement covering the last six months of 1925 was executed for all requirements of the car divisions, and 50% or more of Fisher Body's requirements. Lynah testified that the reason for the 50% requirement of Fisher Body was that it "was not a wholly owned division of General Motors" and had to be sold on the desirability of participating in this contract. When the second contract was to expire, Lynah advised Research that it would be impossible to approve a competitive lacquer for at least another year and the same contractual arrangement was continued for 1926.

In 1927 the contract was changed so that General Motors bought its requirements of seller's make. Lynah testified this meant that General Motors could buy as much or as little of du Pont's pyroxylin finish as it wished and was free to purchase from competitors and this interpretation of the contract is supported by the terms of the contract itself. Competitive lacquers were approved by General Motors in 1927.

Some time between 1927 and 1930 Cadillac and Oldsmobile began using competitive lacquers. Fisher Body for many years purchased finishes from a number of sources, incluing du Pont, and is the principal purchaser at General Motors of undercoats, but buys these principally from Rinshed-Mason. Cadillac has continued to use Rinshed-Mason topcoats since the late 1920's, and its

undercoats have been supplied by a number of different companies, including Rinshed-Mason, Ferbert-Schorndorfer. Ralph J. Wirshing, head of General Motors Research Laboratories testified one of the reasons Cadillac uses Rinshed-Mason is because of the proximity of its plant to Cadillac. The Chevrolet Division continues to buy its entire requirements from du Pont for both its topcoats and undercoats. Pontiac Division buys exclusively from du Pont; the du Pont plant being only thirty miles away. Buick uses du Pont topcoats and undercoats from a du Pont plant close by. Oldsmobile has used Rinshed-Mason topcoats since 1927 and Forbes undercoats since the 1930's.

It has been admitted that soon after the advent of Duco du Pont sold this finish to a considerable number of other automobile companies. Shortly after the adoption of Duco, du Pont offered and sought to promote a nitrocellulose undercoat made from essentially the same material as Duco as a substitute for the oil base product then used. The new product was sold to automobile companies other than General Motors—Nash, Marmon, and Chrysler—because it afforded quicker drying and better surfacing qualities. Du Pont was unable to sell it to Fisher Body or any of the General Motors car divisions.

*Dulux*

By 1926 Duco was in extensive use as an exterior finish for domestic refrigerators. At that time Frigidaire used Duco as an exterior finish for substantially all of the refrigerators which it made. In 1927 Frigidaire abandoned the use of Duco and spent over $1,000,000 to install equipment for finishing refrigerators with porcelain. It did this despite the efforts of du Pont to persuade Frigidaire that it should continue to use Duco. By 1930 Frigidaire was using a porcelain exterior finish on more that 80% of its refrigerators. Throughout this period General Electric, Frigidaire's major competitor, continued to use Duco or a similar lacquer finish. When Westinghouse began to manufacture refrigerators in

1932, it also used Duco. Even after the development of Dulux, Frigidaire continued to finish the exterior of about one-fourth of its refrigerators with porcelain—and is the only manufacturer of refrigerators in the United States which uses an exterior porcelain finish.

In 1932 General Electric and Westinghouse used Duco. The technical personnel of du Pont, and General Electric worked closely in General Electric's plants and laboratories on the problem of adopting Dulux to General Electric's manufacturing process. General Electric was the first refrigerator manufacturer to use Dulux, Westinghouse was second, and Frigidaire did not adopt it until a year later.

C. L. Van Derau, a manufacturing executive at Westinghouse for over twenty-five years, testified that the reason it has purchased its entire requirements of refrigerator finishes from du Pont for many years was the fact that du Pont had "the finest trained technical group at their beck and call" and rendered excellent service.

With the exception of Frigidaire, the principal manufacturers and many of the smaller companies use Dulux exclusively; Frigidaire uses it on three-fourths of its refrigerators. Knight of General Electric, Norberg of Crosley, and Van Derau of Westinghouse, testified that these companies have used Dulux for many years because of its outstanding quality.

Dulux is not used by Frigidaire or the other major refrigerator manufacturers in inner liners or food compartments.

*Finishes—Accessory Divisions*

Richard C. Williams, Manager of Automotive Sales, Fabrics and Finishes Section of du Pont, testified that it sold substantial quantities of black lacquers to AC Spark Plug, but that Delco-Remy purchased its insulating varnish from two other sources. Du Pont has not sold to the Inland Division in large quantities because the service problem was too great.

Guide Lamp Division has purchased quantities of enamel from du Pont, but

a competitor succeeded in developing a primer which gave greater satisfaction and secured the business. The Ternstedt Division before World War II obtained its interior enamel requirements from du Pont for a number of years but "as an economy move" switched to a competitive product although du Pont still has some of its business.

Williams testified that du Pont enjoyed varying degrees of success in its efforts to sell to the accessory divisions. Each division, he testified, purchases from du Pont or one or more of its competitors in accordance with the division's determination of price, quality and service.

Electro-Motive Division, manufacturer of Diesel locomotives, purchases 70–75% of its exterior finish requirements from du Pont. Its interior finish and its insulating varnish requirements are supplied by competitors.

The Packard Electric Division which uses cable lacquers and varnish was supplied by du Pont from 1929–1933 with all its requirements of black high tension lacquer being approximately 15,000 gallons a year. In 1933 a superior product was introduced by a competitor and du Pont lost the business although it continued as a supplier in lesser volume. In 1936 du Pont regained 50–75% of the black high tension lacquer business due to improvement in its product and continued to supply Packard Electric until 1939, when a competitor, the Standard Varnish Company, produced a lacquer of considerably higher heat and oil resistance and procured practically all the requirements of Packard Electric until the war.

Packard Electric was purchasing clear high tension lacquer from Arco and Ferbert-Schorndorfer, until 1934 when William Fisher testified they recognized the need for higher quality clear and started to buy most of their requirements from du Pont. This continued until 1936 when ethyl cellulose was produced. The Glidden Company secured the business in 1936, although du Pont was selling the lower quality clear high tension lacquer to Packard Electric, until 1939. Fisher

testified that since the war du Pont has not sold this lacquer to the Packard Electric Division.

In 1929 du Pont failed in its attempt to sell Packard Electric its low tension lacquer for cables. This was before the Division was acquired by General Motors. In 1931 Packard Electric produced its own low tension lacquer and purchased its film scrap solution from the Eastman Kodak Company. Fisher testified that du Pont was never able to persuade them to purchase their low tension lacquer and their film scrap solution from them.

*Price Inertia*

In 1927 the manager of General Motors Canadian subsidiary wrote to Pratt protesting that du Pont's subsidiary in Canada was not giving them a square deal on prices charged for Duco, that they were therefore contemplating using in part competitive products. Pratt replied that he saw no objection to using competitive products to get the du Pont subsidiary on a "proper basis" and that in fact it had been recently necessary for General Motors in the States to place some thinner business with a competitor as a disciplinary measure to bring down the price of Duco and thinner. The record shows that six months later du Pont met the competitive price and gained a general contract for 60% of General Motors thinner requirements.

In February 1927 Pratt wrote to Coyne of du Pont, complaining of their price policies:

"* * * I want to tell you confidentially that the fellows responsible for the price policies in selling du Pont products to General Motors Corporation have used very bad sales psychology. I think I am safe in saying the du Pont company has never voluntarily made a price reduction on its products to General Motors. Price reductions have only been obtained by General Motors bringing in outside competition and forcing the du Pont Company to meet prices of outside competition

in order to maintain the business. * * * Practically all successful suppliers of automotive parts and materials (with the exception of the du Pont Company)—when through improved design or increased production are in a position to make lower costs—pass part of the advantage of the lower costs on to their customers with reduced prices, without solicitation or pressure. I know you are salesman enough to appreciate the psychology in this policy, and realize the lack of good will created with a customer when it is necessary for that customer to take steps to bring down prices to a proper point, rather than having proper prices made through the initiative of the supplier." (GTX 485.)

In response Coyne wrote Pratt stating he assumed he would have no objection to showing that part of the letter referring to the sales policy to du Pont's sales advisor so that he could look into the matter.

Du Pont's slowness in meeting competitive prices on Duco was contained in a du Pont report for 1928 wherein it was stated:

"Naturally the manufacturers welcomed this reduction although several of them did not fail to remind us that our competitors had long since favored them with lower prices." (GTX 490.)

80% of du Pont's total finish sales are made to customers other than General Motors. In 1948 du Pont sales of finishes to General Motors totaled $21,209,642 and its finishes sales to customers other than General Motors totaled approximately ninety-seven million dollars. The loss of a number of the early automobile customers for Duco had been due to the fact that they had gone out of business—such as Franklin, Rickenbacker, Marmon, Moon, Cleveland, Chalmers, Morris, Lexington, Paige, Hupmobile, Gardner, etc. Williams testified that du Pont had been selling to Nash, Studebaker, Hudson, Packard and Willys since the middle

1920s. Until the early 1930's du Pont sold substantial quantities of topcoats and undercoats to Chrysler, but Chrysler thought their interests would be better served if they found a supplier who would take care of their entire requirements, and Pittsburg Plate Glass has enjoyed the major share of Chrysler's finish requirements. Government Exhibits 1376–7 show that in 1935 Ford was buying one-half of its requirements from du Pont and manufacturing the other half. In 1938 Ford ceased to buy Duco from du Pont but resumed substantial purchasing when Henry Ford II became active in Ford management.

Du Pont admits that for the ten years preceding the filing of the complaint, approximately three-quarters of its total sales to General Motors have consisted of products of its Finishes Division and that General Motors has been its largest single customer. The largest single finishes item which General Motors purchases from du Pont is Duco. In recent years about two-thirds of General Motors' total purchases of finishes from du Pont have consisted of Duco, and the thinner and solvents used in its mixing and application. Thus in 1947 of du Pont's total sales of finishes to General Motors amounting to approximately nineteen million dollars, Duco and thinner sales constituted over twelve million dollars. For the six year period 1938–1941, 1946–1949, the sales totaled sixty-nine million dollars, forty–eight million dollars of which, constituting slightly over 69% of the total sales, were for Duco and thinner.

### Statistical Charts on Finishes

The charts submitted by the Government are GTX 1387, being du Pont's percentage of finish sales to General Motors; GTX 1393, 1394 and 1400 being General Motors' purchases of finish products from du Pont and from competitors of du Pont. GTX 1387 indicates 90% of du Pont's finish sales in the automotive field were to General Motors. GTX 1393 and 1394 show General Motors' percentage and dollar volume of purchases from du Pont and competitors in paints, enamels, primers, lacquers, thinners and pyroxylin was 70% in 1946 and 72% in 1947. GTX 1400 is a tabular representation of the same information contained in GTX 1393 and 1394 and lists approximately twenty suppliers of finishes to General Motors other than du Pont with the amounts supplied in 1946 and 1947, and indicates that General Motors purchased finishes from du Pont constituting 70% of its purchases in 1946 and 71.55% in 1947. Defendants have offered DP 568 as being an accurate portrayal of General Motors' purchases of finishes from du Pont and its competitors. This chart shows that General Motors purchased 67% of its finishes from du Pont in 1946 and 68% in 1947.

The only differences in Government charts GTX 1393, 1394 and 1400 and defense chart DP 568 are: (1) the Government has excluded from its charts the purchases of solvents which are items listed in GTX 1343A as being purchased from competitors of du Pont in the amount of one-half million dollars in 1946 and over a million dollars in 1947, and (2) the defendants have included solvents and excluded from their chart products described as heavy-bodied cements, pyroxylin solutions, plastic protective coating, wax, and rubbing and polishing compounds.

Since the range of difference between the percentages submitted in the defense chart and the Government charts are not in significant disagreement—the Government asserting 70–71% and the defense 67–68%—the Court is of the opinion that a conclusion as to percentages will have no material bearing on the issues herein, and will not indulge in a technical discussion of the relative methods used in arriving at the respective percentages.

The record discloses that a very substantial portion of finishes sales consist of Duco, a pyroxylin lacquer used principally as a topcoat on automobiles, and Dulux, a synthetic enamel widely used as a refrigerator finish. The Court finds on the basis of all of the evidence of record that du Pont's success in the sale of

finishes to General Motors is in large part attributable to the superior quality of these finishes and to the pre-eminence it gained as the developer of these two products, its continuing research, and outstanding service.

Duco was invented and patented by du Pont. It made a substantial contribution to the art of automobile finishing and was one of the factors that made possible mass production of automobiles. Testimony of Sloan, Lawrence Fisher and Weckler establish beyond any doubt the high value of this development to the automobile industry. Sloan recognized its potentialities in advance of some of his associates and urged the adoption of Duco. Such action on his part does not evidence a trade agreement with du Pont or response to alleged du Pont control. It is rather an instance of his foresight and leadership, not unlike a number of other incidents that contributed to his success as the Chief Executive Officer of General Motors. The testimony of Weckler, who for many years was an executive of Chrysler Corporation, was similarly convincing that Duco answered a long-felt need in the automobile industry and made its way solely on its merits. In short, the Court rejects as wholly without foundation any contention that Duco was forced upon General Motors by reason of du Pont influence or domination.

The record shows that after competitors began to produce a lacquer comparable to Duco some General Motors Divisions turned to such competitors while others continued to buy in whole or in large part from du Pont. Du Pont, it appears, has retained its position as the most important single supplier of General Motors. The Government has failed to establish, however, that this position was maintained in any illegal manner. Flaherty, Williams and Wirshing all made clear that du Pont's position was at all times a matter of sales effort and keeping General Motors satisfied. There is no evidence that General Motors or any Division of General Motors was ever prevented by du Pont from using a finish manufactured by one of du Pont's com-

petitors; nor is there any evidence that General Motors has suffered competitively from its substantial use of Duco. Kettering testified explicitly that the superior finish used on General Motors cars was responsible for their higher resale value. In view of all the evidence of record, the only reasonable conclusion is that du Pont has continued to sell Duco in substantial quantities to General Motors only because General Motors believes such purchases best fit its needs.

The evidence with respect to Dulux presents a similar picture. It is apparently an ideal refrigerator finish and is widely used by a number of major manufacturers other than General Motors. Several representatives of competitive refrigerator manufacturers testified that they purchased 100% of their requirements from du Pont. There is no evidence that General Motors purchased from du Pont for any reason other than those that prompted its competitors to buy Dulux from du Pont—excellence of product, fair price and continuing quality of service.

### Fabrics

One of the first fabrics which du Pont developed after its 1910 purchase of the Fabrikoid Company was a pyroxylin coated fabric which was used in the automobile industry for upholstery. By mid-1913 sales of this artificial leather fabric were made to nearly every major automobile company including the General Motors car units. In 1918 du Pont developed "Pontop" a double rubberized top material. During 1925, it produced "Glazed Pontop", which was replaced in 1926 by "Everbright", a material similar to the Pontop but having greater lustre and durability. Everbright at one time supplied 75% of all the closed car top material business in the country. In 1937 Cavalon, a rubberized upholstery material compounded with ground leather and finished with a thin coating of shellac, which was brominated or given a case hardened surface, was developed and was used particularly in the trucking, theatre seating and public seat-

ing trades. During the period Glazed Pontop and Everbright were manufactured, du Pont developed a combined uncoated fabric which it called "Teal". This fabric was dyed before it was woven and used for the tops of open cars.

For about two decades none of the automobile divisions of General Motors have been purchasers of fabrics for use in making automobile bodies. With the advent of the closed body car in the late 1920's and early 1930's, these automobile divisions discontinued the making of open car bodies. Fisher Body had manufactured closed bodies for General Motors cars before that type became popular and later continued the manufacture. In the mid-1930's it adopted the all steel top for all General Motors cars. Since these changes Fisher Body became a large consumer of fabrics for automotive use.

Until the adoption of the closed body car, fabric purchases by the General Motors car divisions were made principally by the respective divisions.

Before the stock purchase in late 1917, du Pont was supplying substantially all of the coated fabric requirements for both upholstery and top material for Chevrolet and Oldsmobile; about one-half for Buick; about one-third for Oakland; and all interior trim for Cadillac, but none of the top material.

Cadillac, Oldsmobile and Oakland used fabrikoid for interior trim and by 1916 Buick was one of du Pont's four largest fabrikoid customers.

In 1918–1919 Chevrolet, Buick, Oldsmobile and Oakland made purchases of Pontop when it was introduced but Cadillac made no purchases until 1920.

Chevrolet continued to use artificial leather until 1930 and du Pont enjoyed a substantial portion of its upholstery and trim requirements. After the discontinuance of the open body it made only limited purchases of the same for upholstery and trim. In 1917 du Pont attempted to persuade Chevrolet to change to another top material which it believed was superior but was unsuccessful and the business went to a competitor; this was regained in 1919, however, when du Pont introduced "Pontop". Du Pont maintained its pre-1917 position as Chevrolet's rubber coated top material supplier until 1924 when it purchased its requirements from competitors, but regained that business in 1925 when Chevrolet was having both quality and delivery difficulties with its other suppliers. Du Pont did not succeed in selling Chevrolet its combined uncoated top material until 1927, when it started buying du Pont's Teal. During this time Haartz was Chevrolet's supplier. In 1929 Chevrolet used this fabric for about one-half of its production. In 1930 Chevrolet abandoned rubber coated top materials and du Pont secured about one-half of Chevrolet's business for uncoated materials.

During 1920 du Pont, at Chevrolet's request developed a coated panel board and sold it to Chevrolet at about one-half the price charged by other panel board manufacturers. By the end of 1920 these manufacturers reduced their prices and Chevrolet thereafter purchased exclusively from them. During the 1920's and 1930's Chevrolet used a large quantity of coated fabrics for winter fronts to prevent radiator freezing and during this period purchased the du Pont product for only one year—1936.

Cadillac purchased du Pont's fabrikoid for interior trim for all its requirements until 1924. In that year for six months it purchased its requirements from Textileather. Prior to 1917 Cadillac purchased all its requirements of top material from competitors of du Pont until 1920. In that year it purchased du Pont's "Pontop" and continued to do so until 1924 when it ceased manufacture of open bodies.

Oakland purchased fabrikoid for use as interior trim until 1933 when it ceased the manufacture of open bodies. Previous to 1917 and from 1919 to 1922 this division purchased one-third of its coated fabric requirements from du Pont. In 1918 du Pont had difficulty in maintaining color uniformity and Oakland purchased from competitors. In 1922

Oakland purchased its entire requirements of coated fabrics from du Pont, but in 1923 began to purchase from competitors. By 1925 du Pont again received about one-third of its coated fabric business. In 1926 it converted to uncoated combined top material and purchased from du Pont's competitors.

Except for 1922, when du Pont supplied Buick's entire requirements for coated fabrics, it supplied one-half of this division's requirements. When du Pont commenced the manufacture of uncoated combined top material, it solicited the Buick business but received no orders until 1927–1928, when it supplied all its requirements. In 1929–1930 Haartz became Buick's supplier of this fabric. Buick discontinued the manufacture of open bodies in early 1930.

Oldsmobile, between 1923 and 1929, purchased about one-half of its requirements for coated and combined fabrics from competitors of du Pont. In 1923 it purchased one-half of its requirements from du Pont in the rubber coated material "Pontop". From 1924 through 1926, this division used uncoated combined top material and purchased a substantial amount from du Pont. In 1927 and until 1929 it purchased from du Pont's competitors.

Between 1918 and 1923 du Pont supplied the bulk of General Motors' fabric business. The depression of 1920 and 1921 caused a drop in automobile sales and the automobile manufacturers, including General Motors, had large stocks of coated fabrics on hand, including future commitments under contracts. Several of the General Motors units requested du Pont to cancel their contracts but du Pont refused. An agreement for deferred delivery was made on Chevrolet's contract and settlement eventually made on the Buick, Oldsmobile and Oakland contracts to cancel same on the condition that each would purchase their entire requirements of coated material for the year 1922 from du Pont. Due to the settlements of the 1920 contracts, du Pont in 1922 supplied a greater percentage of General Motors' requirements than it had previously. In 1923 these three divisions commenced to purchase this fabric from other manufacturers.

Early in 1923 the General Purchasing Committee found that General Motors had purchased nearly all its fabric requirements in the preceding year from du Pont and determined that at least 20% of the requirements should be placed elsewhere. In 1931 du Pont made a study of its total sales of coated and combined fabrics and the study showed that du Pont supplied 31.5% of General Motors' requirements in 1930.

Fisher Body manufactured closed cars for the General Motors car divisions before 1917, and between 1924 and the early 1930's, manufactured the open bodies and convertibles. Until 1935 or 1936, when the all steel top was introduced, Fisher Body used coated fabrics as top material for the closed cars, but used no coated fabrics for upholstery and trim until 1939. It used combined fabrics as top material on convertibles. Fisher Body was buying none of its material from du Pont, purchasing from Textileather, until it bought du Pont's "Glazed Pontop" in 1925. In 1927 it changed to pyroxylin top materials and purchased one-half of its requirements from Textileather. It commenced to use du Pont's Everbright in 1928–1929. In 1929 it purchased two-thirds of its requirements from du Pont competitors. It continued such purchasing until 1936, when all of the General Motors closed bodies had an all steel top practically eliminating requirements for coated or combined fabrics except for convertible top material. Fisher Body began to use uncoated combined fabrics for top material on convertible models in 1926, purchasing about one-half of its requirements from du Pont. In 1931, when du Pont refused to grant a guarantee against damage by cleaning, it purchased its entire requirements from Haartz. In late 1946 or early 1947 Fisher Body had difficulty with shrinkage and fading of top material purchased from Haartz. In 1948 du Pont successfully met the difficulty and secured a part of the Fisher

Body business. Since that year du Pont has supplied Fisher Body with less than one-half of its requirements of top material.

In 1939 Fisher Body began to use coated fabrics for interior trim and purchased part from du Pont and part from its competitors. Du Pont secured a major portion of its requirements for the years 1940–1941, and immediately following the war Fisher Body purchased from du Pont all of the coated fabrics du Pont would sell since there was a shortage of said material. Since 1947 or 1948, Fisher Body has been purchasing its coated and combined fabrics from Textileather, Federaleather, Haartz Auto Fabric Co., and United States Rubber, as well as du Pont.

Fisher Body also purchases about $1,000,000 of weather stripping cement. It purchases from du Pont a neoprene base adhesive called Fairprene 5115. Sales of this cement amount to about 3% of Fisher Body's total purchases. The bulk of its requirements for this material are purchased from Armstrong Cork, although Nickowitz testified that du Pont was still trying to sell larger quantities of Fairprene 5115.

In 1930 General Motors purchased the Indianapolis plant of the Martin-Parry Corporation, which became the Chevrolet Commercial Division of General Motors. This division makes bodies for light trucks and commercial vehicles. Between 1922 and 1930 Martin-Parry Corporation purchased 100 percent of its requirements of coated fabrics for upholstery and trim from du Pont. From 1930 to 1937 it purchased only du Pont pyroxylin coated fabrics. In 1937 du Pont supplied 90% of its rubber coated fabric requirements, but in that year it started to purchase from United States Rubber a part of its requirements. In 1940 du Pont lost more of this business, and in 1948 supplied only 60% of this division's requirements. Du Pont now obtains less than one-third of the approximately two million dollars of annual fabric purchases made by this division.

GMC Truck & Coach Division buys one-third of its requirements for light truck upholstery from du Pont. Its requirements of heavy truck upholstery are supplied by United States Rubber. When GMC Truck shifted, after the war, to vinyl coated fabrics instead of natural leather for the upholstery of its heavy trucks, United States Rubber succeeded in getting that business. Vinyl material for bus seats was supplied by B. F. Goodrich Company.

A C Spark Plug purchases about $2,-000,000 annually of coated fabrics for fuel pump diaphragms and continues to use its own material despite du Pont's sales efforts. At Chevrolet's request A C uses du Pont material for its automatic transmission. Electromotive's requirements of synthetic rubber coated material for batten strips and rubber coated fabrics for insulating material are not supplied by du Pont although it supplies its principal competitor. Delco Appliance Division has a large requirement for synthetic rubber coated fabrics and sheet stock, but does not purchase from du Pont. Packard Electric Division also has large requirements for vinyl coated insulating tape, but does not purchase from du Pont. Du Pont supplies one-half of Packard Electric's requirements in "Teflon" a coated glass fabric for insulating aircraft ignition wire.

General Motors Overseas Division, which before the war purchased substantial amounts of coated fabrics in the United States, purchasing one-half from du Pont, has since the war made all of its purchases abroad.

A du Pont Annual Report for 1940 shows that demand for rubber coated fabrics continued until 1940 when pyroxylin coated material came into being. It stated:

"About five years ago rubber coated fabrics started to supplant pyroxylin materials for automobile truck seat upholstery and usage of the latter by the automobile industry gradually decreased until 1940 when style changes resulted in considerably higher requirements of pyroxy-

lin coated fabrics as trim on the interior of closed cars. Our sales improved from $360,000 in 1939 to $870,000 in 1940, approximately 50% of the industry's total requirements." (GTX 1380.)

In 1941 a du Pont Annual Competitive Report stated:

"The trim of the interiors of 1941 and 1942 passenger cars was such as to permit increased usage of pyroxylin coated fabrics for such purposes as the tops and backs of front seats, kick-pads, shelves behind rear seats, etc. Du Pont sales increased to $1,365,000 in 1941, 5% over 1940, and represents 30% of the total automobile requirements. It is believed that Textileather Corporation secures the next largest share, as they supply a sizeable portion of Chrysler's needs." (GTX 1381.)

In 1949 du Pont's total dollar sales to General Motors increased from $3,500,000 in 1948 to $3,700,000; and du Pont's Annual Market Survey for 1948 stated that du Pont's fabric division sold four million dollars of its fabric to the automotive industry, General Motors purchasing over 80%, or $3,700,000.

Nickowitz testified that since 1944 when he became Director of Sales at du Pont, sales of coated fabrics to the automobile industry represented only 20% of the total, and that sales of coated fabrics represented approximately 2%-3% of its sales. He stated the largest customer in the automobile field of the Fabrics Division for the year 1948 was General Motors which purchased $3,700,000 of fabrikoid, fabrilite and Teal, and that sales to General Motors in that year represented about 80% of the Fabrics and Finishes Departments automobile sales.

### Statistical Fabric Charts

The charts submitted by the Government in this field are GTX 1391 and 1392, showing General Motors' percentage and dollar volume purchases from du Pont and its competitors for 1946 and 1947. These charts indicate that 74.5% of General Motors' purchases of fabrics in 1946 and 60% in 1947 were made from du Pont. Defendants have offered DP 569 showing that in 1946, 52.3% in 1946 and 38.5% in 1947 was purchased from du Pont.

In support of its charts the Government states a study of the evidence shows that the largest usage of any automobile fabric was for upholstery and trim; that GTX 1391 and 1392 reflect the percentage of fabric purchased by General Motors from du Pont for that use. It is stated that one of the chief reasons for concluding that this sole classification is an accurate one and the one most commonly used in the automotive field, was the usage of that term by Thomas A. Nalle, a du Pont fabrics salesman, whose reports are represented by GTX 1349 and 1358. The Government arrived at its percentages by comparing du Pont total sales of fabrikoid, fabrilite and Cavalon to General Motors, as shown on GTX 1344, with only that part of General Motors' purchases from du Pont competitors which is shown in GTX 1343A under heading "Imitation Leather".

The defendants object to the accuracy of this comparison and to the assumptions on which it rests for the following reasons:

1. The Government's assumption that all fabrikoid, fabrilite and Cavalon sold by du Pont to General Motors is used solely for upholstery and trim is improper; the du Pont sales figures shown on GTX 1344 are for total sales and purchases without regard to the end use of the fabric; the record does not support the assumption that all coated fabrics purchased by General Motors from du Pont were used for upholstery and trim; on the contrary the record shows that these fabrics had other uses such as head linings, winter fronts, seat covers, top materials, case coverings, spring boots, sheet stock, work clothing and curtains.

2. The Government's assumption that only those purchases by General Motors from du Pont competitors shown on GTX 1343A under the heading "Imitation Leather" were used for upholstery and trim is likewise improper; that the

record shows that the terms "coated fabrics" and "imitation leather" are used interchangeably and that these separate headings in GTX 1343A were used merely to permit recording in accordance with personal preference in usage of terms, and that in collecting and presenting the figures contained in GTX 1343A, General Motors included under both headings fabrics that were competitive with those offered by du Pont. The Government states that General Motors did not use the fabric suppliers listed under "coated fabrics" as suppliers for upholstery and trim fabric; that they supplied fabrics which General Motors used for other purposes as gaskets, welts, gimps, etc. as is substantiated by the testimony of Nalle and Nickowitz and the documentary evidence. Defense chart DP 569 includes both categories of "coated fabrics" and "imitation leather" figures in its computations.

The Court is of the opinion that the product comparison made by the defense chart from the base charts, GTX 1344 and 1343A, reflects the proper delineation to be accorded the figures contained therein, and the use figures submitted by the Government calls for assumptions not supported by the record. Thus, the Court concludes that in the fabrics field General Motors purchased approximately 40–50% of its requirements from du Pont for the years 1946 and 1947.

Du Pont since 1910 has been one of the major producers of coated fabrics and related products. At the time of its investment in General Motors it had been engaged in selling such products to the automobile industry for many years and its customers included many of the companies that subsequently became a part of General Motors. Following its investment it continued to sell to the General Motors divisions, and over the years those divisions that use fabric products have purchased them from du Pont in varying amounts.

On the basis of all of the evidence of record the court finds that there was at no time any agreement that bound General Motors to buy any fixed portion of its fabric requirements from du Pont with the exception of the year 1922. In that year it appears that du Pont was promised, and perhaps received, all of General Motors' fabric business. This arrangement grew out of the cancellation of certain contracts in the previous year which caused du Pont substantial loss. It thus grew out of a normal buyer-seller relationship. The Court further finds that such purchases of fabrics as the General Motors divisions have made from du Pont from time to time were based upon each division's exercise of its business judgment and are not the result of du Pont domination. Du Pont, the record shows, has maintained its position as the principal fabric supplier to General Motors through its early leadership in the field and by concentrating upon satisfactorily meeting General Motors' changing requirements as to quality, service and delivery.

### Tetraethyl Lead

C. F. Kettering became associated with General Motors in 1918 when it merged with United Motors, a division of which included the Delco Company. He was its General Manager and retained that office after the merger. On December 31, 1920 he was made a director and shortly thereafter a Vice-President of General Motors.

Kettering became interested in exploring the causes of engine "knock" in 1912 or 1913. He conceived the idea that he might lessen the knock and improve the engine efficiency by adding something to the motor fuel.

This was a subject of revolutionary interest in the evolution of the internal combustion engine because until the problem of "knocking" could be solved, the possibility of improving engines and engine performance was limited. The oil and automotive industries both were tremendously interested in Kettering's research.

Research was conducted at the Delco Company, then a part of United Motors, with Thomas Midgley in charge, and was later transferred to the Dayton Metal Products Company, acquired by General Motors in 1919.

During this research Kettering prepared papers and made talks before technical groups, wrote letters, and invited help in the research. Among those interested, who directed an inquiry to Kettering in 1916, was a Mr. Kurtz of du Pont who inquired for more particulars after hearing of a talk Kettering had made in Cleveland. Kettering sent him a copy of a new paper he was about to deliver, also stating "any time we get anything of interest we will be glad to give you the benefit of it." In 1919 Frank Howard of Standard Oil of New Jersey contacted Mr. Kettering because of Standard's interest in the problem. Kettering explained the work he was doing, and Standard started research work on its own.

Through the American Chemical Society, Kettering testified he met some du Pont chemists and after World War I invited them to visit his laboratory to see what he was doing. In August 1919 Dr. Midgley or Dr. Clements wrote to the Manager of the du Pont laboratory listing materials which had been tried in the "suppression or elimination of the kerosene knock" and indicated that a study was to be made of the "homologues of aniline," listed the materials desired to be studied in connection therewith, and requested du Pont to supply them with any information they had on the best methods of preparing compounds which du Pont could not supply, and closed with the statement that "we are anxious to cooperate with you in every possible way." Subsequent to joining General Motors, Kettering testified he continued to call on du Pont scientists for assistance.

On October 28, 1919 K. W. Zimmerschied, Assistant to the President of General Motors, wrote C. M. Stine, Assistant Director of Chemical Research at du Pont that:

"The Dayton Laboratories will continue the broad subject of fuel utilization in internal combustion engines, and your people will take up the development of chemicals which may be added to undesirable fuels for the purpose of converting them into usable products. * * *

"It is presumed that the marketing of this chemical will be a matter of interest to the du Pont organization, and that the expense of developing it will be borne by your Research Department. We are glad to lend the mechanical equipment * * * without charge for the purpose of this investigation." (GTX 599.)

Du Pont's Chemical Director replied that he had no funds available for such work and that in any case the ultimate expense of the research should be borne by whichever company derived the greatest benefit from the work.

On June 20, 1920 Lammot du Pont, Chairman of the du Pont Executive Committee, submitted to it for their approval a form of proposed general chemical agreement between General Motors Chemical Department and du Pont, which the committee approved.

On August 5, 1920 General Motors Research wrote to the Chemical Director of du Pont, stating:

"Confirming our conference on my recent visit to Wilmington: I understand that the du Pont Company will cooperate with our Company in placing aniline on the market for use as an anti-knock material, in connection with the aniline injector which we are developing.

"* * * A further working out of this program would comprise the sale of aniline by the du Pont Company through some satisfactory distributing agency, such as has been suggested by the Standard Oil Company, who could give aniline national distribution * * *

"In connection with the above, it was agreed that we would cooperate with du Pont in securing satisfactory patent protection on the above mentioned devices." (GTX 601.)

Dr. C. M. Stine, Assistant Director of Chemical Research of du Pont, on April 22, 1920, reported on a conference held

in Wilmington at which Mr. Kettering was present and members of the du Pont Chemical Department, including Irenee and Lammot du Pont and Raskob, wherein "various phases of the proposal to use the Chemical Department of the du Pont Company in a consultant capacity and for research work for the General Motors" was discussed.

On August 14, 1920 Lammot du Pont wrote Kettering that he believed that a memorandum submitted by Mr. Midgley on the results of the conference was substantially correct except in one respect: "We agreed that the du Pont Company would cooperate with General Motors on this aniline subject, provided the manufacture, distribution and sale of aniline for this purpose appeared sufficiently attractive from the profit standpoint."

In connection with the General Chemical Research agreement urged by Lammot du Pont, Kettering replied on October 21, 1921 that the Executive Committee of General Motors was antagonistic to the proposition and after talking with Pierre S. du Pont, Kettering wanted to arrange a later meeting between du Pont and General Motors to discuss the whole problem, but that at the present time to consider the matter of the contract "out of the picture." Lammot du Pont again wrote Kettering on October 24, 1921 stating:

"Our understanding of present conditions is that we are expected to take up experimental chemical work for the General Motors Corporation when requested. We have taken up such work from time to time and have consulted and advised from time to time.

"At present we have no definite authority for doing this and have no mutually agreed upon basis of charging for the work or dividing the results in the shape of rights. The purpose of the agreement is to give the du Pont Company definite authority and a basis for charging, and either reserving or turning over to General Motors any rights that may be developed. It seems to me

that this purpose must be accomplished regardless of what arrangement is made with respect to any of the work, and that, therefore, the agreement should be executed at once." (GTX 583.)

Research continued for a better antiknock solution and negotiations with du Pont for the production of aniline were suspended. In December 1921 Kettering's research organization discovered tetraethyl lead to be a more effective antiknock than aniline. On January 28, 1922 General Motors advised du Pont that their work at the laboratories had taken an entirely different turn and that it had been decided for the time being no contract would be made. On March 18, 1922 Frank A. Howard of Standard was also advised by the General Motors Research that "research work took a very sudden turn in a direction that would indicate that it would be a mistake both on your part and on ours to enter into an agreement such as we discussed."

On March 27, 1922 Lammot du Pont again wrote Kettering stating he had heard nothing from him on the General Motors-du Pont contract regarding experimental chemical work, that the fuel problem was in no way the cause of his present writing, that he felt a general contract should be prepared and executed in order to clear up the present situation, and he had no objections to any suggested changes Kettering would make. Mr. Kettering replied he had taken the matter up with Pierre S. du Pont suggesting it would be well to get some representative of the du Pont Company to come to Dayton to "get a picture of what our problems really are" and that after a time, if "we find it would be desirable to enter into a contract" it would be worked out. Lammot du Pont on April 1, 1922 replied that Kettering seemed to have missed his point stating that General Motors in its research frequently runs into chemical problems, that the du Pont Company in its research was continually dealing with all kinds of chemical problems, that duplication of staff could be avoided "by an arrangement whereby General Motors

has a contract with du Pont" to assign chemical problems to du Pont whenever desired, that an arrangement of this kind should provide for some form of compensation or payment of expenses otherwise the assignment of each particular problem would "require a conference and settlement in each case before work could proceed, which obviously would cause delay and loss." He also said:

"Why can we not execute a general contract to cover any and all future cases?

"The only reason I can see for not doing so is the decision by General Motors to establish their own chemical staff. If you have come to this conclusion, I have no objection as a representative of the du Pont Company, and have nothing more to say." (GTX 591.)

Kettering replied affirming the desirability of the du Pont organization supplementing the work in the General Motors laboratory, but felt that some of the du Pont associates should come out to their laboratory to see "what we are aiming at" and that possibly after such visit "there would be no difficulty whatever in getting together and working this matter out." The following month he replied to Lammot du Pont's renewed urging saying:

"In going through this matter I consider that this is entirely outside the range of the Research Laboratory to enter into a contract of this kind. I am, therefore, turning the matter over to the head of our Corporation and any plan which they may work out will be entirely satisfactory to us." (GTX 594.)

Kettering sent a copy of the proposed contract submitted by Lammot du Pont to Pierre S. du Pont. On November 6, 1922 the matter was permanently closed as shown by a file memorandum written by Lammot du Pont:

"In conversation with Pierre S. du Pont he advised that it does not seem possible at this time to institute any plan for cooperation on chemical research work between General Motors Corporation, his feeling being that as problems come up, special arrangements with reference to each should be made between the two companies, rather than an attempt now to make a general arrangement to cover prospective cases." (GTX 598.)

Kettering testified that when the proposed contract was originally discussed at the Wilmington conference, he was opposed to it because "du Pont Company was thinking in terms of manufactured chemicals rather than the research chemicals General Motors was interested in." Sloan also testified: "the fact is that the whole proposition was unsound. Mr. Kettering was against it. Everybody was against it. It couldn't be considered from the General Motors point of view."

During the negotiations concerning this General Chemical agreement, on March 22, 1922, Pierre S. du Pont sent a brief report to Irenee du Pont on the new "doping" compound—tetraethyl lead— and stated that:

"Mr. Kettering would like to take up the question of manufacture with the du Pont Company representatives at an early date." (GTX 610.)

On April 15, 1922 the patent application covering TEL was filed and Dr. Midgley wrote to Dr. Stine of du Pont advising him of the "new anti-knock material" TEL.

It was Kettering who made the decision to call in du Pont for assistance in the manufacture of tetraethyl lead. In June 1922 Kettering invited Irenee du Pont to come to Dayton to discuss the problem. Thereafter, he met with C. S. Mott and Pierre S. du Pont and proposed that the manufacture of TEL be started as soon as possible by du Pont in order to produce about one hundred gallons a day. Sloan testified that he recognized General Motors had no competence in chemical manufacture and that research and manufacture of chemicals were quite different; that the manufacture of tetraethyl

lead involved danger and was an entirely new venture, the product never having been manufactured in the United States. He stated du Pont had demonstrated through its war work "its ability to deal with problems involving dangerous materials, such as dynamite; and their well organized research offered the best opportunity for us to produce tetraethyl lead and put it on the market."

Kettering and members of his staff went to Wilmington for a series of conferences with Irenee du Pont and members of the du Pont chemical staff. Irenee du Pont advised Dr. Stine, Harrington and Reese of du Pont of Kettering's forthcoming visit and stated he was anxious for du Pont to sell Kettering on du Pont's ability to help General Motors on the TEL proposition.

At this time, du Pont without a written contract, undertook the production of TEL using the bromine process developed by Midgley. On September 5, 1922 General Motors Research reported to the Executive Committee of General Motors that satisfactory progress had been made in the production program, that research and production at General Motors could be dropped, and that the du Pont Company would continue production. Kettering testified he told Sloan that a contract should be made since there was nothing between the two companies regarding prices or anything else. Sloan wrote Kettering advising him that Irenee du Pont also felt that a more definite arrangement between the companies should be made and that an appointment had been made for Kettering, Irenee du Pont, Harrington of du Pont, and Sloan to discuss the matter.

On October 6, 1922 General Motors and du Pont entered into a contract relating to the manufacture of tetraethyl lead. Under this agreement du Pont was to build a plant to produce TEL at the rate of one hundred gallons (1300 lbs.) a day using the ethyl bromine process; the price was set at $26 a gallon; the contract was a "continuing one" but included a provision for cancellation and gave General Motors the right to manufacture

TEL itself or have it manufactured by others if at any time du Pont prices should not be the lowest.

The distribution of tetraethyl lead was made in February 1923 at gas stations in Dayton, Cincinnati, and Hamilton, Ohio and by the middle of 1923 had tremendous public acceptance. In April 1923 Midgley of General Motors met with Howard of Standard Oil, which corporation had been interested in the antiknock project from the beginning. At this meeting Howard revealed a new ethyl chloride process developed by a chemist at Standard Oil. This new process could produce tetraethyl lead at less than $10 a gallon, which was cheaper than the ethyl bromine process. There was a shortage in the supply of bromine from commercially developed sources.

During this time Midgley continued working out distribution arrangements of TEL with the various oil companies, including Standard. Midgley suggested that Standard consider the possibility of its manufacturing TEL and offered that if Standard would establish facilities for manufacturing one hundred gallons of TEL per day, General Motors "would then sign with them a similar contract to the one now in force with the du Pont Company"; that Mr. Howard stated to him they were not chemical manufacturers and suggested a meeting between the principal executives of the two companies to develop a "working arrangement between General Motors and Standard Oil." On June 15, 1923 Mr. Pickard, General Manager of du Pont's Dyestuffs Department wrote to Irenee du Pont that Standard had developed a new cheaper process for producing TEL.

On January 28, 1924 Sloan wrote to Irenee du Pont, president of du Pont, that he had talked with two or three of the Standard Oil people with reference to TEL; that they reported that in discussing the manufacture of TEL with Kettering and Midgley they had been encouraged to see what they could do in developing a process for marketing TEL; that they had a method covered by patents which gave lower cost of production;

that Standard had a contract with General Motors on the distribution of TEL and was urging a deal to license competitors to distribute TEL thereby getting broader distribution which "they claim will be in our interest in return for that they want the right to manufacture for our account tetraethyl lead at a price competitive with the du Pont Company." He expressed his thought that since TEL was still in the development stage that manufacture by Standard should not be discussed and further did not think it was good business "from our standpoint for them to manufacture tetraethyl lead and at the same time have such a large slice of the distribution." In addition he stated he would rather obtain a license from them, pay for it and "get the du Pont Company to use it in reducing the cost" instead of dealing with Standard as a manufacturer. Irenee du Pont replied on February 2, 1924 that du Pont was in accord with that course of procedure and suggested General Motors write Standard indicating it had contacted du Pont on its estimated requirements for TEL "believing that they are the best equipped company to handle complicated organic chemical problems" and also suggesting that Standard contact du Pont "to see if they are in any wise interested in your proposed method for the manufacture of that compound." Sloan sent Irenee du Pont a copy of the letter he sent to Standard Oil, and stated he thought it best in view of his conversation with Standard Oil to write along different lines and had taken the liberty of modifying Irenee's suggested letter. His letter to Standard stated that because of rapid developments in the plant built for the manufacture of TEL and the fact that the whole picture is more or less in the development stage, it was desirable to refrain from discussing the situation at the present time" but that General Motors would be glad to discuss the relative merits of the two processes and perhaps work out a plan which would preserve the equities."

The minutes of the Executive Committee of General Motors for February 27, 1924, members present being Pierre S. du Pont, Raskob and Sloan, reported that discussion was had on the future policy of General Motors in the development and marketing of TEL and that "it might be possible to work out a plan whereby a company could be formed to control our patents and the distribution of the material which would be jointly controlled by the large oil companies and ourselves."

Several conferences took place in June 1924 between General Motors and Standard Oil on the subject of tetraethyl lead and the possibility of Standard engaging in its manufacture. Standard proposed to erect a one hundred gallon plant, chlorine process, to be installed at the Bayway Refinery for the purpose of affording "the experience basis for future construction of this process" and "provide an additional one hundred gallons of TEL per day for the end of the peak season, September and October."

On June 25, 1924 Howard of Standard Oil had a meeting with Irenee du Pont to be shown through the du Pont plants. Irenee du Pont testified that he learned for the first time of Standard's interest in the manufacture of the anti-knock compound. Irenee du Pont wrote to Sloan following Howard's visit stating that Howard was anxious to start the Standard plant at Bayway, that Irenee appreciated there would be some advantages in having an independent plant operated by General Motors and Standard "as a check on prices charged by the du Pont Company and also to obtain such advantage as there may be in the enthusiasm of the Standard Oil men to put across their own 'baby.'" To this letter Sloan replied indicating du Pont should increase its production and production facilities for TEL; that

"for psychological reasons we should permit the Standard Oil Company of New Jersey to expend $35,000 or $40,000 of their own money to experiment with the 100 gallon a day outfit in one of their plants, I believe in Bayway, in a building which they could use temporarily for the pur-

pose. This will serve to satisfy them from the psychological standpoint and it is certain that it will be impossible to operate such an experimental plant successfully when the larger units are running, but will give them a means to work out their viewpoint which certainly can do us no damage when we approach it from the bigger way.

"Any further thought of developing any real production other than under the auspices of the du Pont Company will be deferred until some later time." (GTX 661.)

Sloan wrote to Kettering on July 25, 1924 reporting a conference he had with Howard of Standard Oil for the formation of the company to be jointly owned by General Motors and Standard under the name of the Ethyl Gasoline Corporation. In August 1924 a formal agreement was entered into between General Motors and Standard Oil organizing such a corporation.

This agreement provided that the capital stock of Ethyl be divided equally between General Motors and Standard, each to have a 50% interest; each was to have five directors of the ten members on the Board; each was to grant Ethyl exclusive licenses under all patent rights from their respective patent applications in the field of anti-knock compounds; and each was to grant Ethyl exclusive rights on all future discoveries until August 1, 1940. In addition, the agreement provided that Ethyl would handle the distribution of TEL and would purchase the same

"in the open market at the lowest price at which it is offered and, to permit competitive bidding, shall offer to instruct and license any bona fide probable supplier, including the Standard Company; * * * provided, however:

"Purchases shall be made from E. I. du Pont de Nemours & Company under the existing contract between it and General Motors * * * until the expiration of said contract or until a substitute therefor is made

direct with the Ethyl Company." (GTX 668.)

The General Motors directors on the Ethyl Board were Sloan, Kettering, Donaldson Brown, Midgley and John T. Smith; the officers were Kettering, President, Howard of Standard, Vice President, and Midgley, General Manager.

Tetraethyl lead is a poisonous substance. Both General Motors and du Pont were fully aware of its toxic effects. Sloan in June 1924 wrote to Kettering regarding the appointment of a board of medical men to study the problem. Sloan and Kettering both testified that General Motors had not invented TEL as a product to add to its line in order to make money producing and selling it, but that its interest was the advance in engine compression and to make a better and more efficient motor car.

The properties of tetraethyl lead made its production on a commercial scale a hazardous undertaking and Sloan stated he fully realized the dangers incident to the manufacture of this material. He testified that he knew Standard was not a chemical manufacturer, that its chief business was digging wells and pumping oil from the ground, and he felt Standard was not equipped to enter the field of chemical manufacture at this stage of TEL's development. His acquiescence to Standard's plant at Bayway was because Standard wanted to try the manufacture of TEL and further he thought something might be learned from the experiment.

During the Summer of 1924 technical planning at Bayway and du Pont's Deepwater plant proceeded, and a difference of opinion emerged between the engineers of the two companies with respect to the manufacturing equipment to be employed in producing the ethyl chloride process. Harrington testified that du Pont advocated a completely closed, airtight system of manufacture, while Standard felt economy would be achieved by permitting the working force to handle the lead residue directly. After visiting the Bayway plant, Harrington

308

said there was unanimous agreement that Standard's process was "too dangerous" for du Pont to use, notified Standard to that effect, and received permission from Ethyl to install equipment of its own design.

In October 1924 the Bayway plant was stricken with a series of fatalities resulting from TEL poisoning—there were five deaths within a period of a few days, with many other employees being poisoned. A public uproar followed; exaggerated reports filled the press; university professors made adverse comments; major oil companies announced they would no longer distribute TEL and municipalities banned its distribution. The Standard plant was immediately closed. The New Jersey authorities ordered its dismantling and Standard was ordered not to engage in TEL manufacture. Following this disaster Sloan in writing to Irenee du Pont on December 12, 1924 asking him to take a position on Ethyl's Board stated:

> "du Pont will always be the manufacturing agent of Ethyl Gasoline Corporation whether we make tetra ethyl lead or whatever we make, now or in the future. I am sure of that. * * *" (GTX 710.)

Ethyl was forced to suspend its sales of TEL completely. Ethyl requested du Pont to withhold deliveries from its bromine process plant. The figure of $1.66 per pound was the approximate cost of producing TEL at this plant and $1.17 at du Pont's chloride plant. Du Pont withheld its deliveries. Howard wrote to Irenee du Pont on March 28, 1925 stating the problem following the Bayway disaster as follows:

> "while owing to conditions over which neither party has had any control it would have been to the advantage of the du Pont Co. to have continued uninterruptedly to produce lead from its bromine plant and its failure to do so, out of consideration for the interests of the Ethyl Corp., resulted in some loss to the du Pont Co., this is a loss of profit which neither party contemplated

at the beginning the du Pont Co. would make. On the other hand, the du Pont Co. is suffering a loss of profits which the parties did contemplate the du Pont Co. would make, through the failure of the chloride plant to deliver the quantity of lead which both parties hoped and expected it would deliver prior to April 15th.

> "Owing to conditions over which neither party has had any control the Ethyl Corp. at the same time finds itself with a stock of over $1,000,000 worth of lead on hand and deliveries still coming in very much more rapidly than the goods can be marketed at present. This situation was not contemplated by the Ethyl Corp., but, on the contrary, the Ethyl Corp. had hoped and expected to be able to market immediately and at a profit to itself any lead supplied to it by the du Pont Co. prior to April 15th, even though such lead bore a price of $1.66 per pound." (GTX 677.)

He continued stating that he was content to leave the decision in Irenee du Pont's hands, "with entire confidence in your reaching a fair conclusion."

Irenee du Pont replied to this letter stating:

> "apart from the contract we were asked to defer deliveries of material which we could make in January and would have made at a profit. We suggested that these deliveries be simply deferred and not cut out entirely, an eminently fair proposition to make. Owing to the fact that the Ethyl Gas executives were very busy and/or away, delay would have ensued detrimental to your interests if we had stood 'pat' and waited for you to 'come across'. In our desire to be helpful to the 'picture' we acted on your orders without getting approval for a deferment of the deliveries in question. It seems to me only equitable that you should have accepted our offer of deferment and not take advantage of our efforts to be of service to you.

"It is, therefore, my judgment that you should accept delivery at $1.66 per lb. of the amount of tetraethyl lead which we voluntarily abstained from making and shipping in January, and that, further, if owing to our misfortune at the ethyl chloride plant you are sufficiently short of ethyl lead so as to make a loss thereby, the amount up to that accruing by reason of the lead not delivered in January, should not be assessed to us on the damage paragraph." (GTX 679.)

He admitted that from a law point of view Ethyl might maintain its position, but that the equities indicate otherwise.

When the manufacture of TEL was suspended, there was also disagreement between Ethyl and du Pont as to the settlement to be made on cancellation of their contract. Under the terms of its contract du Pont was to be reimbursed for its expenditures in building the chloride plant. Webb in a letter to Sloan stated that Ethyl had informed du Pont it would be reimbursed for the cost of such building and any expenditure incurred so as to make du Pont "whole". He stated further:

"It seems to me that we should get from the du Pont Company at the time of settlement assurances of placing us in possession of all facts and data relative to this work, so that we may have the benefit of any information or knowledge gained in such research work. This has not been suggested to the du Pont Company as a part of settlement, but I feel confident that Mr. du Pont will not raise the slightest objection to giving us full and complete copies of or access to this data." (GTX 685.)

He also reported that he wrote to Mr. du Pont:

"I naturally assume that if operation of the plant is not resumed during our present contract period and meanwhile it has been paid for by us in accordance with the terms of the understanding which we are now attempting to reach, then it would seem to me that the building, its equipment and appurtenances (excluding land) would be our property." (GTX 685.)

but that Mr. du Pont replied:

"If it is your desire that the plant be scrapped at your expense, the proceeds of the scrapping should properly be yours under a general proposition that we shall be made whole. However, the economies of such a procedure are not good, which being the case, it seems essential that the physical property of unknown and somewhat doubtful value should be left in our hands, perhaps as a compensation for our having waived any profits on the contract." (GTX 685.)

Webb stated that "if it should not ultimately be used to manufacture something for us that we be paid the salvage value, whether demolished or converted to some other purpose."

Howard had written Webb of Ethyl on June 29, 1925 regarding the discussions concerning settlement and stated:

"If at any time the du Pont Co. wishes to make use of the ethyl plant for any purpose, it shall then pay to the Ethyl Corp. the then value of the plant to the du Pont Co. for the purpose for which they contemplate its use." (GTX 686.)

He further revealed the sum of $1,500,-000 was to be paid du Pont on account of the settlement. On June 30, 1925 Webb delivered the $1,500,000 "without any strings attached to it at all" and further discussion of the settlement terms were to be had later with Irenee du Pont.

Irenee du Pont wrote to Webb on July 1, 1925 that Howard's letter of June 29, 1925 relating to the adjustment of the controversy was "not satisfactory" stating that du Pont could not cede ownership of the plant and that

"our contract speaks for itself as regards ceding to you any inventions on the anti-knock compounds but we could not undertake to teach you

\* \* \* how to carry on that manufacture as well as we could do." (GTX 688.)

Webb replied saying that he considered the salvage or conversion value of the chloride plant as the principal matter to be adjusted between them.

In August 1925 Webb suggested that settlement of the question of ownership of the plant be deferred until the investigation then being conducted by the Surgeon General of the United States was completed, and if the report made by him was favorable Ethyl would make another contract covering manufacture of TEL with du Pont and "the salvage problem would have answered itself," but this suggestion was not acceptable to Irenee du Pont who did not wish to defer the issue. Harrington testified that eventually Webb's suggestion was accepted and the matter was not settled until the contract between Ethyl and du Pont was negotiated in March 1926. Du Pont retained the chloride plant at Deepwater, since in January 1926 the Surgeon General of the United States in a report approved renewal of the business and production of TEL and manufacture was resumed in March 1926.

In the negotiations regarding this controversy Sloan testified he took little part since he wanted to be in a completely unprejudiced position, although he revealed he believed the du Pont position was entirely correct. In March 1925 he wrote to Irenee du Pont that he had come to the conclusion it was a mistake to leave the management of Ethyl's property so largely in the hands of Dr. Midgley who was entirely inexperienced in organization matters, and thought progress would be made more rapidly and constructively if there was more of a business side to the development, but that Kettering opposed that idea. He continued that while Standard Oil was not receptive to the idea in the beginning he found later in discussion with Mr. Teagle of Standard that they had come to the same conclusion and it was agreed that Mr. Kettering and Mr. Howard, President and Vice-President, respectively, should resign and

"an active President should be appointed of proper ability, administrative and otherwise, to deal with the problems that confront the Corporation". Sloan proposed Earl W. Webb then in the Legal and Real Estate Department of General Motors and Standard accepted the recommendation. Webb was appointed President in the Spring of 1925 when he had made a satisfactory report on Ethyl's operations as a preliminary test of his qualifications.

Ethyl's losses during the shutdown necessitated a series of loans from Standard and General Motors and by July 1925 General Motors and Standard had loaned Ethyl $1,700,000 with authorization for further loans of $500,000. On May 22, 1925 Irenee du Pont wrote to Raskob at General Motors that he approved of the borrowing of funds by Ethyl from General Motors and Standard and said:

"As the amounts due to the du Pont Co. are in some particulars overdue, I am very glad you can arrange to immediately send the necessary cash to Ethyl Gasoline Corp." (GTX 682.)

During the cessation of manufacture at Ethyl's plant, Webb and the Dow officials had a series of conferences on the subject of the manufacture of TEL for Ethyl. Dow had developed a process for producing TEL by means of a reaction which used magnesium. In April 1926 Webb also came in contact with the American Research Laboratories, which also claimed to have developed a process using magnesium and offered to undertake the manufacture of TEL. Webb visited the Dow plant with a representative of the American Research Laboratories and upon seeing the Dow chemical manufacturing facilities, the American Research Laboratories realized "it would be rather foolish for them to venture into anything of this kind", suggested cancellation of the contract and an arrangement whereby manufacture under their process would be conducted by Dow. The American Research Laboratories process proved worthless. Irenee du

Pont, then a director of Ethyl and aware of American Research Laboratories' desire to manufacture, expressed opposition pointing out that if another disaster occurred after the Bayway disaster only a few months before:

"No amount of explaining will excuse our directors for having encouraged novices to undertake such a dangerous operation." (GTX 711.)

Dow continued as a prospective manufacturer until late in 1926 when it informed Webb it was unwilling to undertake the manufacture of TEL by any process because of the hazard factor.

During these incidents du Pont and Ethyl entered into a contract in March 1926 for the production and sale of TEL. From 1926 to 1937 du Pont sold TEL to Ethyl under a series of short term contracts negotiated for Ethyl by Webb. The 1926, 1928 and 1929 contracts made no reference to patents, improvements or new developments in TEL, and from 1928 the contracts provided that Ethyl's entire requirements were to be taken from du Pont.

In 1929 Ethyl Corporation gave consideration to the situation that would exist when the basic patents expired— Midgley's to expire December 30, 1947, and the chloride process patent of Standard January 1, 1946. Ethyl, not being a manufacturer, would find it difficult to manufacture the product without knowledge of the du Pont processes. Sloan stated in a letter to Webb of Ethyl that they should make their contracts on the supply of TEL so that the supplier of the lead, the du Pont Company

"together with others later on, would at all times sell to us exclusively" (GTX 748)

so that if tetraethyl lead is still a factor in the fuel situation at the expiration of the patents and there was no restriction on manufacturers as to whom they would sell the material, "there would be no place in the picture for Ethyl."

In 1930 a new contract was executed between Ethyl and du Pont and in all subsequent contracts between them until 1938, it was provided that if Ethyl would purchase at least 50% of its annual requirements of TEL from du Pont until January 1, 1938, du Pont would on that date make full disclosure to Ethyl of all its patents, know-how and secret processes on TEL manufacture and would license Ethyl to manufacture TEL under the du Pont patents.

From 1930 to 1937 Ethyl began a long term campaign to put itself in a position to manufacture TEL. Several proposals were considered and rejected before the execution of a Manufacturing Service Agreement between du Pont and Ethyl on January 1, 1938. In 1936 du Pont agreed to build a TEL plant for Ethyl at Baton Rouge, Louisiana and the following year agreed to construct a second plant for Ethyl. Under the 1938 agreement du Pont contracted to construct for Ethyl plants at Baton Rouge, Louisiana, a site selected by Ethyl, lease the du Pont facilities at Deepwater to Ethyl, and operate them as Ethyl's agent in return for a specified percentage of Ethyl's proceeds from operation for the next ten years. Du Pont further agreed to advance certain funds to Ethyl and build such tetraethyl lead and raw material plants as Ethyl required. In addition, the agreement provided that on the expiration of patent protection in 1948, Ethyl and du Pont would each be free to engage in both the manufacture and distribution of tetraethyl lead.

During the negotiations preceding the ultimate agreement, Sloan replied to a letter from Webb that he was not opposed to contracting to give du Pont 50% of the business of Ethyl but felt strongly that Ethyl should be entitled to any of du Pont's improvements resulting from the manufacture under Ethyl's patents.

Sloan wrote to Lammot du Pont in April 1930 in connection with the proposed know-how clause and urged him to do anything he could to "facilitate this and broaden the base upon which it is developed." Lammot du Pont felt that Ethyl did not have the background to

undertake the manufacture of a dangerous chemical.

On June 9, 1936, prior to the ultimate agreement, a comprehensive report and study of the origin and early history of the tetraethyl lead business, including suggestions on arrangements to be worked out between Ethyl and du Pont, was made on behalf of the du Pont Company by N. P. Wescott and submitted to F. Spaare, Director.

During the pre-1938 period du Pont fixed its prices on the sale of TEL to Ethyl at a level high enough which would give du Pont a manufacturing profit equal to one-third of the total profits derived both from the manufacture and distribution of TEL, and the remaining two-thirds to be divided equally between General Motors and Standard in the form of dividend payments from Ethyl, after deducting the royalty due General Motors on its patents. From 1930 to 1937 du Pont's total profits from Ethyl's operations were approximately $35,000,000 and General Motors and Standard received dividends of approximately $30,-000,000 each, and in addition General Motors received the sum of $19,000,000 in royalties.

The Manufacturing Service Agreement in 1938 provided a compensation of 30% of Ethyl's gross operating profits to be paid to du Pont. The 30% was premised on a minimum of 53,000,000 pounds of tetraethyl lead and one-tenth of the profits for production above that figure.

The percentage of profits received by du Pont is reflected in the defendants' chart which premises the ratio of du Pont profits to Ethyl's profits on figures before taxes and bonus of either corporation. The basic figures used by the Government chart also show du Pont's profits before taxes and bonus. The average share of Ethyl's gross operating profits which du Pont received during the 1938–1948 period was 18%.

Shortly after the 1938 agreement Standard Oil conveyed to du Pont and Ethyl the information that a new oil cracking process in the gasoline industry would require an expansion in the production of TEL, and necessitate the erection of additional plants at Ethyl's Baton Rouge site.

On December 31, 1947, all the basic patents relating to the production and use of TEL having expired, du Pont and Ethyl discontinued operations under the 1930 agreement and each went its separate way. Ethyl's lease on du Pont's Deepwater plant expired at the same time and du Pont undertook to manufacture lead for its own account. Ethyl took over the direct operation of the larger plant facilities at Baton Rouge. Both sold their respective fluid to oil companies. J. R. Sabina, a du Pont executive, testified that beginning in 1945 du Pont began to expand its petroleum products staff; a petroleum laboratory was organized in the Fall of 1947, and in anticipation of freedom from Ethyl's patent in 1948, every oil company in the United States had been personally visited and orders were solicited.

In 1948, all but seven of the fifty-nine companies that dealt with du Pont had dealt previously with Ethyl. In 1948 du Pont owned at Deepwater the four original plants constructed before 1938, and Ethyl owned five plants at Baton Rouge, four of which were designed to have the same size and capacity as the Deepwater plants. In 1948 du Pont had a capacity of between 180,000,000 and 194,000,000 pounds per year for its four plants, or about four-fifths of Ethyl's capacity. John F. Daley, General Manager of the Organic Chemical Department at du Pont, testified that in selling to the oil companies, the Ethyl trademark was very much of an obstacle. He also testified that du Pont lost customers to Ethyl and vice-versa in the years following the severance.

The evidence with respect to the discovery and development of TEL fails to establish the Government's charges. It will not support a finding that the discovery of TEL was surrendered to du Pont pursuant to any agreement that du Pont was to have exclusive rights to General Motors' chemical discoveries. The

record, rather, establishes that the services of du Pont as a manufacturer were secured by General Motors in the unrestrained exercise of its own judgment. Kettering appears to have been largely responsible for this decision, and neither the alleged pre-existing agreement nor du Pont's stockholdings in General Motors was the basis of the decision. It is clear that General Motors' lack of experience in chemical manufacture and du Pont's superior competence and wide experience were the reasons for the decision.

Similarly, du Pont retained its position as the manufacturer of TEL by reason of the continued high quality of its performance. The Court finds that General Motors and Ethyl Corporation were at all times free to turn elsewhere and were not coerced in any way to continue purchasing from du Pont.

### Kinetic Chemicals, Inc.

In 1928 Frigidaire and its leading competitors were using sulphur dioxide as a refrigerant, a chemical presenting health hazards. Pratt, Kettering, and E. G. Biechler, General Manager of Frigidaire, expressed a desire for a new safe refrigerant and Mr. Midgley was assigned the task of working on the problem. An appropriation for this research was approved by Frigidaire. The objective sought by this research was a refrigerant which had a suitable boiling point, non-toxic and non-inflammable, and which had a distinct but not unpleasant odor.

Thomas Midgley spent eighteen months on this project and by the end of 1928 had determined that freon 12 (F-12) met the above requirements and the discovery was patented, with patents being assigned to General Motors. The principal elements of freon were chlorine and fluorine, both being dangerous and toxic. During 1929 and early 1930 Midgley continued to work on Freon "to develop suitable manufacturing processes." In August 1929 Pratt approved the erection of a small plant to produce F-12 in quantities sufficient to make laboratory tests. Frigidaire erected a semi-commercial plant in the Winter of 1929–1930.

In March 1930 Biechler wrote to Pratt stating a decision on the manufacture should be made as quickly as possible, recommending that either Frigidaire or some other division of General Motors manufacture the same because he felt

> "a great deal would be gained if we would control this rather than let a chemical company do it." (GTX 838.)

Pratt, on March 15, 1930, although having approved the small scale production for test purposes of Frigidaire, stated:

> "It is quite a fundamental step for us to start General Motors in chemical manufacture. Up to this time we have more or less elected to confine ourselves to the mechanical side of manufacture and I do not want to depart from this until a very thorough consideration has been given to all of the factors involved." (GTX 839.)

He stated that he would have to discuss the same with Sloan. When he did so, Sloan agreed that General Motors should not manufacture the new refrigerant. Sloan testified that he took that position on the basis of General Motors' lack of competence to manufacture a material involving the dangers in manufacture "somewhat analogous to TEL." Sloan left it to Pratt to investigate and develop a suitable program for supplying Frigidaire's requirements of F-12. Without consulting Sloan further, Pratt went to see H. F. Harrington of the Dyestuffs Division of du Pont and suggested that a joint company be formed between General Motors and du Pont to sell freon. He testified he selected du Pont because of their experience in handling dangerous chemicals and because he had confidence in the du Pont people. Biechler expressed his pleasure that the responsibility of manufacture had been assumed by du Pont. The desirability of getting into the production of freon quickly was recognized by all.

Harrington and Pratt agreed substantially upon the details of the contractual agreement and Pratt suggested that the new company be owned 51% by du Pont and 49% by General Motors, so that operating responsibility rested on du Pont which had the personnel and experience required for manufacture. Pratt also suggested a provision that future chemicals developed by General Motors be first offered to Kinetic, the joint company.

The formal agreement organizing Kinetic was executed August 27, 1930 and was approved by the General Motors Finance Committee, the minutes reciting:

"It was felt that because of the experience of the du Pont Company in the chemical field that it is to the interest of General Motors Corporation to arrange with the du Pont Company for the commercial development and production of these chemicals rather than for us to undertake the organization of the necessary personnel, technical staff, etc. for their production; and in order to give the du Pont Company an incentive for the most efficient development of these chemicals it was considered mutually advantageous that the du Pont Company should have the right to subscribe to 51% of the stock of the Kinetic Chemicals, Inc. Under this agreement a royalty will be paid to General Motors for the right to use the inventions transferred to Kinetic Chemicals, Inc. as covered more fully in the agreement." (GM 238.)

The clause regarding future General Motors chemical discoveries required that the offer to Kinetic of any such discovery should be "on such terms as may be mutually agreed upon." The new corporation had a board of directors of five members—three selected by du Pont and two by General Motors; its personnel was furnished by du Pont and the latter received a management fee of $50,000 a year; General Motors granted Kinetic an exclusive license on its patents covering freon and received a royalty in the amount of 5% of sales.

The process used by Frigidaire during the experimental period was found to be so expensive as to be commercially prohibitive. Du Pont chemists assigned to the problem succeeded in developing a feasible commercial manufacture which reduced the costs. In addition, an essential raw material—anhydrous hydrofluoric acid—was not commercially available in sufficient quantities and du Pont invented and patented for Kinetic a process which enabled Kinetic to make its own acid.

The New York Fire Department was disturbed over the possible danger in the use of freon and du Pont was able to demonstrate its properties as being a safe refrigerant. Du Pont, through Kinetic, also undertook a general educational campaign to convince the public of its safety.

With respect to the clause regarding future chemical discoveries by General Motors, Pratt wrote to Lammot du Pont on July 20, 1931 as follows:

"This clause was placed in the Kinetic agreement because we wanted to remove from some of our organization the temptation of attempting to build up within General Motors an independent chemical manufacturing activity and to place any developments along chemical lines in an organization in which we have confidence from the standpoint of their ability to carry on chemical manufacturing process.

"To summarize, as far as I am concerned I hope to see General Motors Corp. utilize to the fullest extent the chemical experience of the du Pont Company in manufacturing any chemical compounds that General Motors laboratories may discover, where there is a possibility of commercialization." (GTX 899.)

Clause Seventh of the agreement provided:

" \* \* \* it being further agreed that future chemical developments (other than those relating to 'said products') originating in the laboratories of General (Motors), or its subsidiaries, shall be offered by General to the New Company, on such terms as may be mutually agreed upon, and if after six months the New Company shall elect not to exploit such new chemical developments, the General shall be free to dispose of the same elsewhere." (GTX 850, p. 3.)

Pratt suggested this clause for the reason he believed that "General Motors instead of having a lot of different activities" might wish to use Kinetic as a single vehicle for developing any chemical discovery it made. He also testified that during the existence of the clause, no development was turned over to Kinetic.

In May 1944, fourteen years after the agreement, John T. Smith, General Counsel for General Motors, gave his opinion that this clause was "unenforceable," and the two companies by formal contract cancelled it in its entirety on June 6, 1945.

In the Fall of 1923, Biechler reported to Pratt that the supply of lithium chloride necessary to be used in an airconditioning system which Frigidaire was developing was limited and asked Pratt to investigate the possibility of additional supply of lithium chloride. Pratt informed Harrington confidentially of the Frigidaire work on the airconditioning system, asked whether du Pont could provide the additional supply, stated that he would rather have the du Pont Company undertake the chemical development than General Motors, and inquired whether it would be an industry in which du Pont would be interested. He testified, "It was a business that required mining, and just a complete new business that wasn't in line with anything we were doing." General Motors did not pursue the experiment using lithium chloride and there was no need for an additional supply of the lithium chloride refrigerant.

From the outset, Freon 12 and all of the freons, with one exception, were offered for sale to all refrigerator manufacturers. Thomas Midgley in 1932 discovered Freon 114. Each of the freons had distinct properties and were suitable to different uses and types of refrigerator machines. Frigidaire developed a rotary compressor for its household refrigerators and discovered that Freon 12 could not be used efficiently in the new compressor. Freon 114 was found to be effective and a product patent was obtained.

The Kinetic Board on September 29, 1932 approved the construction of a plant to manufacture F–114 and it further resolved that for the time being commercial distribution should be confined to Frigidaire. Pratt testified that Frigidaire had developed its own machine, developed the special refrigerant for it, and to release that refrigerant would cause competitors to duplicate their machine.

The exclusive sales policy on F–114 continued, and in 1938 Sears Roebuck threatened an appeal to the Federal Trade Commission to force the release of this freon. In the Fall of 1938 W. W. Rhodes, Sales Director of Kinetic, reported to its President, E. G. Robinson, that a market for approximately one million pounds of F–114 a year could be obtained if sales restrictions were lifted.

Harrington testified that the attitude of the du Pont members on Kinetic's Board was that for the first year or two it was reasonable for Frigidaire to make the request for exclusive use, and after that argument regularly ensued between General Motors and du Pont on this policy but "General Motors was so urgent and so insistent on the thing, rather than create the ruction that would be involved if we just completely overrode them, the du Pont directors went along and allowed the product F–114, to be exclusive for quite a long time."

Following the challenge Sears Roebuck had made, the Kinetic Board on October 3, 1938 met again to review this policy. Harrington testified at this meeting

"General Motors was more vehement than ever that we should reserve the thing to them for a further length of time, and in order to keep peace in the family we agreed."

General Motors General Counsel, John T. Smith, wrote to Ernest R. Breech, General Motors Vice President, on May 8, 1939 on the exclusive use by Frigidaire and concluded that the best way to protect Frigidaire in such use was to have Kinetic Chemicals grant an exclusive license to it. This recommendation was adopted and an agreement executed on September 18, 1939 accomplishing such result. During the war Frigidaire granted permission to others to use the refrigerant. In June 1943 the question of its unlimited sales again arose and in 1944 the product was offered for sale generally when the exclusive use license to Frigidaire was cancelled. However, F–12 proved to be a cheaper and better refrigerant, and Sears Roebuck refused to purchase F–114 when it was offered to it, and no manufacturer of household refrigerators uses F–114 today, including Frigidaire.

The Development Department of du Pont reported to the Executive Committee in April 1945 on anticipated post war demand for freons and their future promise in plastics and other fields, and recommended that du Pont negotiate for the purchase of General Motors interest in Kinetic if General Motors indicated a desire to sell.

The actual purchase of General Motors interest in 1950 was preceded by negotiations which began in 1948. On January 1, 1950, General Motors sold its 49% interest for approximately ten million dollars. Since this purchase was subsequent to the filing of the complaint in the instant case, the Department of Justice was consulted, and it assured du Pont in writing that it did not oppose the purchase and if it were carried out the prayer in the complaint seeking divestiture from du Pont would be dropped. Upon that assurance the purchase was made.

### Synthetic Rubber

In January 1926 Sloan authorized Midgley to conduct some research on synthetic rubber under Kettering's supervision, authorizing a budget of $60,000 for the first year. When Midgley had worked two months on the project, James McEvoy, Director of the General Motors Patent Section, wrote to Sloan expressing concern about Midgley's project, criticized Midgley's research technique as being deficient in failing to give sufficient evaluation to existing literature in the field, and indicated that Midgley was wasting time and money because prior patents existed on the discoveries he was trying to make. Sloan decided to let Midgley continue, pointing out that Midgley was "a research man first and foremost", and stated that he fully recognized that it was a problem on which it would take over six months to accomplish anything. Midgley went ahead with his research, and under arrangements approved by Sloan conducted his research in the Thomas and Hochwalt Laboratories in Dayton.

A year after this work began, Lammot du Pont heard of it and stated that du Pont had been working on one phase of synthetic rubber and was not conducting as broad an investigation as General Motors. In writing to Raskob, he questioned the advisability of General Motors spending this money, since a great deal of work had already been done on the subject by competent people and well organized research groups; he thought that the du Pont Company, which had also been doing some research, was better equipped for the purpose than General Motors. He further stated:

"Should General Motors be successful in developing a process, it would probably not be desirable for it to go into the manufacture; whereas if du Pont were successful, it is just the kind of manufacturing operation which the Company should be qualified to enter. This is an additional reason why du Pont should

work on the problem rather than General Motors.

"In view of the above, it seems to me that either General Motors must be making a mistake in working on this problem, or du Pont is making a mistake in not working on it in a broader way. Won't you refer this letter to the party responsible for General Motors having embarked on this investigation, and ask him to let me know the reason which has guided his decision to undertake the work." (GTX 888.)

Raskob replied that the rubber situation was very close to General Motors Corporation and it was tremendously important for the corporation to interest itself in every possible phase of it, and further felt that the laboratories were equipped to do the research that was being conducted. Raskob referred Lammot du Pont's letter to Sloan, who also wrote to Lammot du Pont defending the research being conducted. Lammot du Pont replied that he regarded synthetic rubber to be a problem which would tax the facilities of the most complete laboratory, but

"Do not let me trouble you any further on this point—I am not trying to force upon you my views or opinions. If I have put into your mind the thought that possibly synthetic rubber is not a suitable subject of investigation by the General Motors Chemical Department, then I am perfectly willing to accept your decision." (GTX 891.)

In February 1927 Sloan again wrote to Lammot du Pont that he thought it was desirable to encourage people in the General Motors organization, that he had done so in Midgley's case even though he did not expect the research to accomplish much, and stated:

"As I said before, if nothing tangible develops during the current year, I shall feel fully warranted in feeling that he has been given his chance and that, considering we are not directly concerned even if we are greatly indirectly concerned, we

might better transfer his efforts to some other direction." (GTX 892.)

Lammot du Pont replied acknowledging the letter and stated that he appreciated fully the desirability of allowing good minds to "have a little more than the normal amount of rope", and that du Pont followed this also since it tended to "keep up the enthusiasm and interest of all concerned."

In March 1927 Midgley suggested that his work be reviewed by a "good rubber chemist". Sloan replied that he thought this was a mistake since he felt a chemist in commercial practice and even the du Pont Company would not have the imagination, sympathy, and enthusiasm possessed by Midgley, and preferred to leave the determination to his own judgment, supported by Mr. Kettering.

Midgley went forward during 1927 with his research and made his progress reports directly to Sloan. In December 1927 McEvoy wrote to Pratt that Midgley knew nothing about the subject he had not learned from others and recommended that the "whole operation be terminated".

By April 1928 the price of rubber had dropped from $1.00 to twenty cents a pound. Midgley thought that if he could produce a synthetic rubber it would cost not less than thirty-five cents a pound. Sloan testified that both Midgley and Kettering then determined that General Motors should abandon the project. In late March or early April 1928 it was decided that while the work for General Motors should cease, Midgley could have all the equipment and continue the research on his own if he desired. On April 27, 1928 an agreement to that effect was executed.

Midgley went ahead on his own, but as Sloan testified, he never succeeded in solving the problem, but made some very outstanding contributions to the evolution of synthetic rubber.

The evidence relating to the formation and operation of Kinetic Chemicals and to General Motors synthetic rubber research does not establish that General

Motors had agreed to surrender or was bound to surrender to du Pont its chemical discoveries.

The Court finds that du Pont did not terminate or in any way limit General Motors research on synthetic rubber, although Lammot du Pont, as well as others in General Motors, suggested it was an an inappropriate project for General Motors to undertake. Despite this suggestion Sloan directed that the project should be continued. The evidence bearing on the entire incident is inconsistent with either a basic agreement with respect to General Motors chemical research or with du Pont domination of that research.

The provision of the agreement between du Pont and General Motors establishing Kinetic Chemicals Company which related to further chemical discoveries is no longer in effect, having been eliminated some years before the Complaint herein was filed. The Court finds that this agreement was not executed pursuant to any prior understanding or arrangement that du Pont was to have the exclusive right to discoveries of General Motors. On the basis of the evidence of record, particularly the testimony of Sloan and Pratt, the Court finds that General Motors entered into the contract because those responsible in General Motors believed that Freon could best be manufactured by du Pont rather than by General Motors itself or by some other chemical company.

### Antifreeze

In connection with the glycerin-alcohol incident in 1926, du Pont's proposal that General Motors make a contract to purchase ethyl alcohol from du Pont was rejected by the General Purchasing Committee even though in 1927 du Pont quoted a "special price".

General Motors commenced selling antifreeze in 1933 using glycerin purchased from Glycerin Producers Association. In 1935 the association advised General Motors, which sold the antifreeze to its dealers for resale to the public, that due to a glycerin shortage, none would be available for 1936. General Motors made an effort to meet its needs by trying to purchase ethylene glycol from Union Carbide, which was sold under the name of Prestone. Union Carbide was unwilling to accept the condition that it be furnished under General Motors' private brand name.

Before 1929 du Pont was engaged in the production of a synthetic methyl alcohol known as methanol. In 1930 it sought an outlet for it. Du Pont marketed the product in 1934 under the trade name Zerone and sought to persuade General Motors to purchase it for resale to its distributors. Zerone had a large market by the end of 1935, but du Pont was unable to sell it to General Motors.

Du Pont made no sales of antifreeze to General Motors until 1936, when it agreed to General Motors' condition that the product be sold under its private brand name. Elmer F. Schumacher, Director of the Polychemical Department at du Pont, testified that at that time he had become aware of the volume of General Motors business and "couldn't forego the opportunity to enlarge our sales of methanol", capitulating to General Motors demand on the brand name. Irvine W. Thompson, General Parts & Accessories Merchandising Manager of Chevrolet and General Manager of the Parts Division, testified that after the notification from the Glycerin Producers Association, General Motors immediately sought to find a source of supply for the non-permanent, or methanol antifreeze; that permanent type antifreeze sources were limited to Union Carbide and that company was not interested in contracting with General Motors. He stated that after canvassing every source available for methanol type antifreeze, a contract was signed with du Pont. Contracts were made for six months duration because of future possibilities of getting a better price or product. General Motors purchased this type of antifreeze from du Pont for the period 1936–1940 and packaged the same under the private brand name. It purchased the product from du Pont because it was the only avail-

able supplier and because it offered both quality and fair price.

Thompson, who was in charge of General Motors purchases of antifreeze, testified that each season bids were solicited from all known suppliers and a thorough canvass was made for other sources of supply. According to his testimony, the General Motors Divisions continued to buy from du Pont "because we felt very definitely that they gave us the best product at the best price."

In 1939 du Pont developed a new process for making a permanent type antifreeze, described as ethylene glycol, and sold it under the trade name Zerex. The product was approved by the General Motors Laboratories and in 1940 purchasing of this product began and continued until 1953. Du Pont and Union Carbide were the only two producers of ethylene glycol antifreeze. Both Schumacher and Thompson testified that during 1946 and 1947 this type and the methanol type were in short supply; and ethylene glycol was not produced in quantities to meet the market demand until 1952–1953. Du Pont packaged both the methanol and ethylene glycol products under General Motors private brand name.

In 1946 and 1947 General Motors purchased 97% of its antifreeze requirements from du Pont. In 1951 when du Pont advised General Motors that it could no longer sell either type of antifreeze under the private brand name for the reason that its purchases were a small portion of du Pont's total sales and too costly to accommodate the packaging requirements, General Motors sought to find another source. In 1953 when other sources became available, Buick, Chevrolet and Pontiac turned to a competitor who agreed to General Motors private brand packaging. Du Pont presently sells antifreeze for resale only to Oldsmobile.

The only evidence offered by the Government in support of its contention as regards antifreeze is that in recent years General Motors has purchased practically all of its requirements from du Pont.

The proof offered by the defense, however, establishes that General Motors determined *initially* to make such purchases because du Pont was the only available supplier that could meet General Motors' demands as to price, quality and delivery. The defendants' proof further shows that General Motors reexamined the supply situation each year and sought regularly to obtain new sources of supply. The Court finds this proof convincing that General Motors was not limited by agreement or by du Pont domination in its purchases of antifreeze and bought from du Pont only because it believed that du Pont best served its needs.

### Miscellaneous Products

*Electroplating Chemicals*

Electroplating is a process of depositing a coating of one metal upon another and is a highly technical field in which metallurgists disagree sharply in assessing relative merits of various processes. In 1934 du Pont developed the first improved copper plating process known as du Pont's "High Speed Copper", and development work on it was done for the next four years. When it was offered in 1938 it was accepted and adopted by a number of electroplaters which supplied the automobile industry, including companies, which did work for Chrysler, Studebaker and Nash. In addition, du Pont sells chemicals for copper electroplating and has sold to electroplaters materials for zinc, cadmium, and tin plating, including sodium, copper, zinc, cyanides, anodes, additive agents and brighteners, even though the most important of its processes was the "High Speed Copper" method.

There are three processes for copper electroplating—the cyanide process in which du Pont is interested; the acid copper method developed by General Motors Research; and the pyrophosphate process.

Chevrolet installed the du Pont process in 1939 and discontinued it within two months returning to heavy nickel

electroplating. During the nickel shortage, it installed the acid, "Day-Brite" and pyrophosphate "Unichrome" methods.

Ternstedt, a Division of General Motors which is relied upon by the General Motors car units for their electroplating, installed the du Pont copper process in 1938 and discontinued it in 1939. It adopted the General Motors Research acid process in 1939.

Buick has never used the High Speed Copper process, but does little electroplating.

Cadillac has continued to use the High Speed Copper process and purchases the majority of its chemical requirements for it from du Pont since its introduction in 1938.

Oldsmobile did not adopt the High Speed Copper process until 1941 and used it until 1949 when it shifted to a competitive process.

Pontiac adopted the process in 1940 for part of its plating work and in 1950 shifted entirely to a different and competitive process.

Although Cadillac and AC Spark Plug use the du Pont process for the major part of their plating operations, eight of the nine General Motors Divisions have installed it for varying periods of time and have gone to other processes for all or a major portion of their electroplating process.

In a du Pont study of the electroplating industry in 1945 or 1946 it was reported that unless certain difficulties in the high speed copper process were eliminated or greatly minimized, a "further serious loss of business will result". However, the study reported that "regardless of the difficulties with High Speed Copper * * *, the process, because of certain basic factors, has a greater potential field of usefulness than any offered by competition."

Dupont's Durobrite process of zinc plating is used by Delco-Remy which does a substantial amount of zinc plating, although Chevrolet, which also does a substantial amount of zinc plating, and purchases a portion of the zinc and sodium cyanide from du Pont, does not use it. Du Pont's two processes, "Zin-O-Lyte" and "Durobrite", are well established in the trade and enjoy a major part of the business in the plating field.

### Case Hardening Chemicals

Prior to its acquisition by du Pont in 1930, R & H Chemical Company supplied sodium cyanide, a chemical used for hardening steel surfaces, to all of the automobile manufacturers. Sodium cyanide was imported from France in substantial amounts; before du Pont entered the field, Chevrolet and Buick Divisions of General Motors were using case hardening materials.

Beginning in the early 1930s the first of two departures from the sodium cyanide method of case hardening occurred. A new chemical product was introduced on the market by another chemical manufacturer, called "Aerocase". This and other subsequently developed processes by Perliton, Holden and Parkcase resulted in a loss of business for du Pont. With these newly developed processes, Chevrolet, Buick and GM Truck turned to the newly accelerated deep case hardening method.

When Aerocase was introduced by the American Cyanamid Company, Buick became the first major user. Du Pont sought to develop a competitive product and in 1933 introduced Ducase, which was never adopted for general use since it was not the complete answer to the type of case hardening requirements of many large customers.

In the 1930's shortly after Aerocase was introduced, a gas carburizing process was developed wherein the steel to be case hardened was run through a furnace into which gas was introduced at high temperature. Initially the larger installations for gas carburizing were expensive and the largest units of the automobile manufacturing industry were the first to convert to this method. Buick commenced displacement of liquid hardening with the gas process in 1936 and in 1937 Ford had partially converted to the process. Saginaw Steering Gear Works

of General Motors and Chevrolet Gear and Axle started the new process in 1937.

In 1937 du Pont conducted a comprehensive survey of the quality and type of case hardening material used in the Chicago territory, including Michigan. The survey showed that automobile manufacturers other than General Motors were buying 88% of their case hardening requirements from du Pont while General Motors bought only 47% of their requirements from them. Of four divisions using over 100,000 pounds per year of case hardening products, two bought less than 5% from du Pont and two bought over 90%. In 1937 Ford was buying a greater quantity of case hardening materials from du Pont than all General Motors Divisions combined.

With the new gas carburizing process liquid case hardening operations were largely displaced by the new process, although a demand for du Pont case hardening materials still exists.

Cadillac purchased its needs from R & H before its acquisition by du Pont in 1930 and continued to do so under 1935; from 1935 to 1947 it obtained its case hardening materials from competitors. Since 1947 Cadillac has used the gas process to an increasing extent and purchases its liquid hardening materials in part from du Pont and in part from du Pont competitors.

Buick purchased none of du Pont's case hardening materials until 1946, using imported sodium cyanide or competitive case hardening salts. Since 1946 Buick has purchased du Pont materials for a minor part of its liquid case hardening operations and has converted the majority of its operations to the gas process.

Chevrolet Gear & Axle and Saginaw Transmission purchased a minor part of their case hardening materials from du Pont prior to 1938, purchasing the bulk of their requirements of sodium cyanide from importers and other competitors. In 1938 du Pont developed a special case hardening material for Chevrolet Gear & Axle which purchased substantial quantities thereafter. Saginaw Trans-

mission continued to purchase imported cyanide until such material became unavailable. Since 1946 most of the Chevrolet plants have purchased part of their materials for liquid case hardening from du Pont and part from its competitors. Chevrolet's case hardening operations have been largely displaced by gas carburizing.

Oldsmobile purchased no du Pont case hardening materials prior to 1937. From 1937 through 1946 Oldsmobile purchased some of du Pont's sodium cyanide and small quantities of du Pont's heat treating salts. Since 1947 Oldsmobile has used the gas hardening process to an increasing extent and purchased its requirements of liquid case hardening materials entirely from du Pont competitors.

Pontiac purchased only a minor part of its requirements of case hardening from R & H before the acquisition and from du Pont thereafter. Since 1938 du Pont has sold no case hardening materials to Pontiac except for small quantities of high-purity sodium cyanide.

General Motors Truck & Coach, A. C. Spark Plug, Ternstedt, and Saginaw Steering Gear all have displaced their liquid case hardening processes with gas and purchase only small quantities of du Pont's sodium cyanide. Brown-Lipe-Chapin and Frigidaire prior to 1930 had purchased sodium cyanide from R & H. Brown-Lipe-Chapin continued to purchase from du Pont for about two years after its acquisition of R & H, using competitive materials for a majority of its case hardening operations until they were discontinued in 1936. Shortly after the acquisition of R & H, Frigidaire commenced using imported sodium cyanide and other competitive materials. Since 1946 it has purchased some sodium cyanide and carburizing salts from du Pont. Delco-Remy and Delco Products purchased all their case hardening requirements from R & H prior to 1930 and continued to buy from du Pont until 1941 and 1948, respectively. Delco-Remy since 1946 and Delco Products since 1948 purchased sodium cyanide and small quanti-

ties of heat treating salts from du Pont, purchasing other case hardening materials from du Pont's competitors.

Before the advent of the new processes, du Pont's sodium cyanide was from one-half to one cent higher per pound than the imported product. In 1947 and 1948 when no imported sodium cyanide was available du Pont supplied all the requirements of 96–98 percent sodium cyanide to General Motors and other users.

In addition to sodium cyanide, du Pont developed accelerated salt and carburized salt to meet the competition of Aerocase. These compete with the other liquid case hardening products, including sodium cyanide.

*Rubber Chemicals and Synthetic Rubber*

Ernest R. Bridgwater, Director of Sales for the Rubber Chemicals Division of du Pont, testified that he believed this Division enjoyed about 25% of the rubber chemicals requirements of the Packard Electric and Inland Manufacturing Divisions of General Motors; that du Pont is the second largest supplier to these divisions. Of 65 rubber chemicals which du Pont offers, there were only three that du Pont supplied to these Divisions in larger volume—M.B.T.X., Thiuram M and Thionex.

About 15% of the Rubber Chemical Division's sales are comprised of rubber chemicals; the remaining 85% of the business of this division being represented by sales of neoprene, du Pont's synthetic rubber product.

Neoprene, the first synthetic rubber made on a commercial scale in the United States, is regarded as one of the outstanding achievements of du Pont's research. It was introduced in 1931, receiving acceptance in the market because of its resistance to oil, heat and sunlight. By 1940 more than three hundred rubber fabricators were using neoprene. Neoprene competes with other synthetic rubbers and with natural rubber. Some synthetic rubbers are less expensive than neoprene.

Automotive radiator and heater hose made of neoprene are being used as standard equipment by Chrysler and Ford because their experience in using this hose has demonstrated advantages for neoprene which justify its higher cost.

Buick once used neoprene for radiator hose but discontinued its use and switched to butyl rubber which cost seventeen cents less per pound than neoprene. Du Pont did not consider reducing the price of neoprene to retain the Buick business because

"we sell 'neoprene' at the same price to everybody * * * so that if we were to reduce the price of 'neoprene' for Buick, we would have to reduce it for everyone, and we could not afford to do that." (Bridgwater 4987.)

Chrysler and du Pont worked together to pioneer a synthetic rubber adhesive based on neoprene to replace old countersunk brass rivets formerly used to attach brake linings to the brake shoe. At General Motors adhesive for this purpose was based on a Buna-N type of synthetic rubber which is more expensive than neoprene. Du Pont sought to sell neoprene to General Motors as an adhesive for use in brake linings but was not successful. A du Pont trade report stated that General Motors would not use neoprene in resilient applications where oil resistance was the primary requirement.

Chrysler and Ford purchase and use neoprene for covering electric wires, seals, gaskets, and have used it to a greater extent than any General Motors Division.

General Motors followed the common practice of using sub-contractors for major parts and these were left to choose adhesives for brake linings as they desired consistent with specifications, whether it be neoprene or some other material, and du Pont sales efforts were directed to General Motors sub-contractors. Chevrolet Division on one occasion supplied du Pont with the names of its sub-contractors who were supplying it with axle seal, but did not specify the material to be used in their manufacture.

Chrysler also provided du Pont with a list of its suppliers fabricating its synthetic rubber parts and included the specifications.

Du Pont also sought to interest Fisher Body in using neoprene for weather stripping. Fisher admitted it was to its advantage to use neoprene but that the price was too high. Since 1945 the du Pont Fabrics Division has sought to sell Fisher Body its special rubber cement— Fairprene 5115—to fasten weather stripping to automobiles. Fisher Body uses about one million dollars worth of adhesive annually. It was not until 1951 that du Pont secured an order for this product although it was equal competitively to others. Since 1951 du Pont secures about 3% of this business. Louis Weyand of Minnesota Mining & Manufacturing Company testified that General Motors bought various adhesives from his firm for attaching trim materials to metal, rubber weather stripping, rubber for windshields and rear lights, felt for sound deadeners. In 1946 it sold two million dollars worth of adhesive to General Motors, and in 1947 three million dollars worth.

*Automotive Plastics*

In 1930 du Pont marketed a cellulose acetate—Plastacele—and commenced selling some to the Inland Division of General Motors for use in the manufacture of steering wheels which it made for all automobile companies, including General Motors. In 1937 sales to Inland amounted to $1,200; in 1938 $39,-000; and in 1939 sales increased to $157,-000, representing about 25% of Inland's requirements—the major supplier being Tennessee Eastman. After 1940 no sales of cellulose acetate were made by du Pont and Inland purchased all of its supply from Tennessee Eastman, which had developed a product called Tenite. Gillie testified that he felt du Pont's product was equal to that of its competitor, and the price was the same. Du Pont made large sales of the product to other customers for uses other than steering wheels.

Du Pont began producing acrylic resin molding powder in 1937 which it sold under the trade name of Lucite. It is a transparent plastic used in the manufacture of reflectors, instrument panels, tail lights and various knobs. Du Pont sells the product to the Inland, Guide Lamp, and AC Spark Plug Divisions. Du Pont's first sale of this material for the manufacture of automobile parts was to Dodge, and it sold no substantial amount of the plastic to General Motors until 1946. Two years after du Pont produced Lucite, Rohm & Haas offered Plexiglas. In 1948 Rohm & Haas supplied more of the requirements of AC Spark Plug Division than du Pont and at the present time du Pont gets a little more than 50% of it. At times du Pont had as much as 95% of the business. At Guide Lamp, du Pont was able to develop a colorfast red composition and obtained its business, but Rohm & Haas matched it and Guide Lamp began to divide its purchases equally between du Pont and Rohm & Haas.

*Brake Fluid*

Brake fluid is used in hydraulic brakes which came into usage on automobiles in the early 1920's when Chrysler adopted them. General Motors commenced to install such brakes in 1934 and Ford in 1936. Both Chrysler and Ford used brake fluid which they themselves mixed. No technical skill is required in the making of brake fluid, it being a mixture of several oils and no hazards are present in the mixing. The characteristics sought in brake fluid are a high boiling point and a low freezing point.

General Motors first used a brake fluid supplied by Wagner Electric Company, but shortly thereafter followed Chrysler and Ford in mixing its own, and continues to do so to date.

The General Motors Division assigned to the brake fluid mixing operation is Delco Products. In 1935 it produced a satisfactory fluid and improved it from time to time. Du Pont in late 1934 offered General Motors a fluid to replace that provided by the Delco Division but did not succeed. Other automobile manufacturing companies used du Pont's propylene glycol fluid called Lockheed

21. In 1939 du Pont developed a new fluid marketed as Lockheed 21–11, but was not able to sell it to any of the General Motors car units.

In late 1938 or early 1939 Delco and Union Carbide developed a fluid called Delco 9 which was more expensive than Lockheed 21. Walker testified the reason for the refusal of General Motors units to purchase the du Pont fluid was an agreement among the car division engineers to buy from Delco and help Delco write off the investment they had made in the equipment. Delco bought the chemical ingredients for the Delco 9 fluid from the Carbide & Carbon Chemicals Corporation, a unit of Union Carbide.

*Safety Glass*

In 1928 du Pont's Viscoloid Company and Pittsburgh Plate Glass jointly and equally owned Duplate Company which made safety glass. Duplate supplied the glass and Viscoloid supplied the laminating plastic, or pyralin. The automobile industry was a market for safety glass, but all automobile manufacturers were not then entirely converted to its use. In February 1929 only Cadillac and La Salle were using it, while it was optional equipment at Buick.

In 1929 General Motors was installing experimental equipment for compositing safety glass and expected to build a regular compositing plant at their subsidiary, the National Plate Glass Co. A report in 1929 by the President of the du Pont Viscoloid Company stated:

"  *   *   * a larger proportion of the safety glass for Cadillac and La Salle is being produced by the Fisher Body Company. The progress which is being made by the General Motors and its subsidiaries in laminating safety glass indicates that the best prospects for the immediate future for Duplate sales depend upon manufacturers other than General Motors." (DP 164.)

and the Annual Report for the year 1929 states:

"Competition became more severe during the year. In the latter part of 1929 Libby-Owens Glass Company came into production with strong sales efforts being made to secure business. Fisher Body Company increased production with the result that they were able to supply practically all safety glass required for Cadillac and La Salle, with a consequent loss of this business which had previously been supplied by Duplate." (DP 169.)

In January 1931 du Pont sold its interest in Duplate to Pittsburgh Plate Glass, and later that year General Motors disposed of its safety and plate glass business to Libby-Owens-Ford.

Total sales by Duplate to General Motors and Fisher Body exceeded two million dollars in 1928 and 1929, but as General Motors expanded its purchases, decreased to $67,000 in 1930 and $37,000 in 1931.

All of the evidence bearing upon du Pont's efforts to sell these various miscellaneous products to General Motors supports a finding that the latter bought or refused to buy solely in accordance with the dictates of its own purchasing judgment. There is no evidence that General Motors was constrained to favor, or buy, a product solely because it was offered by du Pont. On the other hand, the record discloses numerous instances in which General Motors rejected du Pont's products in favor of those of one of its competitors. The variety of situations and circumstances in which such rejections occurred satisfies the Court that there was no limitation whatsoever upon General Motors' freedom to buy or to refuse to buy from du Pont as it pleased.

### Sales to General Motors by United States Rubber

The rubber plantations in the Far East were considered the most valuable single asset owned by United States Rubber when the syndicate investment was made, and in 1926 profits from these amounted to six and one-half million

dollars, being approximately one-half of United States Rubber's total profits. These plantations supplied less than 25% of United States Rubber's requirements of crude rubber. In 1926 the rubber corporation had the smallest proportion of its total sales in tires—70% of its production being in footwear and mechanical goods. Tire sales accounted for 98% of Fisk's business and 95% of Firestone's business. In addition, both Goodyear and Goodrich had a higher portion of their business in tire sales than did United States Rubber.

Of total raw inventories which United States Rubber had, 45% were in the tire department. During the correspondence between Sloan and Lammot du Pont concerning the synthetic rubber project, Sloan in 1927 stated:

"As a matter of fact, however, the single item by all odds that we purchase from outside sources and the one that has been most unsatisfactory from the standpoint of erratic costs out of line with the real economics of the case is the rubber tire." (GTX 892.)

As early as 1925 General Motors had considered buying a rubber tire manufacturing company—the Ajax—and the Executive Committee of General Motors to whom the matter was submitted concluded it would be a constructive thing for General Motors to acquire an interest in an established tire company. The matter was postponed for further consideration and finally dropped because the profit opportunities did not warrant the investment.

Prices in the crude rubber industry during the period 1923–1932 fluctuated widely from twenty cents in 1924 to over a dollar per pound in 1925, forty cents in 1926 and 1927 and below twenty cents in 1928, falling to ten cents and lower in 1930.

Wilson testified that the problem at the time was how the tire manufacturers who had rubber stock at high prices and could buy rubber cheaper with the decline, could get their customers to purchase tires on the basis of high rubber prices. Another factor leading to the high cost of tires was the fact that contracts were written for short periods of from three to six months. The General Purchasing Committee in 1926 and again in June 1930 voted against a general contract for tires and had been continually reviewing the situation on tires to see if anything could be done about it. A plan was considered for General Motors to manufacture its own requirements or to acquire a small tire plant and get some knowledge of cost as a check on the tire companies prices.

During this period United States Rubber negotiated with Goodyear on a proposal to sell or lease its tire business. Irenee du Pont in February 1929 wrote to F. B. Davis that while negotiating for such a lease of the tire business to Goodyear, that United States Rubber should negotiate for a lease of Goodyear's plantations as well; he stated further that it seemed likely that Chrysler or General Motors would acquire their own tire manufacturing facilities which would leave the tire manufacturers in a "very trying position". These negotiations with Goodyear never came to fruition.

In April 1930 at a joint meeting of the General Motors Executive and Operations Committees a discussion was had on whether General Motors should manufacture tires either by buying a small plant or undertaking substantial manufacture. Pratt was designated to investigate both proposals, and he assigned Wilson to make the study.

Wilson made a report on June 3, 1930 stating he had made a survey of the tire industry, had visited the Kelly-Springfield and United States Rubber plants, and recommended against General Motors going into the tire business since his investigation showed the companies were losing money on both original equipment and replacement sales. His recommendations were accepted.

Wilson then proposed a plan whereby General Motors was to purchase the necessary raw materials—rubber and

cotton—and furnish the same to a tire manufacturer who would fabricate them into finished tires thus eliminating the cost of raw material going into the tire price. He prepared and submitted a plan for investing twenty million dollars in raw materials such as copper, lead, zinc, tin, rubber and cotton. The plan was approved by the Finance Committee of General Motors on September 8, 1930 and the purchase of these commodities was started and continued for several years. Wilson also believed that this plan should be combined with a long term contract with a tire manufacturer who could then plan his production more efficiently, enabling him to produce more and to sell at a lower price.

While getting Sloan's approval on this plan, Wilson learned that Sloan and Litchfield, President of Goodyear, had been classmates at Massachusetts Institute of Technology, and Sloan arranged an appointment. In the Fall of 1930 Wilson discussed the matter of long-term fabrication with Goodyear since he thought it was the "best", "biggest", and "a progressive company", and one of General Motors' principal suppliers. Litchfield was not interested in the fabrication plan.

Goodrich, which was supplying one-half of the tire business of Chevrolet, was approached by Knudsen, who knew its President, Mr. Tew, and Goodrich quoted some prices which were unsatisfactory.

The formula used in requesting submission of prices was

A—rubber converted into pounds of raw rubber

B—cotton converted into pounds of raw cotton

C—all other items of cost

Wilson finally contacted United States Rubber through Emmet Sheehan, its Detroit Sales manager. Sheehan contacted F. B. Davis and L. D. Tompkins, Vice-President of the Tire Division of United States Rubber, made an appointment with Wilson, and the plan appealed to them. Tompkins testified:

"We evidenced all the interest we possibly could in the matter, and told him very frankly that at least part of it was not new to us because we had already negotiated contracts with Montgomery Ward and Atlas in which the question of rubber and cotton financing and so forth, had become a part, so we were playing along the same alley with him in connection with his plan. We knew what he was talking about, at least." (5732.)

Wilson invited United States Rubber to submit prices and indicated that W. S. Knudsen, head of the Chevrolet Division would have to be satisfied since this division accounted for one-half of General Motors' tire business. Knudsen was delegated to talk price with the rubber corporation. Tompkins said that "we sharpened our pencils more than we had ever done"; costs were carefully calculated; account was taken of the additional increase in operating efficiency if General Motors' volume was obtained; and the prices were then submitted to Knudsen. Both Goodyear and Goodrich were asked and gave prices on the sale of tires if they could buy rubber and cotton at the current market price and of the three companies, the price quoted by United States Rubber was the lowest.

Wilson then made a report to the Operations Committee concerning all of these negotiations with the three companies, the price formula followed and recommended an authorization for 50% of General Motors' requirements to be supplied by United States Rubber. He also attached a schedule comparing the prices submitted. He stated:

"Goodrich brought in figures as above, but added 6% to the total, for profit. United States included their profit in factor 'C'. When prices were compared, it was decided to ask for prices on other General Motors sizes, with the result that we have today a complete list of all, making it possible to compute the tire prices by simply multiply-

ing Factors 'A' and 'B' with today's market price and adding Factor 'C' to the total.

"Comparison developed that United States Tire & Rubber Company have given us the most favorable terms, and Mr. Pratt has notified them of our willingness to enter into a contract for 1½ years on the above basis, and has at the same time signified our willingness to underwrite the purchase of up to 5,000 tons of rubber @ .08 per lb. this representing about 25% of the Corporation's requirements for one year and an expenditure of $800,000.

"Immediately when the decision was announced to the trade, Goodyear and Goodrich both made applications for permission to quote on the balance of the Corporation's requirements, or any part of them, at competitive prices.

"It is our opinion that it would not be desirable to close contracts for 100% of the Corporation's tire requirements, but that the remaining open 50% should be left to the Divisions to handle on the best possible basis. We therefore ask authority to conclude the contract for 50% of General Motors tire requirements with United States Tire & Rubber Company." (GTX 1089.)

On October 9, 1930 the Operations Policy Committee approved a contract with United States Rubber for 50% of General Motors' requirements.

Purchases from United States Rubber by the General Motors Car Divisions for the years preceding 1928 are not available.

In 1928, 1929 and 1930 Pontiac purchased approximately 18%, 8% and 10%, respectively, of its requirements of casings from United States Rubber based on an estimate in 1929 of 315,000 cars produced.

In January 1928 the sales manager for United States Rubber wrote to the Oakland Division confirming that it was to receive from 20–25% of the Pontiac

business, both domestic and foreign, and 40–50% of Oakland's business, domestic and foreign, for the first six months of 1928. In May 1929 Glancy wrote Davis that United States Rubber was getting 30% of Pontiac business, a percentage larger than any other manufacturer received, and 15% of Oakland's business, which was the same percentage other suppliers received; that although the large percentage for Pontiac had been opposed by the Sales Department, he believed that it was United States Rubber's intention to bring the quality of its goods up to competition and was "happy to take this chance" with United States Rubber.

In 1929 Chevrolet purchased no tires from United States Rubber and in 1930 through the efforts of its sales staff a small volume was procured. General Motors purchases in 1929 decreased from 524,205 units in 1928 to 441,659 and to 465,267 in 1930 before reaching 2,508,241 units in 1931. Oakland-Pontiac purchases declined from 227,652 units in 1928 to 105,882 in 1929, and to 124,005 in 1930.

Both Chrysler and Ford were also purchasing tires from United States Rubber in 1928; Ford purchasing 362,016 units and Chrysler 287,742.

In 1929 General Motors had a car manufacturing subsidiary in Canada— General Motors of Canada, Ltd., and United States Rubber had a Canadian subsidiary—Dominion Rubber Company. Canadian Industries, Ltd., in which du Pont held an interest, held stock in the Dunlop Tire & Rubber Goods Company of Canada. On March 25, 1929 R. S. McLaughlin, President of General Motors of Canada, wrote to A. B. Purvis, President of Canadian Industries, advising him that du Pont had acquired an interest in United States Rubber and

"they naturally would like to see us do some business with the Dominion Rubber Company." (GTX 1082.)

He inquired whether Canadian Industries was still interested in Dunlop.

Purvis replied that it was still interested in Dunlop, holding 35% of its common stock, that General Motors' business was vital to Dunlop and would be sorry to see it go to United States Rubber, and that McGowan would appreciate their continued support of Dunlop.

Six months later, Purvis forwarded copies of this correspondence to Lammot du Pont and advised that Dunlop, effective April 18th, 1930, would be entirely supplanted as a tire supplier to General Motors of Canada by Dominion Rubber Company, and asked that McLaughlin of General Motors be relieved of the "evident pressure to which Mr. McLaughlin refers and which Mr. Davis would very naturally bring to bear upon them".

Lammot du Pont wrote to F. B. Davis:

"Now it is, of course, all right for United States Rubber Company to 'go after' the General Motors of Canada business through the Dominion Rubber Company, but I do not believe it is either fair or proper under the circumstances, to use as an argument the interests of the U. S. Rubber stockholders or their connection with General Motors. Could you not get the business on the basis of quality, services and price?

"I have told Mr. Purvis that as far as I am personally concerned, and I think I represent the feelings of the other individuals here, that I cannot subscribe to the idea of using our interests in both General Motors and United States Rubber as a means of getting business." (GTX 1085.)

Davis replied stating that this account was secured on

"the basis of quality, service and price, and we not only do not use any du Pont or General Motors connections as arguments for getting business, but find that many times we are handicapped because of rumors of the tie between the three companies, and we take great pains in explaining the facts—just as we have done to Mr. McLaughlin." (GTX 1086.)

He continued that Mr. McLaughlin had advised Eden, President of Dominion Rubber that

"he would be very glad to give him a portion of his business but that his hands were tied as he had instructions from Mr. John L. Pratt, of the General Motors Company, requiring him to favor Dunlop." (GTX 1086.)

and that if this could be rescinded he would be able to give Dominion some of his tire business; that Tompkins had immediately contacted Mr. Stettinius in Mr. Pratt's office and

"Mr. Pratt arranged to have the instructions whatever they might have been, rescinded." (GTX 1086.)

whereupon Dominion actively opened negotiations with General Motors of Canada.

Tompkins testified that when he called on Mr. Stettinius in 1929 he was advised no such instructions had in fact been issued, and Pratt testified he had never given any instructions that General Motors of Canada was to use Dunlop. For the years 1928 to 1930, inclusive, Goodyear was the principal supplier of tires to General Motors of Canada. Dunlop's business with General Motors of Canada shrank from 23% in 1929 to 4.6% in 1930, whereas Goodyear's increased from 70.83% to 84.34% in the same period. The 1931 contract with United States Rubber provided for 50% of General Motors of Canada's requirements.

In 1930 Davis contacted General Robert E. Wood, President of Sears, Roebuck & Co., with the view, shared by Tompkins, that large retail outlets would result in volume business for the tire department. He found that Sears had an arrangement with Goodrich and that Montgomery Ward was buying its tires from several small suppliers but might be interested in dealing with United States Rubber. Following a conference with Mr. Everett, Ward's President, a contract was signed covering 90% of

Ward's requirements of its own brand of tires. In the same year United States Rubber succeeded in obtaining a five year contract with Atlas for 50% of that company's requirements of "Atlas" brand tires to be sold through Standard Oil Service stations. In 1937 United States Rubber's share of Atlas business was increased to 100%. Tompkins stated the procurement of this business was of vital importance to the company and "was the turning point" in the future success of the tire division.

Tompkins and Davis testified that throughout the 1930s Emmet Sheehan, the Rubber Company's sales representative contacted all automobile manufacturers, including Ford, Chrysler, and the General Motors Divisions, and succeeded in getting orders from Ford and Chrysler until both turned to Firestone and Goodyear respectively as their principal suppliers.

The 1931 tire contract was for a term of 21 months containing an automatic renewal clause and was signed by L. D. Tompkins and Charles E. Wilson. It provided that (1) General Motors would buy at least 50% of its original equipment tires, including spare tires, for cars produced and sold in the United States and Canada, (2) the prices to be determined by the ABC formula in Wilson's plan—that is the number of pounds of rubber in a set of four tires multiplied by the price per pound of rubber specified by General Motors, a similar computation for the cotton used, and all other costs, including profit, the total of these three items being the price per set of four tires, (3) General Motors designated United States Rubber as its purchasing agent to buy crude rubber, General Motors to inform the rubber company the quantity to be purchased and the price to be paid. It would then resell to the rubber company the rubber requirements for each succeeding month for the manufacture of tires. In such resale, General Motors was permitted to charge a mark-up of not to exceed 12½% over the original cost of the material. (4) United States

Rubber was to bill the General Motors divisions for the tires supplied but was to do the billing at billing prices agreed upon with General Motors. These billing prices were on regular shipments to the divisions and the level of prices which the various car division buyers had been able to establish in the purchase of tires beyond the 50% covered by the contract. After the divisions made payments on the basis of the billed price, United States Rubber was to make an adjustment between the billing price and the lower prices fixed by the formula.

On February 25, 1931 a supplemental letter agreement was executed wherein Oldsmobile, Oakland-Pontiac and GMC Truck Divisions agreed to purchase all their remaining requirements from United States Rubber, and Cadillac-LaSalle agreed to purchase 15% additional. Buick and Chevrolet bought their remaining 50% elsewhere.

In July 1931 when the price of rubber was around six cents per pound, Tompkins and Wilson signed a modification of the 12½% mark-up providing that General Motors could resell up to ten cents a pound regardless of the 12½% limitation.

The provision regarding the billing arrangement was included so that the basic or ultimate price resulting from the contract could be kept "as confidential as possible." Tompkins testified that both Goodyear, which sold to Chrysler in substantial volume, and Firestone, which supplied Ford, also kept their prices secret, and that the same practice was followed by United States Rubber and Goodyear in their contracts with Montgomery Ward and Sears, respectively.

An addendum to the 1931 contract provided that tires used by General Motors as spares would be priced at a specified amount above running tires. No extra price was to be charged for second spares or spares on exported cars. The Government concedes the allegations contained in ¶128 of the Amended Complaint relating to the price of spare tires is erroneous.

United States Rubber continued to sell tires to General Motors pursuant to contracts until 1942. After the original contract, new contracts were signed in 1932, 1933 and 1936. The 1932 contract adhered to the ABC pricing formula, the percentage of General Motors requirements, and also provided for the extra percentages reflected in the agreement of 1931. During the 1932 contract a patent license option agreement was made, providing that if General Motors desired to manufacture its own tires it would be granted a non-exclusive license on United States Rubber's patents and applications relating to tire manufacturing processes and "know-how," provided General Motors continued to purchase 50% of its tire requirements. The license was never used by General Motors.

The 1933 contract executed May 22, 1933, effective January 1934, replaced the ABC price formula with a provision that prices to be charged General Motors should be no greater than the lowest price charged by the four largest manufacturers of tires—Goodyear, Firestone, Goodrich, and United States Rubber. This change was made because of the increased stability of the rubber and cotton markets and the higher level of prices for those commodities.

In a separate concurrent agreement, United States Rubber agreed to give General Motors the following discounts on its annual volume of sales:

| | | |
|---|---|---|
| $10,000,000 | ....... | $ 825,000 |
| 11,000,000 | ....... | 940,000 |
| 12,000,000 | ....... | 1,040,000 |
| 13,000,000 | ....... | 1,200,000 |
| 14,000,000 | ....... | 1,350,000 |
| 15,000,000 and up.. | 10% | (GTX 1141.) |

It was also provided that United States Rubber should not be required to furnish tires at prices which, after the discount, would not return its costs. The current billing price before the year end discount was measured by cost plus 10%.

The dollar sales figures for 1934 to General Motors totaled over sixteen million and General Motors was entitled to receive the maximum discount. United States Rubber and General Motors agreed on December 17, 1934 to fix the discount for 1934 at $500,000 or 2.8% on its 1934 sales.

The 1933 contract was supplemented by an extra percentage letter agreement and for the first time United States Rubber received an additional 20% of Buick's business, Cadillac-LaSalle was increased to 20%, Pontiac and Oldsmobile declined to 30% and 40% respectively.

In 1934 the price and discount arrangements were modified and United States Rubber agreed that in the event General Motors purchased fifteen million or over and if the rubber company's profit exceeded 10% that General Motors would receive one-half of the amount of such profit exceeding 10% up to and including "an excess of 5%" which would make it possible for General Motors to receive a maximum discount of 10% on purchases of fifteen million or more. The discount paid after some negotiations on total purchases of $25,114,888 was $1,044,516.87, or 4% of the 1935 sales.

On August 1, 1936 another contract containing an automatic renewal clause was executed which lasted until May 8, 1942 when the United States entered World War II. The maximum discount provided was 3½% on sales of twenty-one million dollars. After the war General Motors resumed its purchases from United States Rubber on a non-contractual basis. Purchasing was done through orders and the percentages of business to be supplied the General Motors car divisions from March 1, 1949 to August 31, 1949 were: 64% of Buick, Oldsmobile, Pontiac, Cadillac and GMC Truck passenger tires, 50% Chevrolet passenger tires, 55% truck tires for Chevrolet and GMC Truck. The prices fixed by this order were subject to being lowered if General Motors bought from other suppliers at a lower price or if United States Rubber sold at a lower price elsewhere.

For the years 1934 through 1940, United States Rubber's profit attributable to sales of original equipment to General Motors was $9,737,000 and its net income was $45,764,000. Wilson testified that United States Rubber's share of General Motors' business during the period 1931 to 1936 was about 55%; 1936–1942 it was about 60%–70%; and the years following the war 1946–1948 it was 55%–58% of General Motors' needs. Throughout the years United States Rubber's sales to General Motors of tires for original equipment constituted a high percentage of its total sales of original equipment. General Motors also made purchases of tires from Goodrich and Firestone in the years 1946, 1947 and 1948 averaging approximately 20–23%. The Company's private brand unit sales have been greater in most years than its total original equipment sales.

Throughout the years Irenee du Pont viewed the tire business of United States Rubber as its most precarious branch and expressed his desire that this phase of its operations be dropped. He urged Davis in 1934 to sell this branch of its business and testified that his views today are the same as those expressed at that time. Davis confirmed the fact that Irenee du Pont had made repeated suggestions for the rubber company to dispose of its tire business.

The Court finds that the evidence with respect to the original negotiation of the tire contract and United States Rubber's subsequent sales of tires and tubes to General Motors establishes that General Motors initiated discussions leading to that contract, entered into it, and has ever since continued to buy a substantial portion of its tires and tubes from United States Rubber for its own good business reasons—and for no other reason. The Government's contentions to the contrary are supported only by suspicion and conjecture.

*Other Products*

The Government concedes that du Pont sales to United States Rubber are far greater than the purchases du Pont makes from United States Rubber.

*Paint.* On January 18, 1932, William Richter wrote to William Zintle, also a du Pont employee, and attached a letter from F. B. Davis to Lammot du Pont regarding a Pratt and Lambert can of paint which Lammot du Pont had seen being used in painting a building at United States Rubber. Davis assured Lammot du Pont the can contained du Pont paint because the contractor had been told "he could not have the contract unless he used du Pont paints" and stated that United States Rubber had a genuine interest in using and recommending du Pont products wherever possible. United States Rubber since 1929 has purchased more paint and maintenance paint from du Pont's competitors than from du Pont. The percentages of all paint purchased from du Pont in 1946, 1947 and 1948 were 31.1%, 34.5% and 25.3%.

*Rayon.* Rayon, first introduced to the rubber industry in 1936, was for a time produced only by du Pont. From 1936 to 1941 du Pont supplied almost 100% of United States Rubber's requirements of high tenacity rayon. During the war years the percentage of the rubber company's requirements declined since rayon was in short supply and subject to Government allocation orders. United States Rubber approached du Pont requesting a larger percentage of their total production or to increase their facilities for production, but du Pont refused to do either. The percentage of United States Rubber's requirements of rayon purchased from du Pont which was 100% in 1936 declined to 37.7% in 1946, 33% in 1947, and 27.3% in 1948. In 1946 and 1947 United States Rubber purchased more rayon from one du Pont competitor than it did from du Pont, and in 1948 it purchased more rayon from each of two du Pont competitors than from du Pont. United States Rubber purchases of rayon constituted two-thirds of its total purchases from du Pont during 1946–1948. In the years 1942–1948 du Pont sold more high tena-

city rayon to Goodyear Tire & Rubber than it did to United States Rubber.

*Neoprene.* Neoprene is a synthetic rubber manufactured only by du Pont. Tisdale testified that United States Rubber purchased neoprene from du Pont during and shortly after World War II, despite neoprene's odor and heaviness, only because natural rubber latex was unavailable. When natural rubber latex was again available, United States Rubber returned to its use. GRS and buytl are other synthetic rubbers and are cheaper than neoprene. Dry neoprene and other types of dry rubber are purchased by United States Rubber and are used to make products other than lastex thread. Eliminating the abnormal purchase of neoprene in the making of lastex during the years natural latex was unavailable, United States Rubber obtained from du Pont only 11% of its total requirements of neoprene and competitive rubbers in 1948.

Dr. Tuley testified that the only significant test of price of rubber products was the relationship of price to the ultimate cost of the article to be produced. In addition, in making the table of competitive rubber products, United States Rubber did not use neoprene in the manufacture of some products, although its competitors did. He stated that only rubber which was used to make products directly competitive with those in which other companies used neoprene was included in USR 217.

*Rubber Chemicals*

Naugatuck Chemical Division of United States Rubber supplies its parent company with rubber chemicals as does du Pont and other competitiors of du Pont. Tisdale testified that this division of the rubber company is a self-sufficient operation and has to compete with outsiders for United States Rubber's business and maintains a sales and technical staff. United States Rubber pays no lower price to Naugatuck than to any other customer.

*Wetting agents.* These products constitute a small portion of United States Rubber purchases. Tisdale testified that these and other items were included in the survey made by Dr. Tuley because in the judgment of technical men they were competitive in use although du Pont does not make the same type. Dr. Tuley stated that more competitive products were studied than were included and as to those included "we established in each case that our use of them matched some commercial use of the du Pont product."

*Terprene.* United States Rubber purchases terprene products, a small item in its total purchases, from naval stores industry. Du Pont does not manufacture this product. Exhibit USR 217 includes an item in that class manufactured by du Pont which has the same character as that manufactured in naval stores and turpentine industries and is sold in competition with those industries.

*Diphenylamine.* Du Pont is the only commercial producer of diphenylamine and United States Rubber purchases this product exclusively from du Pont. The Naugatuck Division of United States Rubber uses this material for a patented antioxidant, BLE, which it sells in competition with du Pont's product called the "Neozones". Next to rayon, this product constituted the largest dollar volume purchases made by United States Rubber from du Pont, being about 10% of its total purchases from 1946–1948.

*Nylon.*

Nylon is patented and manufactured exclusively by du Pont. United States Rubber does not use the product in its truck or passenger tires for civilian use although its competitors do. In 1946 du Pont's total sales of nylon to United States Rubber were $617,000 and two years later increased to $895,000. In 1946, 1947 and 1948 Goodyear, Goodrich and Firestone purchased more nylon from du Pont than did United States Rubber.

The foregoing four products—rayon, diphenylamine, neoprene and nylon accounted for a great preponderance of United States Rubber's total purchases from du Pont. In 1948 these products

accounted for over ten million dollars of the total purchases made by United States Rubber equalling $11,500,000, or 87%. Of all products required by United States Rubber and which were manufactured by du Pont, United States Rubber's purchases from du Pont constituted 36.5% in 1946, 31.9% in 1947 and 28.8% in 1948.

In the compilation of Exhibits USR 217 and GTX 1332 Dr. Tuley testified that a product purchased from a competitor of du Pont was not regarded as competitive unless it met certain tests, such as:

> "First, the composition of the material, its price in relation to related products; its availability; quality; du Pont's position in regard to supply and their ability to deliver in the quantities required and at the time we required them; and particularly the critical test was whether there was an established commercial use for the du Pont product identical with our use of the product we had purchased from some other supplier." (Tuley 6661–2.)

In 1932 Lammot du Pont sent Davis a table of the purchases by du Pont from United States Rubber and its competitors, showing purchases from United States Rubber of $361,000 in 1930 and $204,000 in 1931. He said:

> "the purchases we make from United States Rubber Company are far larger than from any other rubber company." (GTX 1059.)

In 1935 he again wrote regarding purchase figures for 1933 and 1934 and commented that the 1934 purchases were less than those for 1933 from United States Rubber, whereas the Rubber Company's purchases for 1934 from du Pont were higher than in 1933 stating he thought that was due to the fact that the rubber company bought products which were raw materials, whereas

> "du Pont buys from U. S. Rubber substantially nothing, except products that are used as supply or small items in construction of machinery and equipment." (GTX 1060.)

On January 19, 1938, E. R. Bridgwater of du Pont's Research wrote Ackart of du Pont's Engineering Department that local buyers at du Pont's various plants had told salesmen for rubber manufacturers other than United States Rubber that

> "they are unable to give them any business because they are instructed to place business with U. S. Rubber whenever possible." (GTX 1061.)

He stated that the managers of the purchasing departments had been circularized and told to refrain from giving the impression that United States Rubber had any better chance of getting du Pont's business than any other rubber manufacturers and concluded:

> "I do think it would be very helpful to us if you would ask all members of your department who contact rubber salesmen or engineers to so conduct their conversations as to convince the salesman that he has as good a chance of getting our business as anyone else and that our rubber goods are bought solely on the basis of price, quality and delivery. I realize, of course, that we do show preference to U. S. Rubber in certain instances but I think that's no one's business but ours, and it is, of course, a fact that we buy much less than half of our rubber goods from U. S.

> "Perhaps Mr. Hawkins would like to again remind all buyers on the Company that our rubber chemicals business need not suffer by reason of the fact that we buy much more from U. S. Rubber than from any other rubber manufacturer so long as they take pains to prevent any salesmen from getting the idea that it is our policy to give U. S. Rubber all the breaks and reporting that to his main office as an alibi for not getting du Pont business." (GTX 1061.)

On February 26, 1947, L. D. Reed, Director of Trade Analysis Section of du Pont, in answer to Lammot du Pont's

inquiry on trade relations with United States Rubber stated:

"You will notice from this summary sheet that the purchase/sales relationship with United States Rubber would still be way out of line if we had purchased our entire requirements of industrial rubber commodities from them alone, which amounted to $1,264,348. In view of the other large sales which are made to competitors of United States Rubber, some recognition must be taken of this business, and the result is that rather insignificant purchases are made from the remainder of the rubber industries listed, with the possible exception of Goodrich." (GTX 1062.)

He explained that Goodrich sold a chemical which the Rubber Company did not make and made no similar product. He stated:

"Goodyear Tire and Rubber are generally competitive with United States Rubber so far as rubber commodities are concerned, but they have not been successful in securing much of the business we have to give the rubber trade in rubber lined tanks. Just recently, they visited our office feeling that they were not being treated fairly in this respect, but were finally convinced that they had not been successful bidders and would still have to sharpen their pencils. The other rubber companies do not engage in this type of endeavor." (GTX 1062.)

The evidence relating to purchases and sales between United States Rubber and du Pont was, for the most part, introduced by the defendants. The Government has failed to show the existence of any agreement or understanding that each of these companies would prefer the products of the other and would decline to deal with competitors of the other. The Court finds that, in fact, each company has enjoyed freedom to buy as it pleased.

## The Issue of Conspiracy

At the outset of this memorandum the Court stated that the issue of conspiracy permeated the entire case, underlying both the trade and the control aspects thereof. This is so because conspiracy to restrain trade can only be determined after consideration of the entire record of evidence. The Court finds, on the basis of all the evidence of record, that the Government has failed to establish the existence of any such conspiracy.

The record discloses a number of instances in which various of the defendants have engaged in concerted action of one kind or another. For example, the syndicates that were formed to purchase du Pont stock in 1915, and United States Rubber stock in 1927; and the collaboration on the development of "Duco" and TEL. But concerted action does not necessarily constitute conspiracy or proof of conspiracy. It does so only if the object of the action is to restrain trade or commerce. The Court finds that none of the actions taken in concert had as their objective, or necessary consequence, the imposition of any limitation upon the free flow of trade and commerce. A number of such actions, such as the formation of Christiana in 1915 and Delaware in 1924, were undertaken for purely personal reasons of the participants, largely financial and unrelated to restraint of trade and commerce or the monopolization thereof. The record as a whole does not support a finding that any of them, or all of them in the aggregate, did restrain or intended to, or had the effect of, restraining or monopolizing trade and commerce. The Court bases this conclusion on both documentary and testimonial evidence of record and upon the more detailed findings made in the earlier parts of this memorandum.

## Conclusion

The Amended Complaint charges violations of both the Sherman and the Clayton Acts. Those Acts broadly condemn conspiracies, contracts, agreements, understandings, and acquisitions that result

in monopoly or unreasonable restraints of trade. If the facts established the existence of a conspiracy or agreement to restrain or to monopolize trade, or if the facts showed that a restraint of trade or monopolization had occurred, it would be necessary to determine as a matter of law whether the situation disclosed was condemned by the statutes. However, there is no need in this case to consider that question or to discuss legal principles or precedents because there has been no conspiracy to restrain or to monopolize trade and no restriction or monopolization of the market.

The essence of the conspiracy and restraint which the Government finally charged and sought to prove in this case is the alleged limitation upon General Motors' ability to deal as it pleased with competitors of du Pont and United States Rubber. In various ways and subject to various limitations, the Government has alleged that General Motors either itself agreed to such a limitation, or was forced to it by du Pont. But the evidence of record fails to support the Government's charges. In preceding portions of this opinion there has been shown, by detailed analysis of the evidence, the extent to which General Motors enjoyed complete freedom of action with respect to specific products manufactured by du Pont and United States Rubber, and with respect to its discoveries and developments of new products. When read as a whole the record supports a finding, and the Court so finds, that there has not been nor is there at present, a conspiracy to restrain or to monopolize trade and no limitation or restraint upon General Motors' freedom to deal freely and fully with competitors of du Pont and United States Rubber, no limitation or restraint upon the freedom of General Motors to deal with its chemical discoveries, no restraint or monopolization of the General Motors' market, and no restraint or monopolization of the trade and commerce between du Pont and United States Rubber. The findings that there has been neither a conspiracy to restrain or to monopolize trade nor a restraint or monopolization

of trade make it unnecessary to consider the questions of law that would otherwise arise with respect to the Wilmington Trust Co. and the so-called "beneficiary" defendants, including the infants for whom guardians ad litem have been appointed.

■ It may be that a violation of the Clayton Act can be made out in the absence of an actual restraint of trade where it is established that there is a reasonable probability that a condemned restraint will result from an acquisition of stock. The acquisition challenged by the Government—du Pont's investment in General Motors—took place over thirty years ago. In those many intervening years the record discloses that no restraint of trade has resulted. Accordingly, the Court is of the opinion that there is not, nor has there been, any basis for a finding that there is or has been any reasonable probability of such a restraint within the meaning of the Clayton Act.

The Government has failed to prove conspiracy, monopolization, a restraint of trade, or any reasonable probability of a restraint, and for those reasons the Amended Complaint should be dismissed.